# NORTH SAILS GROUP, LLC *v.* BOARDS
## AND MORE GMBH ET AL.
### (SC 20338)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The plaintiff, N Co., sought to recover damages from the defendants, B Co.
and E Co., for breach of a trademark licensing agreement, pursuant to
which B Co. was granted a worldwide license to use N Co.'s trade name
and certain of its trademarks in connection with certain products B Co.
manufactured. N Co. is a Delaware company with its principal place of
business in Connecticut, whereas B Co. and E Co. have their principal
places of business in Austria and Germany, respectively. From 1990 to
2000, N Co. and B Co.'s predecessor were parties to a prior version of
the licensing agreement. In 2000, after a period of negotiations during
which B Co. sent various communications to N Co. in Connecticut, B
Co. and N Co. executed a new licensing agreement, which continued
from year to year until terminated. Pursuant to that agreement, B Co.
agreed to maximize the production, marketing and sale of the licensed
products and to send N Co. royalty payments at a bank in Wisconsin.
The agreement also contained a choice of law provision designating
Wisconsin law as controlling the agreement, but the agreement did
not require that B Co. perform any of its contractual obligations in
Connecticut. N Co. alleged that, in 2018, B Co., at the direction of E
Co., violated the licensing agreement by launching its own trademark,
which it used to replace N Co.'s trademarks for use with the licensed
products. The trial court granted the defendants' motion to dismiss for
lack of personal jurisdiction and rendered judgment for the defendants.
That court concluded that, because the defendants' alleged actions
occurred in Europe, the defendants lacked sufficient minimum contacts
with Connecticut such that the exercise of personal jurisdiction over
them would offend principles of due process. On the plaintiff's appeal,
*held* that the trial court correctly determined that the exercise of personal

---

* The listing of justices reflects their seniority status on this court as of
the date of oral argument.

North Sails Group, LLC *v.* Boards & More GmbH

jurisdiction over the defendants would violate due process, as N Co. failed to establish that B Co., by virtue of its long-term contractual relationship with N Co., had sufficient minimum contacts with Connecticut, and, accordingly, properly granted the defendants' motion to dismiss: considering the totality of the circumstances, including prior negotiations, contemplated future consequences, the terms of the parties' contract and the parties' actual course of dealing, this court could not conclude that B Co. had purposefully availed itself of the benefits of doing business in Connecticut such that it should have been foreseeable that it could be sued in this state, especially when the licensing agreement did not envision an interactive, highly regulated relationship or anticipate a relationship for a specific amount of time; moreover, despite the nearly twenty year business relationship between B Co. and N Co., there was no evidence that either B Co. or its predecessor initiated contact with N Co. in Connecticut, and B Co.'s purposeful contact with the forum was limited to a single visit to Connecticut by its chief executive officer in 2003 and occasional communications sent to N Co. in Connecticut that were ancillary to the performance of the contract, rather than demonstrative of continuous collaboration between the parties, such that N Co. did not establish that, during the course of their relationship, B Co. had contacts with or continuing obligations in Connecticut; furthermore, B Co.'s physical presence in Connecticut was insubstantial and sporadic, it did not conduct business or maintain offices, employees, property or an agent for service of process in Connecticut, aside from the chief executive officer's single visit to Connecticut, all meetings and negotiations between representatives of N Co. and B Co. and its predecessor occurred in Europe or states other than Connecticut, and the fact that B Co. knew that N Co. would perform its contractual obligations in Connecticut was of no consequence, as it is well established that it is the forum contacts of a defendant, not a plaintiff, that are relevant to the minimum contacts analysis; in addition, the licensing agreement did not contemplate performance in Connecticut but, rather, drew a connection to Wisconsin via its choice of law provision and by requiring that B Co. send royalty payments to a bank located there, and, although the licensing agreement gave N Co. certain oversight over B Co.'s production of the licensed products, including the rights to receive samples of and to inspect the products and quality control test data, the parties' course of dealing called into question the extent to which N Co. exercised those limited rights.

(*Two justices dissenting in one opinion*)

Argued November 15, 2019—officially released August 20, 2021**

** August 20, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

North Sails Group, LLC *v.* Boards & More GmbH

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of New Haven and transferred to the Complex Litigation Docket; thereafter, the case was transferred to the judicial district of Hartford, Complex Litigation Docket, where the court, *Moukawsher, J.*, granted the defendants' motion to dismiss and rendered judgment thereon, from which the plaintiff appealed. *Affirmed.*

*Jeffrey R. Babbin*, with whom were *Ariela C. Anhalt, Adam S. Lurie*, pro hac vice, and, on the brief, *Kate Z. Machan*, pro hac vice, for the appellant (plaintiff).

*Christopher J. Gaspar*, pro hac vice, with whom were *John W. Cerreta* and, on the brief, *Bryan J. Orticelli*, for the appellees (defendants).

*Jeffrey J. White* and *Denis J. O'Malley* filed a brief for the Connecticut Business and Industry Association as amicus curiae.

*Opinion*

D'AURIA, J. This appeal requires us to consider whether, consistent with due process, a court of this state may properly exercise personal jurisdiction over the foreign national defendant in this breach of contract action when the resident plaintiff has alleged that its long-term, contractual relationship with the defendant created sufficient minimum contacts with Connecticut. The plaintiff, North Sails Group, LLC, appeals from the judgment of dismissal for lack of personal jurisdiction over the defendants, Boards and More GmbH (B&M) and Emeram Capital Partners GmbH (Emeram).[1] The

---

[1] "GmbH" stands for "Gesellschaft mit beschränkter Haftung," which, in German, means "company with limited liability." (Internal quotation marks omitted.) *TMT North America, Inc.* v. *Magic Touch GmbH*, 124 F.3d 876, 879 n.1 (7th Cir. 1997).

North Sails Group, LLC *v.* Boards & More GmbH

plaintiff claims that the trial court improperly concluded that exercising personal jurisdiction over the defendants would violate their right to due process. Although we recognize that this is a close case, we conclude that the plaintiff has failed to demonstrate that the defendants had sufficient minimum contacts with Connecticut, and, thus, we affirm the judgment of the trial court.

"A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction." (Internal quotation marks omitted.) *Dorry* v. *Garden*, 313 Conn. 516, 521, 98 A.3d 55 (2014). "Because a jurisdictional challenge presents a question of law, our review is plenary." *Samelko* v. *Kingstone Ins. Co.*, 329 Conn. 249, 257, 184 A.3d 741 (2018). When, as in the present case, "the defendant challenging the court's personal jurisdiction is a foreign corporation or a nonresident individual, it is the plaintiff's burden to prove the court's jurisdiction." *Cogswell* v. *American Transit Ins. Co.*, 282 Conn. 505, 515, 923 A.2d 638 (2007). In deciding a jurisdictional question raised by a motion to dismiss, a court must "take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *Dorry* v. *Garden*, supra, 521. In most instances, the motion must be decided on the complaint alone. However, when "the complaint is supplemented by undisputed facts established by affidavits submitted in support of the motion to dismiss . . . the trial court, in determining the jurisdictional issue, may consider these supplementary undisputed facts and need not conclusively presume the validity of the allegations of the complaint. . . . Rather, those allegations are tempered by the light shed on them by the [supplementary undisputed facts]. . . . If affidavits and/or other evidence submitted in support of a defendant's motion to

North Sails Group, LLC *v.* Boards & More GmbH

dismiss conclusively establish that jurisdiction is lacking, and the plaintiff fails to undermine this conclusion with counteraffidavits . . . or other evidence, the trial court may dismiss the action without further proceedings. . . . If, however, the defendant submits either no proof to rebut the plaintiff's jurisdictional allegations . . . or only evidence that fails to call those allegations into question . . . the plaintiff need not supply counteraffidavits or other evidence to support the complaint . . . but may rest on the jurisdictional allegations therein.'' (Internal quotation marks omitted.) *Angersola* v. *Radiologic Associates of Middletown, P.C.*, 330 Conn. 251, 274–75, 193 A.3d 520 (2018).

In the present case, there are no disputed facts relevant to our minimum contacts analysis. Rather, the court's task is to determine whether the plaintiff has advanced sufficient allegations and evidence to establish minimum contacts. If it has not, the plaintiff simply has not met its burden.

Consistent with these principles, we consider the following facts as alleged in the complaint and those facts contained in the affidavits and exhibits submitted in support of the defendants' motion to dismiss and the plaintiff's opposition thereto, none of which creates a dispute regarding a relevant jurisdictional fact. The plaintiff is a limited liability company registered in Delaware, with its principal place of business in Milford, Connecticut. B&M is a limited liability company chartered under the laws of Austria, with its principal place of business in Molln, Austria. Emeram is a private equity investment limited liability company, with its principal place of business in Munich, Germany. Neither B&M nor Emeram has ever appointed or maintained an agent for service of process in Connecticut. Neither of the defendants maintains any offices, employees, or real or personal property, including computers, in Connecticut; nor do they transact any business in Connecticut.

North Sails Group, LLC *v.* Boards & More GmbH

B&M's only sales in the United States are to Boards & More, Inc. (B&M USA), an American company incorporated and located in the state of Washington. B&M and B&M USA are sister entities, both wholly owned subsidiaries of Boards and More Beteiligungs GmbH, which, in turn, is a wholly owned subsidiary of Boards and More Holding GmbH, a German limited liability company that is the top level operational business within the Boards and More group of companies.[2]

On October 1, 1990, the plaintiff entered into a trademark licensing agreement with B&M's predecessor, North Sails Windsurfing GmbH (NSW). NSW subsequently assigned all of its interests in the licensing agreement to B&M.[3] On October 1, 2000, the plaintiff and B&M terminated the October 1, 1990 agreement and substituted for it the trademark and licensing agreement that gave rise to the present action (licensing agreement). Pursuant to the licensing agreement, the plaintiff granted B&M a worldwide license to use certain trademarks the plaintiff owned, as well as the trade name, "North Surf," which the plaintiff also owned (collectively, North Marks), in the manufacture and distribution of certain B&M windsurfing, kitesurfing and associated products (licensed products).[4] In exchange, B&M agreed "to use its best good faith effort to maximize the production, marketing and sale" of the licensed products. B&M also agreed to pay quarterly license fees to a bank account the plaintiff designated— JP Morgan Chase Bank, in Milwaukee, Wisconsin. The licensing agreement provided that it would be governed by and construed in accordance with the laws of the

[2] The plaintiff has not argued in this court that B&M USA is a subsidiary or agent of B&M.

[3] It is unclear from the record when the assignment occurred, except that it happened sometime prior to the execution of the October, 2000 licensing agreement.

[4] B&M's license was exclusive as to some products and nonexclusive as to others.

North Sails Group, LLC *v.* Boards & More GmbH

state of Wisconsin, excluding its choice of law rules. The agreement provided that it would continue from year to year until terminated or canceled as a result of one of a number of occurrences listed in § 8 of the agreement. Emeram is not a party to the agreement.[5]

The plaintiff alleges that, as of the date on which the complaint was filed, B&M, at the direction of Emeram and in violation of the licensing agreement, launched its own trademark (B&M trademark) and replaced the North Marks with the B&M trademark for use with the licensed products to be released in the autumn of 2018. The plaintiff claims that the defendants' actions caused it harm because, due to the licensing agreement, B&M had established a global distribution network for the licensed products, while, at the same time, the plaintiff had refrained from manufacturing, producing and distributing any products that would compete with the licensed products. The plaintiff further alleges that, because of insufficient lead time provided by B&M, the plaintiff lacked sufficient time to partner with a competing company to manufacture and to distribute similar North Marks products.

The plaintiff brought this action alleging breach of contract as to both defendants. The trial court subsequently granted the defendants' motion to dismiss for lack of personal jurisdiction, concluding that, although Connecticut's long arm statute, General Statutes § 52-59b, "likely" would support the exercise of jurisdiction, principles of due process would not. Stating that "[t]he current constitutional standard on specific jurisdiction is just a year old," the court concluded that the case was

_____

[5] As to Emeram, the plaintiff's sole theory of liability is that it is the alter ego of B&M. The plaintiff's claim that specific jurisdiction exists as to Emeram depends, therefore, on whether jurisdiction exists as to B&M. Even if we assume that Emeram were the alter ego of B&M, our conclusion that the exercise of specific jurisdiction over B&M does not comport with principles of due process compels the same conclusion as to Emeram.

North Sails Group, LLC *v.* Boards & More GmbH

governed by the decision of the United States Supreme
Court in *Bristol-Myers Squibb Co.* v. *Superior Court*,
    U.S.    , 137 S. Ct. 1773, 198 L. Ed. 2d 395 (2017).[6]
Applying *Bristol-Myers Squibb Co.*, the court concluded
that, because the actions that allegedly constituted a
breach of contract had occurred in Europe, not in Con-
necticut, the defendants lacked sufficient minimum
contacts with Connecticut, and the exercise of personal
jurisdiction over them would offend principles of due
process. The plaintiff appealed from the trial court's
judgment to the Appellate Court, and the appeal was
transferred to this court. See General Statutes § 51-199
(c); Practice Book § 65-1.

I

"When a defendant challenges personal jurisdiction
in a motion to dismiss, the court must undertake a two
part inquiry to determine the propriety of its exercising
such jurisdiction over the defendant. The trial court
must first decide whether the applicable state [long
arm] statute authorizes the assertion of jurisdiction over
the [defendant]. If the statutory requirements [are] met,
its second obligation [is] then to decide whether the
exercise of jurisdiction over the [defendant] would vio-
late constitutional principles of due process." (Internal
quotation marks omitted.) *Samelko* v. *Kingstone Ins.
Co.*, supra, 329 Conn. 256. In the present case, because
we agree with the trial court that the exercise of per-
sonal jurisdiction over the defendants would violate

---

[6] Although the trial court's statement could be read to suggest that it
interpreted *Bristol-Myers Squibb Co.* to establish a new standard for specific
jurisdiction, in subsequently denying the plaintiff's motion to reargue or to
reconsider the judgment of dismissal, the court made clear that it had not
done so. Specifically, the trial court explained that its decision "did not
turn on a belief that the [United States] Supreme Court changed the basic
underlying applicable standard. Instead, the [trial] court relied on the court's
latest articulation of it."

North Sails Group, LLC *v.* Boards & More GmbH

due process, we need not address whether § 52-59b would support the exercise of jurisdiction over them.[7]

We must determine whether this court may constitutionally exercise specific jurisdiction over B&M by virtue of the contract between the plaintiff and B&M. See footnote 5 of this opinion. For a forum state to exercise personal jurisdiction over a nonresident defendant, due process requires that the defendant must "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." (Internal quotation marks omitted.) *International Shoe Co.* v. *Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945). The United States Supreme Court has recognized two forms of personal jurisdiction: general and specific. The present case involves only specific jurisdiction, which requires that the plaintiff demonstrate both that B&M has minimum contacts with the forum and that the lawsuit arises out of or relates to those contacts. See *Bristol-Myers Squibb Co.* v. *Superior Court of California*, supra, 137 S. Ct. 1780.[8] "Once it has been decided

[7] Despite determining that there were insufficient minimum contacts to comport with due process, the trial court concluded that the defendants' contacts with the forum "likely" satisfied the long arm statute, § 52-59b. Although the plaintiff acknowledges that whether there are sufficient contacts to satisfy the long arm statute and due process are two distinct issues, it argues that it is " 'rare' " for a defendant's contacts with a forum to satisfy the long arm statute but not due process. Even if the plaintiff were correct that such an occurrence is rare, we are aware of no rule holding that, if the state's long arm statute is satisfied, due process likewise is satisfied. Additionally, because the parties do not dispute on appeal the trial court's conclusion that the long arm statute is likely satisfied, we do not address this issue.

[8] Because the plaintiff's argument in favor of specific jurisdiction rests on the contractual relationship between the parties, the relatedness prong does not turn on the location of the actions that constitute the breach of the contract. To the contrary, as long as the cause of action arises from a contractual relationship that establishes sufficient minimum contacts with the forum, the relatedness prong is satisfied. See *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 482–83, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); id., 483 (breach of contract claim brought by resident plaintiff that entered

340 Conn. 266 DECEMBER, 2021 275

North Sails Group, LLC *v.* Boards & More GmbH

that a defendant purposefully established minimum contacts within the forum [s]tate, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.'' (Internal quotation marks omitted.) *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 476, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) (*Burger King*).[9]

As explained, it is the plaintiff's burden to establish that a defendant has sufficient minimum contacts with the forum. See, e.g., *Cogswell* v. *American Transit Ins. Co.*, supra, 282 Conn. 515; see also *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). The plaintiff's jurisdictional argument rests on its contract with B&M. The United States Supreme Court has stated that ''an individual's contract with an out-of-state party alone [cannot] automatically establish sufficient minimum contacts in the other party's home forum . . . .'' (Emphasis omitted.) *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 478. Rather, we must evaluate the totality of the circumstances, including ''prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . in determining whether the defendant purposefully established minimum contacts within the forum.'' Id., 479.

___

into contract with nonresident defendant is one that is ''related to the contacts that [the defendant] established'' in forum state (internal quotation marks omitted)). Accordingly, because *Bristol-Myers Squibb Co.* v. *Superior Court of California*, supra, 137 S. Ct. 1773, relied on by the defendants, involved tort claims, it is not helpful in the determination in the present case of whether the plaintiff's cause of action arose out of the alleged Connecticut contacts.

[9] Because we conclude that the plaintiff failed to demonstrate that B&M has created sufficient minimum contacts with Connecticut such that a Connecticut court's exercise of specific jurisdiction over B&M comports with due process, we do not consider whether jurisdiction would be reasonable. See, e.g., *Vetrotex CertainTeed Corp.* v. *Consolidated Fiber Glass Products Co.*, 75 F.3d 147, 154 n.9 (3d Cir. 1996).

North Sails Group, LLC *v.* Boards & More GmbH

It is well established that, in evaluating the totality of the circumstances, it is the defendant's contacts with the forum state, not those of the plaintiff, that are relevant. See, e.g., *Walden* v. *Fiore*, 571 U.S. 277, 284, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014) ("[T]he relationship must arise out of contacts that the 'defendant himself' creates with the forum [s]tate. . . . We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum [s]tate." (Citations omitted; emphasis omitted.)).[10] In the present case, we conclude that, despite the parties' long-term relationship, the plaintiff has failed to establish that, considering the totality of the circumstances, B&M's contacts with Connecticut weigh in favor of jurisdiction.

A

The seminal case regarding minimum contacts in a contract dispute, undertaking this totality of the circum-

[10] Although *Walden* was a torts case, not a breach of contract case, *Walden* makes abundantly clear when discussing this requirement that the focus on the defendant's contacts applies in contract cases not only because it cites to *Burger King*, a breach of contract case, but also because it is consistent with the analysis in *Burger King*. *Walden* v. *Fiore*, supra, 571 U.S. 284; see also *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 475 ("[j]urisdiction is proper . . . [when] the contacts proximately result from *actions by the defendant himself* that create a 'substantial connection' with the forum [s]tate" (emphasis altered)); *U.S. Bank National Assn.* v. *Bank of America N.A.*, 916 F.3d 143, 151 (2d Cir. 2019) (applying *Walden* to contract case and requiring focus to be on defendant's contacts with forum); *InfoSpan, Inc.* v. *Emirates NBD Bank PJSC*, 903 F.3d 896, 902–903 (9th Cir. 2018) (The court cited *Walden* and *Burger King* in explaining that, in contracts case, "[t]wo principles animate the defendant-focused [minimum contacts] inquiry. . . . First, the relationship between the nonresident defendant, the forum, and the litigation must arise out of contacts that the defendant himself creates with the forum [s]tate. . . . Second, the minimum contacts analysis examines the defendant's contacts with the forum [s]tate itself, not the defendant's contacts with persons who reside there. . . . It follows that a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." (Citations omitted; internal quotation marks omitted.)); *Gulf Coast Bank & Trust Co.* v. *Designed Conveyor Sys-*

North Sails Group, LLC *v.* Boards & More GmbH

stances analysis, is *Burger King.* In *Burger King,* the court concluded that the single contract between the parties, considered with all the attendant circumstances, was sufficient to subject the defendant to specific jurisdiction in the forum state. *Burger King Corp.* v. *Rudzewicz,* supra, 471 U.S. 478–79. The court clarified, however, that "an individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum," rejecting "the notion that personal jurisdiction might turn on 'mechanical' tests . . . ." (Citations omitted; emphasis in original.) Id., 478. To determine whether a single contract suffices to establish the minimum contacts necessary for the exercise of specific jurisdiction over a nonresident defendant, courts review the totality of the circumstances surrounding that relationship to determine whether the defendant, by its actions, purposefully has availed itself of the benefits of the forum state. See, e.g., *Stuart* v. *Spademan,* 772 F.2d 1185, 1192–94 (5th Cir. 1985); id., 1194 (reviewing "the totality of the facts" in determining that parties' interactions leading up to patent assignment agreement did not give rise to sufficient minimum contacts to support exercise of personal jurisdiction); *Combustion Engineering, Inc.* v. *NEI International Combustion, Ltd.,* 798 F. Supp. 100, 105 (D. Conn. 1992) (observing that "due process inquiry rests upon the totality of the circumstances"). Courts have repeatedly rejected reliance on any single factor and instead have examined all aspects of the contractual relationship between the parties, evaluating the "extent, nature, and quality" of the nonresident defendant's contacts with the forum state. *Consulting Engineers Corp.* v. *Geometric Ltd.,* 561 F.3d 273, 281 (4th Cir. 2009); see id., 281–82 (finding no jurisdiction over nonresident defendant and

*tems, L.L.C.,* 717 Fed. Appx. 394, 399 (5th Cir. 2017) (applying *Walden* to breach of contract claim).

North Sails Group, LLC *v.* Boards & More GmbH

rejecting claim that choice of law clause providing that forum state's law governed contract was dispositive).

The United States Supreme Court explained in *Burger King* that the goal of the inquiry is to determine whether the contract and its surrounding circumstances demonstrate that the nonresident defendant "reach[ed] out beyond one state and create[d] continuing relationships and obligations with citizens of another state . . . ." (Internal quotation marks omitted.) *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 473. Under those circumstances, the nonresident defendant is understood to have purposefully availed itself of the benefit of its activities in the forum state, and "it may well be unfair to allow [it] to escape having to account in [the forum state] for consequences that arise proximately from such activities; the [d]ue [p]rocess [c]lause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." Id., 474. As one court has aptly summarized it, the purposeful availment inquiry "represents a rough quid pro quo: when a defendant deliberately targets its behavior toward the society or economy of a particular forum, the forum should have the power to subject the defendant to judgment regarding that behavior. . . . The cornerstones of this inquiry are voluntariness and foreseeability." (Citation omitted; internal quotation marks omitted.) *C.W. Downer & Co.* v. *Bioriginal Food & Science Corp.*, 771 F.3d 59, 66 (1st Cir. 2014).[11]

The significance to the inquiry of both voluntariness and foreseeability is evident in the court's explanation of the principles underlying the " 'purposeful availment' " requirement; *Burger King Corp.* v. *Rudzewicz*, supra,

---

[11] The facts of the present case—involving a licensing agreement between a resident plaintiff and a foreign national defendant—are hardly unique to Connecticut. It is therefore remarkable that, on this federal constitutional question, the parties have provided so little out-of-state guidance. Our research, like that of the dissent, reveals that it is plentiful.

North Sails Group, LLC *v.* Boards & More GmbH

471 U.S. 475; which "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts . . . or of the unilateral activity of another party or a third person . . . . Jurisdiction is proper . . . [when] the contacts proximately result from *actions by the defendant* [*itself*] that create a substantial connection with the forum [s]tate. . . . Thus [when] the defendant deliberately has engaged in significant activities within a [s]tate . . . or has created continuing obligations between [itself] and residents of the forum . . . [it] manifestly has availed [itself] of the privilege of conducting business there, and because [its] activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require [it] to submit to the burdens of litigation in that forum as well." (Citations omitted; emphasis added; footnotes omitted; internal quotation marks omitted.) Id., 475–76.

In determining minimum contacts in a contracts case, courts must take a "highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. . . . It is these factors—*prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing*—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 479.

The court's minimum contacts analysis of the single contract at issue in *Burger King* illustrates well the application of these principles. In concluding that the contract between the plaintiff, Burger King, a Florida corporation, and the defendant, a resident of Michigan, created sufficient minimum contacts between the

defendant and Florida to support the exercise of jurisdiction over the defendant in Florida, the court considered all of the circumstances surrounding the contractual relationship between the parties. Id., 464–66, 479–80. The court began its analysis with the fact that it was the defendant who initiated contact with Burger King by applying for a franchise in the Detroit, Michigan area. Id., 479. The court viewed that fact as evidencing the purposefulness of the defendant's actions, noting that he "deliberately reach[ed] out beyond Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." (Internal quotation marks omitted.) Id., 479–80. During the negotiation period, the defendant had several significant contacts with Burger King—his business partner attended management training courses in Florida, and the defendant and his partner negotiated the proposed franchise agreement not only with Burger King's local Michigan office but also with its corporate headquarters in Miami, Florida. Id., 466–67.

The court also considered it significant that the parties created a "carefully structured [twenty year] relationship that envisioned continuing and [wide reaching] contacts with Burger King in Florida," thus establishing a substantial connection with the forum state. Id., 480. The terms of the contract strengthened that connection. Specifically, in the contract, the defendant agreed to send monthly payments directly to the plaintiff's headquarters in Florida; id.; and "to submit to the national organization's exacting regulation of virtually every conceivable aspect of [his] operations." Id., 465. The contract also provided that the franchise relationship was established in Miami and governed by Florida law. Id., 466. As for the parties' actual course of dealing, the court observed that, although the Michigan office handled the day-to-day monitoring of franchisees; id.;

North Sails Group, LLC *v.* Boards & More GmbH

"[w]hen problems arose over building design, [site development] fees, rent computation, and the [defendant's] defaulted payments . . . the Michigan office was powerless to resolve [the] disputes" and could serve only as an intermediate link to the corporate headquarters in Miami. Id., 481. The court emphasized more than once the significance of the defendant's submission to the "long-term and exacting regulation of his business" by Burger King. Id., 480; see also id., 465. His agreement to submit to the oversight of Burger King provided yet another example of the defendant's connections to the forum state.

The parties' actual course of dealing further reinforced the contacts between the defendant and the forum. Specifically, the court pointed to the "continuous course of direct communications by mail and by telephone" between the parties regarding disputes that arose during the course of the contracting involving building design, site development fees, rent computation, and the defaulted payments. Id., 481. In addition to relying on the sheer quantity and consistency of communications between the parties, the court considered the substance of those communications, which "confirmed that [decision-making] authority was vested in the Miami headquarters . . . ." Id., 480–81.

Significantly, the court in *Burger King* considered *all* of the previously mentioned factors in arriving at its conclusion that the nonresident defendant had sufficient minimum contacts with Florida—no single fact was dispositive. The dissent in the present case, nevertheless, contends that *Burger King* stands for the proposition that there is a distinction between merely entering into a contract and entering into a contractual *relationship*, with the latter creating a "presumpt[ion]" of minimum contacts.[12]

---

[12] The dissent notes that courts have held there to be insufficient minimum contacts in cases involving contracts for onetime product sales or short-term service contracts. That is correct. These holdings, however, do not

North Sails Group, LLC *v.* Boards & More GmbH

But *Burger King* itself actually rejected such a presumption, beginning its analysis by specifically rejecting a presumption that "an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts . . . ." (Emphasis omitted.) Id., 478. The court did not limit this holding to single transaction contracts or exclude long-term contracts but explained that, in all contract cases, the minimum contacts inquiry must focus on the parties' negotiations and contemplated future consequences, the terms of the contract, and the parties' actual course of dealing. Id., 479. Then, in a critical footnote, the court indicated that it was *not* creating a presumption in favor of jurisdiction that was based merely on the existence of a long-term franchise agreement: "We do not mean to suggest that the jurisdictional outcome will always be the same in franchise cases. Some franchises may be primarily intrastate in character or involve different [decision-making] structures, such that a franchisee should not reasonably anticipate out-of-state litigation. . . . For these reasons, we reject Burger King's suggestion for 'a general rule, or at least a presumption, that participation in an interstate franchise relationship' represents consent to the jurisdiction of the franchisor's principal place of business."[13] (Citation omitted.) Id., 485 n.28. Thus, the United States Supreme Court, in the very case both this majority and the dissent are arguing about, rejected a presumption for long-term franchise

stand for the proposition that, when a contract is for an ongoing relationship, there automatically are sufficient minimum contacts. The existence of one does not require the exclusion of the other.

[13] The dissent contends that this footnote does not relate to the minimum contacts analysis because of where it "appears" in the opinion. The language of the footnote belies this argument, however. Specifically, it states that "[s]ome franchises may . . . involve different [decision-making] structures, such that a franchisee should not *reasonably anticipate out-of-state litigation*." (Emphasis added.) *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 485 n.28. This "reasonably anticipate out-of-state litigation" language relates to the minimum contacts inquiry. Id., 474.

agreements that would favor jurisdiction the dissent contends *Burger King* supports. We see no reason why there should be a presumption in favor of jurisdiction for other long-term contractual relationships that the court rejected for franchise relationships, which are arguably long-term in nature.

What then is to be made of the language in *Burger King* that the dissent relies on to argue that "knowingly entering into a long-term contractual relationship with a forum resident presumptively gives rise to the minimum contacts necessary for jurisdiction to attach"? Careful consideration of that portion of the decision in *Burger King* in its proper context yields the answer. The court stated: "[When] the defendant deliberately has engaged in significant activities within a [s]tate . . . or has created continuing obligations between [itself] and residents of the forum . . . [it] manifestly has availed [itself] of the privilege of conducting business there, and because [its] activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require [it] to submit to the burdens of litigation in that forum as well." (Citations omitted; internal quotation marks omitted.) *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 475–76. The dissent claims that this language means that, "[w]hen a commercial entity knowingly and voluntarily chooses to become business partners with a resident of a state, and follows through by engaging in a long-term relationship, it necessarily accepts a connection with the state itself— its laws, economy, transportation and communication infrastructure, and other residents—in all sorts of ways, both predictable and unexpected, such that it should reasonably anticipate the possibility that a contract related dispute may be adjudicated by that state's courts."[14] (Emphasis omitted.) This is an inaccurate

---

[14] In addition to its reliance on *Burger King*, the dissent asserts that the Supreme Court similarly held in *McGee* v. *International Life Ins. Co.*, 355 U.S. 220, 222, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957), that minimum contacts

North Sails Group, LLC *v.* Boards & More GmbH

summary of the quoted language. *Burger King* does
not say that voluntarily entering into a long-term con-
tractual relationship creates minimum contacts but,
rather, makes clear that minimum contacts exist under
those circumstances in which the defendant "has engaged
in significant activities within a [s]tate . . . or has cre-
ated continuing obligations between [itself] and resi-
dents of the forum . . . ." (Citations omitted; internal
quotation marks omitted.) *Burger King Corp.* v. *Rud-
zewicz*, supra, 475–76. Although many long-term con-
tractual relationships will result in such continuing
obligations, the dissent appears to assume that all long-
term contracts presumptively create "obligations
between [a defendant] and residents of the forum
. . . ." (Internal quotation marks omitted.) Part II A of
the dissenting opinion, quoting *Burger King Corp.* v.
*Rudzewicz*, supra, 476. Not all long-term contractual
relationships will lead to significant activities within the
forum or continuing obligations between the defendant
and residents of the forum. If there are such "significant
activities" or " 'continuing obligations,' " then the exer-

exist when "a defendant knowingly entered into a long-term relationship
with a forum resident . . . even when the defendant's contacts with the
forum state were limited to that one relationship and even when they fully
depended on the fact that the plaintiff happened to reside in the forum."
*McGee*, however, is distinguishable, as it involved a life insurance contract
under which the defendant offered to insure the plaintiff's decedent, a
California resident, in California. Moreover, *McGee* predates *Burger King*
and *Walden*.

The dissent also relies on the more recent case of *Ford Motor Co.* v.
*Montana Eighth Judicial District Court*, U.S. , 141 S. Ct. 1017, 209
L. Ed. 2d 225 (2021). *Ford Motor Co.*, however, specifically cites to the
portion of *Walden* v. *Fiore*, supra, 571 U.S. 277, that explains that "[the
court's] 'minimum contacts' analysis looks to the defendant's contacts with
the forum [s]tate itself, not the defendant's contacts with persons who reside
there. . . . Accordingly, [the court has] upheld the assertion of jurisdiction
over defendants who have purposefully 'reach[ed] out beyond' their [s]tate
and into another by, for example, entering a contractual relationship that
'envisioned continuing and [wide reaching] contacts' in the forum [s]tate
. . . ." (Citations omitted.) Id., 285; see *Ford Motor Co.* v. *Montana Eighth
Judicial District Court*, supra, 1025.

cise of jurisdiction over the defendant is reasonable. *Burger King Corp.* v. *Rudzewicz*, supra, 476. But immediately prior to the language the dissent quotes, the court in *Burger King* made clear that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum [s]tate. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." (Internal quotation marks omitted.) Id., 474–75.

Applying these legal principles, the court in *Burger King* concluded that, on the basis of the defendant's "voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters," it was "presumptively reasonable for [the defendant] to be called to account [in the forum] for such injuries." Id., 480. This analysis makes clear that minimum contacts did not presumptively exist merely because of the existence of a long-term contractual relationship but because the contract specifically contemplated, and the defendant agreed to, the defendant's continuing interaction with and obligations to the forum and its residents. Read in context, it is clear that a defendant does not create continuing obligations to "the residents of the forum" by merely entering into a long-term contractual relationship with *one* of that forum's residents. The existence of the contractual relationship alone—whether long-term or not—is evidence only of contact with the plaintiff, not with the forum. In that circumstance, the defendant's only connection to the forum is that the plaintiff resides there, which is precisely the kind of random and fortuitous contact that courts caution against relying on to conclude that

North Sails Group, LLC *v.* Boards & More GmbH

jurisdiction is proper. The defendant presumably would have entered into the contractual relationship regardless of where the plaintiff was located.

Thus, a court applying *Burger King* must look to all of the surrounding circumstances of a contractual relationship to determine whether a defendant has purposefully availed itself of the benefits of doing business in the forum state such that it should have been foreseeable that it could be sued in that state. The inquiry is a very practical and realistic one. Our review of the pertinent facts persuades us that, in the present case, the answer to that question is no.[15]

B

In the present case, to establish minimum contacts, the plaintiff relies heavily on the long-term relationship between the parties. Specifically, the previous licensing agreement with B&M's predecessor lasted for ten years, from 1990 to 2000,[16] and the October, 2000 licensing

[15] Plainly, Connecticut has a general interest in "providing a forum in which [its] residents can seek redress for injuries caused by out-of-state actors." (Internal quotation marks omitted.) *Benton* v. *Cameco Corp.*, 375 F.3d 1070, 1079 (10th Cir. 2004), cert. denied, 544 U.S. 974, 125 S. Ct. 1826, 161 L. Ed. 2d 723 (2005). However, consideration of the impact of this court's constitutional determination of minimum contacts on this state's businesses and its economy is not appropriate. This is especially so when the parties have the freedom to contract, including the freedom to negotiate the inclusion of a forum selection clause in their agreement. See *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 472 n.14.

[16] Even if we assume that the contacts of B&M's predecessor may be attributed to B&M, we conclude that the plaintiff still has failed to satisfy its burden of establishing minimum contacts. We observe, however, that there appears to be a split of authority regarding whether a nonresident predecessor's minimum contacts may be imputed to a nonresident defendant in all cases or only in certain circumstances. See, e.g., *Patin* v. *Thoroughbred Power Boats*, *Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) (jurisdictional contacts of predecessor corporation may properly be imputed to its successor corporation, consistent with due process); *Williams* v. *Bowman Livestock Equipment Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991) (court may impute predecessor's contacts to successor only if forum law would hold successor liable for actions of its predecessor); *Gentry* v. *Kaltner*, Docket No. 17-CV-8654 (KMK), 2020 WL 1467358, *7 (S.D.N.Y. March 25, 2020) (predecessor's contacts

North Sails Group, LLC *v.* Boards & More GmbH

agreement provided that it would automatically "continue from year to year thereafter until terminated" as a result of one of a number of occurrences listed in § 8 of the agreement. Although the 2000 licensing agreement permitted yearly renewal, unlike the agreement at issue in *Burger King*, it did not anticipate a relationship for a specific amount of time. In *Burger King*, the defendant entered into a "carefully structured [twenty year] relationship that envisioned continuing and [wide reaching] contacts with Burger King in Florida." *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 480. The court determined that the defendant's "voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters" established purposeful availment. Id. In the present case, the defendant did not voluntarily accept a carefully structured, long-term contract but, rather, accepted a contract that allowed it to terminate or cancel the contract on a yearly basis. Also, as we discuss subsequently in this opinion, the contract in the present case is distinguishable from the exacting nature of the contract in *Burger King*, which supported the court's determination of purposeful availment; the contract in the present case did not envision an interactive, highly regulated relationship.

We recognize, however, that the duration of a contractual relationship is a factor in considering minimum contacts. Nevertheless, it is not the length of the relationship, but the quality of the relationship—i.e., the

may be imposed on defendant only when successor liability is established); *Berninger* v. *Amada America*, Inc., Docket No. 1:06-CV-886 (FJS/RFT), 2008 WL 4518739, *3 (N.D.N.Y. September 30, 2008) ("in certain circumstances, a defendant can inherit its predecessor's jurisdictional status, although it is not clear whether minimum contacts are one of those circumstances"); *Huth* v. *Hillsboro Ins. Management, Inc.*, 72 F. Supp. 2d 506, 511 n.4 (E.D. Pa. 1999) ("[p]laintiffs must be permitted to establish jurisdiction over successor corporation based [on] its predecessor's contacts with the forum" (internal quotation marks omitted)).

extent the defendant has purposefully reached into the forum—that matters most for determining forum contacts. Other factors have been held to carry greater weight: "[A]ctions in the negotiation and performance of the . . . agreement are more important factors to consider than the duration of the contract in determining whether [there are minimum contacts]. . . . [In prior cases, courts have explained that] the quality rather than the quantity of the contacts is the proper subject of review. Similarly, [the court] should focus . . . on the quality of the parties' relationship, rather than the duration of the relationship." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Calphalon Corp.* v. *Rowlette*, 228 F.3d 718, 722 (6th Cir. 2000); see *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 479 (after rejecting presumption that contract alone creates minimum contacts, court held that "[i]t is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum"); *Freudensprung* v. *Offshore Technical Services, Inc.*, 379 F.3d 327, 344–45 (5th Cir. 2004) (minimum contacts were lacking despite approximately three year contractual relationship, including extensive communication, when contract performance was to occur outside forum); *IDS Publishing Corp.* v. *Reiss Profile Europe, B.V.*, Docket No. 2:16-CV-00535, 2017 WL 4217156, *7 (S.D. Ohio September 19, 2017) ("despite the [parties'] [l]icense [agreement] being in place for more than ten years, the [c]ourt's focus is on the quality of the parties' relationship rather than its duration"). But see *Mississippi Interstate Express, Inc.* v. *Transpo, Inc.*, 681 F.2d 1003, 1007 (5th Cir. 1982) (acknowledging that court's holding—that contractual relationship that foresees plaintiff unilaterally conducting activity in

North Sails Group, LLC *v.* Boards & More GmbH

forum creates minimum contacts—conflicts with those of other federal courts of appeals).

In evaluating the quality of a defendant's contacts, courts have considered the parties' actual course of dealings, the location of performance, the quality and quantity of any communications, the terms of the parties' contract, including any forum selection clause, and whether the defendant reached into the forum, including whether the defendant initiated contact. See, e.g., *Calphalon Corp.* v. *Rowlette*, supra, 228 F.3d 722–23; see also *Halliburton Energy Services, Inc.* v. *Ironshore Specialty Ins. Co.*, 921 F.3d 522, 544 (5th Cir. 2019); *Sangha* v. *Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 102–103 (5th Cir. 2018); *Universal Leather, LLC* v. *Koro AR, S.A.*, 773 F.3d 553, 560 (4th Cir. 2014), cert. denied, 576 U.S. 1035, 135 S. Ct. 2860, 192 L. Ed. 2d 896 (2015); *Freudensprung* v. *Offshore Technical Services, Inc.*, supra, 379 F.3d 344–45.

For example, courts have found minimum contacts in cases involving long-term contractual relationships when other substantial contacts existed or arose during the course of the relationship. See, e.g., *C.W. Downer & Co.* v. *Bioriginal Food & Science Corp.*, supra, 771 F.3d 67 (four year contractual relationship was not of "short duration," especially in light of extensive collaboration on projects showing continued and wide reaching contacts in forum); *CFA Institute* v. *Institute of Chartered Financial Analysts of India*, 551 F.3d 285, 295 and n.17 (4th Cir. 2009) (thirteen year contractual relationship between plaintiff and nonresident defendant that included significant collaboration supported conclusion that licensing agreement established sufficient minimum contacts, with special weight given to fact that defendant initiated contact); *PKWare, Inc.* v. *Meade*, 79 F. Supp. 2d 1007, 1014–15 (E.D. Wis. 2000) (six year contractual relationship, in addition to quantity and quality of contacts, including numerous communications regarding busi-

North Sails Group, LLC *v.* Boards & More GmbH

ness dealings and choice of law provision designating Wisconsin law as controlling, supported conclusion that licensing-trademark agreement established sufficient minimum contacts); *Eaton Corp.* v. *Maslym Holding Co.*, 929 F. Supp. 792, 797–98 (D.N.J. 1996) (ten year contractual relationship, regular communications between parties, several visits by defendant's representatives to plaintiff in forum state, royalty payments defendant made to plaintiff in forum state, and defendant's purchase of "parts" from plaintiff's plant in forum constituted sufficient minimum contacts).

Despite the long-term nature of the agreement at issue, B&M's contacts case are significantly weaker than the defendants' contacts in the foregoing cases and in *Burger King*. In fact, in the life of a contractual relationship of the length involved here, it is difficult to imagine fewer contacts between the defendant and the forum. Besides the long-term nature of the contractual relationship, the plaintiff relies on the following forum contacts: (1) B&M knowingly entered into a contract with the Connecticut based plaintiff; (2) B&M negotiated the contract by sending communications to the plaintiff in Connecticut; (3) the contract contemplated and even mandated that the plaintiff would perform its own obligations under the contract in Connecticut, which would result in Connecticut's being the locus of any harm the plaintiff would suffer as a consequence of a breach of the contract;[17] (4) B&M maintained a nearly twenty year business relationship with the plaintiff in Connecticut, including a visit to the forum and sending hundreds of reports, payments, and

[17] The dissent also asserts that B&M purposefully availed itself of the benefits of Connecticut law because Connecticut law "helped to ensure . . . the ability of [the plaintiff] to carry out its everyday business functions and contractual performance on which B&M's contract relied." As explained throughout this opinion, however, the plaintiff's performance in the forum is not relevant to whether sufficient minimum contacts exist to support personal jurisdiction.

North Sails Group, LLC *v.* Boards & More GmbH

other communications to Connecticut; and (5) B&M breached the contract by contacting and injuring the plaintiff in Connecticut.

These contacts, however, do not focus on B&M's purposeful contact with the forum, which is limited to a single visit to the forum after the contract was executed, and occasional, ancillary communications. The other forum contacts relied on by the plaintiff either are not proper considerations under our minimum contacts analysis or do not weigh in favor of jurisdiction. Unlike the plaintiffs in *C.W. Downer & Co.*, *CFA Institute*, *PKWare, Inc.*, and *Eaton Corp.*, the plaintiff here has not established that, during the course of the long-term contractual relationship, B&M had contacts with or continuing obligations to the forum showing that it purposefully availed itself of the protections of the forum. When the plaintiff's own contacts with the forum (e.g., contacts (1), (3) and (5), as previously discussed) are removed from the analysis, as case law demands, what remains, in addition to the length of the contract, is a single visit to the forum after the contract was executed, and occasional, ancillary communications. We conclude that, unlike the plaintiffs in *C.W. Downer & Co.*, *CFA Institute*, *PKWare, Inc.*, and *Eaton Corp.*, the plaintiff in the present case has not established that, during the course of the parties' long-term contractual relationship, B&M had contacts with or continuing obligations to the forum showing that it purposefully availed itself of the benefits and protections of the forum.

For example, the plaintiff, which bears the burden of establishing jurisdiction, did not allege, let alone offer evidence to establish, that B&M purposefully "reached out" to the forum state by initiating contact with the plaintiff. Although the parties' negotiated over the licensing agreement prior to and after its execution, the record contains nothing to show either that B&M or its predecessor initiated the original licensing agree-

North Sails Group, LLC *v.* Boards & More GmbH

ment or that B&M initiated the October, 2000 licensing agreement.[18] The absence of this evidence weighs against a conclusion that B&M established minimum contacts with the forum. See, e.g., *Diamond Healthcare of Ohio, Inc.* v. *Humility of Mary Health Partners*, 229 F.3d 448, 451 (4th Cir. 2000) (minimum contacts were lacking when plaintiff initiated and negotiated contract between parties in forum state); *Vetrotex CertainTeed Corp.* v. *Consolidated Fiber Glass Products Co.*, 75 F.3d 147, 151–52 (3d Cir. 1996) (minimum contacts were lacking when defendant did not solicit contract or initiate business relationship); *IDS Publishing Corp.* v. *Reiss Profile Europe, B.V.*, supra, 2017 WL 4217156, *7 ("there is no admissible evidence that [the defendant] solicited the [l]icense [agreement] from [the plaintiff]"); see also *RLB & Associates, Ltd.* v. *Aspen Medical Pty.*, Docket No. 2:15-cv-123, 2016 WL 344925, *5 (D. Vt. January 27, 2016) ("[t]he case law is clear that [when] . . . a defendant does not actively initiate contacts in a state, a court does not ordinarily exercise jurisdiction over that defendant, unless there is some other evidence of minimum contacts with the forum state" (internal quotation marks omitted)). A defendant also may reach into a forum through physical presence in that forum. Physical presence may include maintaining offices, employees, real or personal property, or an agent for service of process in the forum state, none of which B&M maintains in the present case. See, e.g., *Universal Leather, LLC* v. *Koro AR, S.A.*, supra, 773 F.3d 557 (one factor in determining minimum contacts is whether defendant maintained offices or property in forum

---

[18] Contrary to the dissent's assertion, we never state that it is difficult to establish minimum contacts in the absence of the defendant's initiation of contact or that the issue of initiation is dispositive. We mention the issue of which party initiated the contract merely as an example of a factor case law indicates a plaintiff might rely on to help sustain its burden of proof that a defendant has reached into the forum. The plaintiff in the present case has not sought to make this argument or to advance such evidence.

North Sails Group, LLC *v.* Boards & More GmbH

state). Physical presence also may include traveling to the forum to negotiate, execute, or perform the contract. See, e.g., id., 562 (that defendant visited forum at least six times for business meetings with plaintiff supported jurisdiction because defendant "repeatedly reached into the forum state to transact business during [in person] visits there" (internal quotation marks omitted)); *CFA Institute* v. *Institute of Chartered Financial Analysts of India*, supra, 551 F.3d 295 (defendant's visit to forum to approach plaintiff about business venture prior to parties' entering into license agreement supported conclusion that sufficient minimum contacts existed).

In the present case, the plaintiff argues that it established B&M's physical presence in the forum through the affidavit of the plaintiff's president and chief executive officer, Thomas A. Whidden, which the plaintiff submitted in opposition to the defendants' motion to dismiss. In the affidavit, Whidden averred that "[B&M] representatives have made phone calls, sent faxes and [e-mails], and mailed letters to me hundreds of times at my Connecticut numbers and address concerning our ongoing contractual relationship and related business matters. . . . This included phone calls and a personal visit to me at my Connecticut office by Yves Marchand, [chief executive officer of B&M]." (Citation omitted.) In support of this last assertion, the affidavit includes as an exhibit a fax from Whidden to Stephan Guter at B&M stating that Marchand intended to visit Connecticut in 2003.

Although Whidden's affidavit establishes that Marchand made a single visit to Connecticut, a single visit to the forum is of minimal weight when considered under the totality of the circumstances, especially when, as here, the defendant did not initiate contact, and the contract does not require performance by the defendant in the forum. See, e.g., *Moncrief Oil International, Inc.* v.

*OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007) (single visit to forum by defendant's executive was of minimal weight when "the defendant did not perform any of its obligations in Texas, the contract did not require performance in Texas, and the contract [was] centered outside of Texas"); *GMAC Real Estate, LLC* v. *E.L. Cutler & Associates, Inc.*, 472 F. Supp. 2d 960, 962, 965 (N.D. Ill. 2006) (there were insufficient minimum contacts when defendant attended single meeting in forum state and contract did not require performance in forum state); see also *Sneha Media & Entertainment, LLC* v. *Associated Broadcasting Co. P Ltd.*, 911 F.3d 192, 199 (4th Cir. 2018) (single business meeting in forum was insufficient to establish minimum contacts); *CEM Corp.* v. *Personal Chemistry, AB*, 55 Fed. Appx. 621, 625 (4th Cir. 2003) ("[o]ne visit to the state . . . would not put [the defendant] on notice that it 'should reasonably anticipate being haled into court' in North Carolina"); *R.L. Lipton Distributing Co.* v. *Dribeck Importers, Inc.*, 811 F.2d 967, 970 (6th Cir. 1987) ("one or two visits during five years by [the defendant's] personnel" were "sporadic and insubstantial contacts" that "by themselves [could not] support a finding of personal jurisdiction").[19]

---

[19] We recognize that the dissent cites to other cases that have held that a single visit to the forum can weigh in favor of jurisdiction. However, in all of the federal court of appeals cases the dissent cites, the visit to the forum by the defendant or one of its employees either was essential to the underlying contract (e.g., training regarding the products at issue) or led to or involved negotiation of the contract at issue. This leaves the dissent with only district court and state court cases to support its view that a single visit to the forum, which was not necessary for the fulfillment of the contract, nonetheless suffices to establish minimum contacts. Those cases are at odds with the federal court of appeals decisions in *Sneha Media & Entertainment, LLC*, *Moncrief Oil International, Inc.*, *CEM Corp.* and *R.L. Lipton Distributing Co.* that we have cited.

In the present case, we know very little about Marchand's single visit to Connecticut, which occurred after the parties had negotiated and executed the licensing agreement, and was not required for B&M's performance of the agreement. Cf. *Bell Paper Box, Inc.* v. *U.S. Kids, Inc.*, 22 F.3d 816, 819–20 (8th Cir. 1994) (single visit to forum weighs in favor of jurisdiction when

North Sails Group, LLC *v.* Boards & More GmbH

Rather, the exhibits the parties submitted demonstrate that, with the exception of this single visit, meetings between the parties regarding the licensing agreement occurred outside of Connecticut. For example, Whidden traveled to Europe to represent the plaintiff during negotiations. The plaintiff's exhibits also demonstrate that, from 1997 to 2000, the board of directors of NSW, B&M's predecessor, held meetings at Cape Hatteras, North Carolina, in New York City and in Orlando, Florida, but not in Connecticut. Representatives of the plaintiff attended the meetings, and the previous licensing agreement appears to have been at issue at the meetings. The plaintiff's exhibits also reflect a planned meeting before the new 2000 licensing agreement between the plaintiff and one of the board members of NSW, and Mistral Sports Group GmbH, in Dusseldörf, Germany.[20] The plaintiff also refers to a meeting Whidden attended in Europe. Accordingly, like the trial court, we conclude that the plaintiff, which has the burden of establishing minimum contacts, has failed to establish that B&M reached into Connecticut through its physical presence in the forum.

To the extent the plaintiff relies on its conduct in the forum to establish physical presence in the forum, as discussed previously, it is well established that it is the forum contacts of the defendant, not the plaintiff, that are relevant in determining minimum contacts. See, e.g.,

contract performance occurs solely in forum state). In light of the scarcity of evidence about the purpose of the visit, and consistent with the case law we cite, we cannot conclude that this visit to the forum was anything other than ancillary and of little significance. Thus, despite the parties' long-term contractual relationship, B&M's physical presence in the forum was insubstantial and sporadic at best, with only one visit to the forum, which distinguishes the present case from those that involve long-term contractual relationships in which other substantial contacts existed or arose during the course of the parties' relationship.

[20] Although the plaintiff appears to rely on exhibits that concern this meeting with Mistral Sports Group, the record does not make clear the precise relationship between Mistral Sports Group and NSW.

North Sails Group, LLC *v.* Boards & More GmbH

*Walden* v. *Fiore*, supra, 571 U.S. 284 ("[T]he relationship must arise out of contacts that the 'defendant himself' creates with the forum [s]tate. . . . We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum [s]tate." (Citations omitted; emphasis omitted.)); *Tuazon* v. *R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir.) ("[t]he cornerstone of the due process inquiry is an analysis of the defendant's contacts with the selected forum"), cert. denied, 549 U.S. 1076, 127 S. Ct. 723, 166 L. Ed. 2d 560 (2006); see also *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 474 ("[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum [s]tate" (internal quotation marks omitted)). The United States Supreme Court explicitly has rejected reliance on a defendant's knowledge that a plaintiff has "strong forum connections" because this type of "analysis impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." (Internal quotation marks omitted.) *Walden* v. *Fiore*, supra, 289.

Nevertheless, the plaintiff argues that B&M purposefully reached into the forum because it knew that the plaintiff performed its obligations under the contract in Connecticut and suffered harm caused by the breach of contract in Connecticut.[21] The fact that B&M was aware, as the dissent states, that "[the plaintiff] would perform its obligations from and suffer any consequences in Connecticut" is not relevant to our minimum contacts analysis. See *Walden* v. *Fiore*, supra, 571 U.S.

---

[21] Similarly, the dissent relies heavily on the fact that "B&M made a voluntary, informed choice to enter into a long-term contractual relationship with [the plaintiff], and it did so knowing full well that [the plaintiff] would perform its principal obligations under the contract—including filing, processing, maintaining, and protecting the parties' rights to and the value of the North Marks trade name—from its headquarters in Milford."

289. None of the plaintiff's forum contacts—its performance in the forum, its use of the royalty funds in the forum, its sales and marketing in the forum, any harm it suffers in the forum—is relevant to determining whether the defendant has minimum contacts with the forum. The plaintiff's reliance on these facts seems to stem from a belief that it is reasonable that a corporation should expect that, if it voluntarily enters into a long-term contractual relationship with another corporation, it will likely be subject to jurisdiction (for incidents involving the contractual relationship) in that other corporation's home state. Although such a concern may factor into determining the reasonableness of the exercise of jurisdiction over the defendant in the forum, it is not a proper concern for the minimum contacts analysis. See id.

Even among cases involving long-term contractual relationships, we have found none—and the plaintiff has not pointed us to any—in which courts have found minimum contacts when there was insufficient evidence that the defendant initiated contact, there was insufficient evidence of physical presence in the forum, and the contract did not contemplate performance by the defendant in the forum. See, e.g., *Freudensprung* v. *Offshore Technical Services, Inc.*, supra, 379 F.3d 344–45 (minimum contacts were lacking despite approximately three year contractual relationship, including extensive communication, when contract performance was to occur outside forum); *IDS Publishing Corp.* v. *Reiss Profile Europe, B.V.*, supra, 2017 WL 4217156, *7 (minimum contacts were lacking despite more than ten year contractual relationship during which plaintiff initiated contact, defendant never was physically present in forum, and licensing agreement contemplated exploitation of markets outside forum).

In the present case, the October, 2000 licensing agreement granted B&M a worldwide license to certain trade-

marks and required B&M to use its best good faith efforts to produce, market, and sell the licensed products. The agreement did not explicitly contemplate performance in Connecticut. Rather, the terms of the licensing agreement create a connection to Wisconsin but are void of any reference to Connecticut. For example, the agreement included a choice of law provision designating Wisconsin law as controlling the agreement and required B&M to send its royalty fees to a Wisconsin bank. The agreement also provided that ''[a]ll notices for the purposes of [the] agreement'' had to be sent to the secretary and general counsel for the plaintiff in Sheboygan, Wisconsin.

Although a choice of law clause is not dispositive, those three contractual provisions raise serious questions regarding the foreseeability that B&M could be haled into court in Connecticut. See *CutCo Industries, Inc.* v. *Naughton*, 806 F.2d 361, 366–67 (2d Cir. 1986) (''a choice of law provision in a contract does not constitute a voluntary submission to personal jurisdiction'' but deserves ''some weight'' when determining whether personal jurisdiction exists); see also *K-V Pharmaceutical Co.* v. *J. Uriach & CIA, S.A.*, 648 F.3d 588, 593–94 (8th Cir. 2011) (considering directions in parties' contract for payments to be sent to plaintiff in determining whether minimum contacts existed); cf. *Vetrotex CertainTeed Corp.* v. *Consolidated Fiber Glass Products Co.*, supra, 75 F.3d 152 (jurisdiction was lacking when defendant did not initiate contact and sent payments to plaintiff in different forum). Under similar circumstances, when the choice of law provision designated another forum and the defendant had an insufficient physical presence within the forum, courts have found insufficient minimum contacts. See, e.g., *Halliburton Energy Services, Inc.* v. *Ironshore Specialty Ins. Co.*, supra, 921 F.3d 543–44 (minimum contacts with forum were lacking when defendant insurer had ''virtually no

North Sails Group, LLC *v.* Boards & More GmbH

connections'' to forum and insurance policy at issue was governed by New York law); *Tidy Car International, Inc.* v. *Firestine*, 810 F. Supp. 199, 205 (E.D. Mich. 1993) (there were insufficient contacts with Michigan when defendant never visited forum and choice of law provision designated New York law as controlling). Additionally, the parties' course of dealings shows that B&M, despite having a worldwide license, never conducted any business in Connecticut. See *Halliburton Energy Services, Inc.* v. *Ironshore Specialty Ins. Co.*, supra, 544 (terms of contract and parties' actual course of dealing must be considered in determining whether minimum contacts exist).

The fact that not only did B&M not perform its contractual obligations in Connecticut, but also that the contract did not require it to do so, weighs heavily against finding minimum contacts. Courts have held that defendants have not reached out and thus purposefully availed themselves of the forum if the contract does not contemplate, and the parties' course of dealings does not show, performance in the forum state. See, e.g., id. (jurisdiction was lacking when defendant did not negotiate contract in Texas, performance did not occur in Texas, and contract's choice of law provision designated New York law as controlling); *Sangha* v. *Navig8 ShipManagement Private Ltd.*, supra, 882 F.3d 103 (''a defendant does not have minimum contacts with a state when it does not have a physical presence in the state, it did not conduct business in the state, and the contract underlying the business transaction was not signed in the state and did not call for performance in the state''); *International Energy Ventures Management, L.L.C.* v. *United Energy Group, Ltd.*, 818 F.3d 193, 213 (5th Cir. 2016) (minimum contacts were lacking when ''(1) [the defendant] did not negotiate the agreement in Texas, (2) [it] did not travel to Texas because of that agreement, and (3) the unwritten agree-

ment did not require performance in Texas"); *Diamond Healthcare of Ohio, Inc.* v. *Humility of Mary Health Partners*, supra, 229 F.3d 451 (contacts were insufficient to support jurisdiction, and "[n]ot only did [the plaintiff] initiate the contractual relationship in Ohio, but the resulting agreement contemplated the bulk of the contract's performance . . . in . . . Ohio"); *Iowa Electric Light & Power Co.* v. *Atlas Corp.*, 603 F.2d 1301, 1303–1304 (8th Cir. 1979) ("entering into a contract with a forum resident does not provide the requisite contacts between a defendant and the forum state . . . [especially] when all elements of the defendant's performance are to take place outside of the forum" (citation omitted)), cert. denied, 445 U.S. 911, 100 S. Ct. 1090, 63 L. Ed. 2d 327 (1980). A lack of performance in the forum undermines jurisdiction because, if the defendant never attempted to "exploit any market for its products in the [forum] state . . . but rather had contact with the state only because the plaintiff chose to reside there," the defendant has not purposefully availed itself of the benefits and protections of the forum's laws. (Internal quotation marks omitted.) *Calphalon Corp.* v. *Rowlette*, supra, 228 F.3d 722–23.

Thus, despite the length of the contractual relationship, the lack of evidence regarding whether B&M initiated contact and B&M's physical presence in the forum or performance of the contract in the forum, coupled with the terms of the contract, belies any contention that B&M purposefully availed itself of the benefits and protections of Connecticut's laws. Specifically, the plaintiff has failed to demonstrate—and this court cannot perceive—how B&M has received those benefits and protections when it has operated its business and performed its obligations under the licensing agreement completely outside the forum. The defendant never attempted to " 'exploit any market for its products' " in Connecticut. Id., 722.

North Sails Group, LLC *v.* Boards & More GmbH

It is true that, after signing the October, 2000 licensing agreement the defendant sent the agreement to Connecticut, where it was executed by the plaintiff. For purposes of jurisdiction, however, the fact that B&M mailed the contract to the plaintiff in Connecticut is of little consequence in determining whether minimum contacts exist. Such limited contact is ancillary to the execution of the contract. See, e.g., *Freudensprung* v. *Offshore Technical Services, Inc.*, supra, 379 F.3d 344 ("the combination of . . . engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the minimum contacts"); see also *Jones* v. *Artists Rights Enforcement Corp.*, 789 Fed. Appx. 423, 426 (5th Cir. 2019) ("[a]n exchange of communications in the course of developing and carrying out a contract . . . does not, by itself, constitute the required purposeful availment of the benefits and protections of [a forum state's] law" (internal quotation marks omitted)); *Stuart* v. *Spademan*, supra, 772 F.2d 1193 ("an exchange of communications between a resident and a nonresident in developing a contract is insufficient of itself to be characterized as purposeful activity invoking the benefits and protection of the forum state's laws").

Nevertheless, the plaintiff points to other communications between itself and B&M that it claims, when considered alongside the long-term nature of the contractual relationship, establish minimum contacts. The plaintiff argues that the continuing and regular communications between them demonstrate that B&M purposefully availed itself of the benefits of its in-state activities. It is true that the parties communicated regularly and consistently regarding the contract, including communications regarding B&M's payment of royalties. Most of the evidence submitted shows that the parties

communicated via e-mail and fax on a quarterly basis when B&M provided the plaintiff with its quarterly royalty report, as required by the agreement. The parties also communicated via e-mail regarding the alleged breach of contract at issue. The plaintiff also submitted some evidence that the parties communicated via telephone on other occasions. Despite this evidence, we conclude that the parties' communications do not weigh in favor of jurisdiction because they were ancillary to the performance of the contract rather than demonstrative of continuous collaboration between the parties. Additionally, even if the parties' communications weighed in favor of jurisdiction, the lack of evidence that B& M reached out to the forum or performed any of its contractual obligations in the forum militates against jurisdiction.

In the minimum contacts analysis, some courts find consistent and continuing communications between the parties to favor a finding of jurisdiction, regardless of the substance of the communications. See, e.g., *Creative Calling Solutions, Inc.* v. *LF Beauty Ltd.*, 799 F.3d 975, 980 (8th Cir. 2015) (after defendant initiated contact with plaintiff, parties e-mailed and phoned each other for close to two years); *Johnson Worldwide Associates, Inc.* v. *Brunton Co.*, 12 F. Supp. 2d 901, 907 (E.D. Wis. 1998) ("routine correspondence regarding the licensing agreement" over long-term contractual relationship, as well as visits to forum, supported jurisdiction). Nevertheless, these cases do not hold that consistent and continuing communication by itself is sufficient to justify jurisdiction but, rather, consider it as one factor in the totality of the circumstances analysis. See, e.g., *Far West Capital, Inc.* v. *Towne*, 46 F.3d 1071, 1077 (10th Cir. 1995) ("[i]t is [well established] that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts"). Thus, even if we adopted this approach, these cases are distinguishable

North Sails Group, LLC *v.* Boards & More GmbH

because they involved continuous communication coupled with other significant contacts, such as reaching out to the forum.[22] In the present case, evidence of other contacts is lacking, such as initiating contact or a sufficient physical presence in the forum, which weighs against a finding of minimum contacts despite the communications between the parties.

Other courts have determined that use of the mail and telephone communications are "ancillary" to the contract's execution and performance and do not constitute a purposeful availment of the benefits and protections of the forum. See, e.g., *Reynolds* v. *International Amateur Athletic Federation*, 23 F.3d 1110, 1119 (6th Cir.) ("[t]he use of interstate facilities such as the telephone and mail is a secondary or ancillary factor and cannot alone provide the minimum contacts required by due process" (internal quotation marks omitted)), cert. denied, 513 U.S. 962, 115 S. Ct. 423, 130 L. Ed. 2d 338 (1994); *Scullin Steel Co*. v. *National Railway Utilization Corp.*, 676 F.2d 309, 314 (8th Cir. 1982) (same); see also *Michigan Coalition of Radioactive Material Users, Inc*. v. *Griepentrog*, 954 F.2d 1174, 1177 (6th Cir. 1992) ("[t]elephone conversations and letters are insufficient to fulfill" purposeful availment require-

—————

[22] The dissent disagrees that these cases require the coupling of other significant contacts with continuous communications to establish minimum contacts, but the case law it relies on belies this point. For example, although the primary case on which the dissent depends, *Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, 988 F.2d 476 (3d Cir. 1993), did rely, in part, on communications between the parties in determining that jurisdiction exists, those were not the only contacts with the forum. See id., 482–83. In addition to twelve communications by the defendants to the forum and more than fifty additional communications between the parties' agents within a short period of time, the defendants "engaged in negotiations for an agreement that would have created rights and obligations among citizens of the forum and contemplated significant ties with the forum." Id. As explained throughout this opinion, the contract in the present case did not envision or require significant ties with Connecticut or significant oversight by the plaintiff from Connecticut.

ment); *Roth* v. *Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991) ("ordinarily use of the mails, telephone, or other international communications simply [does] not qualify as purposeful activity invoking the benefits and protection of the [forum] state" (internal quotation marks omitted)). Under this approach, the parties' communications in implementing the contract carry minimal weight and do not, as the dissent suggests, "go a long way" in establishing minimum contacts.

In this endeavor, courts often will evaluate the weight of communications between the parties, considering not only the extent of the communications but also their quality and substance. See, e.g., *Universal Leather, LLC* v. *Koro AR, S.A.*, supra, 773 F.3d 560 (considering "the nature, quality and extent of the parties' communications about the business being transacted" and requiring substantial collaboration (internal quotation marks omitted)); *CFA Institute* v. *Institute of Chartered Financial Analysts of India*, supra, 551 F.3d 295 (precontractual negotiations initiated by defendant, correspondence and collaboration between parties during thirteen year contractual relationship and visits by defendant to forum state evidenced nature of business relationship); *Calphalon Corp.* v. *Rowlette*, supra, 228 F.3d 723 ("phone, mail, and fax contact with [the plaintiff] in Ohio . . . occurred solely because [the plaintiff] chose to be headquartered in Ohio, not because [the defendants] sought to further [their] business and create 'continuous and substantial' consequences there"). For example, "informational communications in furtherance of [a contract between a resident and a nonresident do] not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over [the nonresident defendant]." (Internal quotation marks omitted.) *Vetrotex CertainTeed Corp.* v. *Consolidated Fiber Glass Products Co.*, supra, 75 F.3d 152; accord

*Sunbelt Corp.* v. *Noble, Denton & Associates, Inc.*, 5 F.3d 28, 32 (3d Cir. 1993). The substance of the communications weighs in favor of jurisdiction when it evinces collaboration regarding the business and is not merely incidental or ancillary to performance of the contract. See *Rice* v. *Karsch*, 154 Fed. Appx. 454, 463–64 (6th Cir. 2005) (finding that communications were " 'ancillary' " when phone, mail, and e-mail contacts in forum occurred only because plaintiff was located there, not because defendant sought to further personal business or to create continuous and substantial consequences there); see also *John Crane, Inc.* v. *Shein Law Center, Ltd.*, 891 F.3d 692, 696 (7th Cir. 2018) (weighing communications on basis of whether "[t]he communications were not incidental to other conduct").

*Burger King* itself suggests that communications between parties weigh in favor of jurisdiction when they involve collaboration between the parties, and the focus is on the quality and not the quantity of the communications. Specifically, the court in *Burger King* noted that the parties "carried on a continuous course of direct communications by mail and by telephone" regarding disputes over building design, site development fees, rent computation, and the defaulted payments because the plaintiff in Florida was granted all decision-making authority under the parties' contract. *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 481. The defendant was required to communicate with the plaintiff in Florida to obtain permission for almost all business decisions, with this level of oversight being central to the underlying contract. Id. Those communications reflected extensive collaboration regarding the business, thereby supporting a determination that the defendant had reached out to the forum.

We recognize that, recently, the United States Supreme Court in *Walden* v. *Fiore*, supra, 571 U.S. 277, explained that, "although physical presence in the forum

is not a prerequisite to jurisdiction . . . physical entry into the [s]tate—either by the defendant in person or through an agent, goods, mail, or some other means— is certainly a relevant contact.'' (Citation omitted.) Id., 285. The court's consideration of direct communications between the parties is consistent with the recognition by the court in *Burger King* of technological changes in modes of communication: ''[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a [s]tate in which business is conducted.'' *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 476. That observation has become only more true in the thirty-six years since the *Burger King* decision, as the globe shrinking evolution of digital communications has made it ever easier for an entity to conduct business without once setting foot in the forum state.

Nevertheless, although it recognized that direct communication between the parties is a relevant factor, the court in *Walden* clarified that the '' 'minimum contacts' analysis [must look] to the defendant's contacts with the forum [s]tate itself, not the defendant's contacts with persons who reside there. . . . To be sure, a defendant's contacts with the forum [s]tate may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction. . . . Due process requires that a defendant be haled into court in a forum [s]tate based on his own affiliation with the [s]tate, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the [s]tate.'' (Citations omitted.) *Walden* v. *Fiore*, supra, 571 U.S. 285–86. Thus, the court in *Walden* recognized that it is the substance of the com-

North Sails Group, LLC *v.* Boards & More GmbH

munication that is central to the analysis—whether the defendant was purposefully reaching out to the forum rather than communicating within the forum merely because the plaintiff happens to reside there. See *Calphalon Corp.* v. *Rowlette*, supra, 228 F.3d 723 (holding that contacts with forum are "random, fortuitous, and attenuated" if they occur merely because plaintiff is located in forum (internal quotation marks omitted)).

In the present case, although it is true that the parties' communications involved their contractual relationship, unlike in *Burger King*, there is limited evidence of any continuous or extensive collaboration regarding the parties' businesses or the licensing agreement. Not only is the level of oversight and control significantly less than it was in *Burger King*, but continuous communication was not necessary for B&M to run its business. B&M did not have to receive permission from the plaintiff in Connecticut for its business decisions before acting. Thus, the nature of the communications in the present case is substantively different from the communications in *Burger King*, which were essential to the performance of the contract in that case. The quality and substance of the communications in this case do not show that B&M purposely availed itself of the forum. Rather, as we discuss subsequently in this opinion, the evidence shows that these communications were ancillary or incidental to the contractual relationship, and occurred in Connecticut merely because the plaintiff happened to be located in the forum.

Most telling, the parties submitted exhibits appended to their affidavits that show the nature of these communications. Some communications involved the negotiation and signing of the licensing agreement, which, as already discussed, are considered ancillary to the contract and do not support jurisdiction. The purpose of many of the other communications was to forward the royalty reports. Contrary to the dissent's contention,

these royalty reports were not "central and essential" to B&M's performance of the contract. These reports, which essentially are receipts, were what case law describes as "ancillary" to the contract, with B&M's sending the reports to the plaintiff in Connecticut not to avail itself of the forum but merely because of the plaintiff's location in the forum. See, e.g., *Diamond Healthcare of Ohio, Inc.* v. *Humility of Mary Health Partners*, supra, 229 F.3d 452 (contract requirement that defendant send plaintiff certain information was ancillary and did not justify jurisdiction). Because the contract made no reference to Connecticut in requiring B&M to forward these reports to the plaintiff, B&M would have been required to send the reports regardless of where the plaintiff was located, thereby rendering this contact between the parties "fortuitous" under the case law. See, e.g., *Calphalon Corp.* v. *Rowlette*, supra, 228 F.3d 723 (holding that contacts in forum are "random, fortuitous, and attenuated" if they occur merely because plaintiff is located in forum (internal quotation marks omitted)); *Johnson* v. *UBS AG*, Docket No. 2:20-cv-00357-MCS-JC, 2020 WL 6826477, *4 (C.D. Cal. November 12, 2020) (" '[w]hen a defendant's relationship to the forum state arises from the fortuity of where the plaintiff resides . . . it does not provide the basis for specific jurisdiction there' "), aff'd, 860 Fed. Appx. 531 (9th Cir. 2021). That does not mean that these reports were not important to the plaintiff. Under governing case law, a contact is ancillary or fortuitous if it is not the result of a defendant's deliberate engagement in significant activities within the forum or its having continuing obligations with the forum. See *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 475–76; *Diamond Healthcare of Ohio, Inc.* v. *Humility of Mary Health Partners*, supra, 229 F.3d 452; *Calphalon Corp.* v. *Rowlette*, supra, 228 F.3d 722–23. Here, the contract did not envision that B&M would deliberately engage in activity

North Sails Group, LLC *v.* Boards & More GmbH

in Connecticut or have continuous obligations within Connecticut. Any link to Connecticut was merely because of the plaintiff's location in the forum, which was a matter of happenstance that could have changed at any time. By contrast, for example, the contract envisioned B&M's making payments of royalties to the plaintiff in Wisconsin, which was not fortuitous or happenstance.[23]

The parties also exchanged correspondence regarding the dispute that led to the current litigation. Communications in advance of litigation or during litigation are considered incidental and are afforded little weight in determining whether minimum contacts exist because they encourage dispute resolution. See, e.g., *Pro Axess, Inc.* v. *Orlux Distribution, Inc.*, 428 F.3d 1270, 1278 n.5 (10th Cir. 2005) (in determining whether purposeful availment has occurred, recriminations between parties in advance of litigation are afforded less weight so as to encourage informal resolution of disputes); *Sheldon* v. *Khanal*, Docket No. 07-2112-KHV, 2007 WL 4233628, *5 (D. Kan. November 29, 2007) ("[The] [d]efendants' communications into Kansas were incidental to the resolution of the bankruptcy proceeding, the completion of the judicial sale and the satisfaction of the mortgage [all of which related to the property at issue]. The quality of these contacts [cuts] against the [c]ourt's exercise [of] personal jurisdiction over [certain of the defendants]. . . . None of the matters, communications or transactions between [the] plaintiffs and [those defendants] created a substantial connection to the [s]tate of Kansas [that] would permit the [c]ourt to exercise

---

[23] The contention by the plaintiff and the dissent that B&M knew that this money would be used by the plaintiff in Connecticut is unavailing. As discussed, the actions of the plaintiff are irrelevant to our minimum contacts analysis. See, e.g., *Walden* v. *Fiore*, supra, 571 U.S. 289. Additionally, the fact that the plaintiff resided in the forum was "fortuitous" under the case law and does not show that B&M was intentionally reaching into the forum, especially when it did not send the payments to the forum.

310 DECEMBER, 2021 340 Conn. 266

North Sails Group, LLC *v.* Boards & More GmbH

personal jurisdiction over [those defendants].'' (Citation omitted.)).

Thus, nothing about the proffered communications shows that B&M was purposefully reaching into the forum. Rather, these communications show that B&M communicated within Connecticut only because the plaintiff was located there. These communications do not show substantial collaboration regarding the business, as in *Burger King*, in which the communications were necessary under the contract for approval of almost all business decisions. *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 481. Here, the communications were ancillary and incidental to the performance of the contract. Accordingly, B&M's communications with the plaintiff do not show that it purposefully availed itself of the benefits and protections of the forum.

Finally, the plaintiff contends that the parties entered into a carefully structured contractual relationship, although the plaintiff does not rely on any particular provision of the contract in support of this argument.[24] Unlike in *Burger King*, however, the contract at issue does not envision continuing and wide reaching contacts into the forum by the defendant. It is true that various provisions in the licensing agreement give the plaintiff oversight over some aspects of B&M's production of the licensed products, which are owned, produced, marketed, and sold by B&M but contain the plaintiff's trademarks and trade name. The agreement

---

[24] The plaintiff argued, at least by implication, that there were minimum contacts because the parties entered into a carefully structured contractual relationship. Specifically, the plaintiff cited and quoted *Burger King*; *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 480 (specific jurisdiction existed when defendant ''entered into a carefully structured [twenty year] relationship that envisioned continuing and [wide reaching] contacts with [the plaintiff] in [the forum state]''); after arguing that the parties entered into a contract that required the plaintiff to perform in Connecticut.

provides the plaintiff "the right, at reasonable times, to inspect the [l]icensed [p]roducts, the premises of B&M on which such products are manufactured or stored, and all quality control test data of B&M pertaining thereto in order to determine and [ensure] that all [l]icensed [p]roducts conform to the quality standards established herein." The agreement also gives the plaintiff the right to receive, when it deems it necessary, samples of the licensed products, as well as examples of advertising and promotional materials and quality control test data to determine whether the licensed products conform to quality standards contained in the licensing agreement. The agreement further provides that, if the plaintiff notifies B&M that the licensed products do not comply with those quality standards, B&M is obligated to correct any defects. The plaintiff also may request an audit of B&M's books and records as they relate to the licensed products. At the end of each fiscal year, B&M is obligated to provide the plaintiff with a set of financial statements demonstrating B&M's financial status. The parties' course of dealings shows that B&M e-mailed the plaintiff quarterly financial statements and royalty reports.

These provisions do not create a "carefully structured [long-term] relationship that envisioned continuing and [wide reaching] contacts" in Connecticut with "exacting regulation" of the defendant's business, as in *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 465, 480. From its offices in Florida, Burger King imposed many requirements on franchisees and, thus, controlled the defendant's daily operations. Among other things, Burger King regulated the defendant's accounting and insurance practices, hours of operation, building layout, service and cleanliness standards, as well as the range, quality, appearance, size, taste, and processing of menu items. Id., 465 n.4. It was not Burger King's relationship with and authority over the defendant, however, that

weighed in favor of jurisdiction; see id., 475–76 (focus is on defendant's contacts with forum, not plaintiff's contacts with forum); but the fact that its control over his business required him to consistently and continuously reach out to Florida to obtain authorization for the operation of his business, thereby establishing purposeful availment and providing him with notice that he could be sued in Florida.

By contrast, the October, 2000 licensing agreement does not grant the plaintiff significant decision-making authority over aspects of B&M's business. See id., 485 n.28 ("[s]ome franchises may . . . involve different [decision-making] structures, such that a franchisee should not reasonably anticipate out-of-state litigation"). The contract requires only that B&M use its best, good faith efforts in marketing and selling the licensed products, which, with the exception of the inclusion of the plaintiff's trademarks and trade name, are owned by B&M. It does not require B&M to conduct its business in any particular fashion or require it to comply with any decisions the plaintiff makes regarding its business operations beyond those relating to the use of the trademarks and trade name. Although the agreement permits the plaintiff to inspect B&M's premises and the licensed products, as well as to audit B&M, these oversight measures do not highly regulate B&M's business—and certainly not in the same way Burger King possessed almost complete control and authority over the defendant's restaurant in *Burger King*. Rather, the agreement's oversight provisions regulate only B&M's use of the plaintiff's trademarks and trade name. Although the licensing agreement requires B&M to obtain approval from the plaintiff as to the design of certain licensed products, the plaintiff is not authorized to regulate the daily operations of B&M's business. Unlike in *Burger King*, in which the defendant consistently and continuously had to reach out to Florida to obtain authorization

for the operation of his business, B&M was not required to reach out to Connecticut to run its business. Rather, the limited supervisory contractual provisions, such as the right to inspect and the right to receive royalty reports, are ancillary and incidental to the licensing agreement. As discussed previously, it was the actual payment of the royalties and the use of the trademark that were the critical components of the agreement. Courts have found oversight provisions similar to those in the present case to be ancillary and not to support jurisdiction. See, e.g., *Diamond Healthcare of Ohio, Inc.* v. *Humility of Mary Health Partners*, supra, 229 F.3d 452 (contract requirement that defendant send plaintiff certain information was ancillary and did not justify jurisdiction); *Guinness Import Co.* v. *Mark VII Distributors, Inc.*, 153 F.3d 607, 614 (8th Cir. 1998) ("[T]here was no evidence that [the foreign entity] exercised control over the distribution of its products in the United States or controlled the importer's decisions as to distribution. All distributorship decisions were made by the distributor and the importer . . . ."); *RLB & Associates, Ltd.* v. *Aspen Medical Pty.*, supra, 2016 WL 344925, *6 (minimum contacts were lacking when contract "did not regulate where [the] [p]laintiff worked, the hours it worked, the manner in which it approached potential clients, or the amount of time it devoted to providing its services").

Moreover, the parties' course of dealing calls into question the extent to which the plaintiff exercised its limited oversight rights under the licensing agreement. For example, one of the plaintiff's own exhibits reveals that the first time it attempted to exercise its auditing rights under the licensing agreement was sometime in 2017. Cf. *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 480. We find no evidence in the record rebutting this statement. That is not to say that we require regular exercise of contractual rights to inspect. Rather, it is

well established that, in addition to the terms of the contract itself, the parties' actual course of dealing is relevant to the determination of whether minimum contacts exist. See id., 478 (considering "the terms of the contract and the parties' actual course of dealing"). We acknowledge, however, that, even if a contract term is not carried out, the terms of the contract may show that the parties contemplated the defendant's contact with or continuing obligation to the forum, which would weigh in favor of jurisdiction. See *K-V Pharmaceutical Co.* v. *J. Uriach & CIA, S.A.*, supra, 648 F.3d 594. We merely conclude that none of the contract provisions at issue weighs in favor of jurisdiction in this case.

In summary, considering the totality of the circumstances, we conclude that the plaintiff has failed to establish that B&M has sufficient minimum contacts with Connecticut to justify the exercise of personal jurisdiction. Because the plaintiff failed to satisfy its burden regarding minimum contacts, we do not need to determine whether personal jurisdiction would be reasonable. See *Vetrotex CertainTeed Corp.* v. *Consolidated Fiber Glass Products Co.*, supra, 75 F.3d 154 n.9. Therefore, we affirm the trial court's judgment of dismissal for lack of personal jurisdiction.

II

The dissent disagrees with our holding, arguing that we improperly apply the relevant standard. The plaintiff, however, had the burden of establishing minimum contacts, and its allegations and proof were modest at best. Even when we apply the favorable motion to dismiss standard, as we must, the plaintiff has failed to satisfy its burden of proof. To overcome this failure, the dissent seeks to supplement the plaintiff's arguments with those of its own—specifically, the dissent relies on (1) sales made by the plaintiff and B&M's sister entity within the forum, (2) speculation regarding

North Sails Group, LLC *v.* Boards & More GmbH

who initiated the October, 2000 agreement, (3) the potential availability to B&M of remedies under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and (4) provisions in the contract regarding litigation support. Although the dissent is correct that we must conduct a de novo review of the record to determine whether the plaintiff satisfied its burden, there is a difference between conducting a de novo review of the record to address the legal arguments raised by the parties and addressing new, legal arguments that have not been raised, for which the record is insufficient. Under the latter circumstance, the applicable legal standards do not require this court to consider every possible legal argument the plaintiff could have made and infer from any void in the record jurisdictional facts needed to resolve these unraised legal arguments in favor of the plaintiff. Rather, the plaintiff's failure to raise such legal arguments goes to whether it satisfied its burden of proof. We briefly address the dissent's arguments to the extent we have not done so already.

A

The dissent's claim that, "at this stage in the proceedings, the plaintiff need only make a prima facie showing that jurisdiction is proper," contradicts our well established legal standard. In *Designs for Health, Inc.* v. *Miller*, 187 Conn. App. 1, 201 A.3d 1125 (2019), the only case from this state that the dissent cites for this "prima facie" standard, the dispositive (and only) jurisdictional fact at issue—whether the defendant had signed the contract containing a forum selection cause—was disputed, with both parties offering competing evidence on the issue. This is not true of the present case. The Appellate Court in *Designs for Health, Inc.*, explained that a plaintiff's burden is lowered to require only a prima facie showing to survive a motion to dismiss *if jurisdictional facts are disputed* and an evidentiary

North Sails Group, LLC *v.* Boards & More GmbH

hearing is not held. The plaintiff would then be required at trial to satisfy its burden of establishing jurisdiction by a preponderance of the evidence. *Designs for Health, Inc.* v. *Miller*, supra, 14.

The dissent contends that the prima facie standard applies whenever a "defendant challenges the trial court's personal jurisdiction but no evidentiary hearing is requested or held." It was in fact true in *Designs for Health, Inc.*, that neither party requested a hearing and that the trial court did not hold one, but that was hardly the point. The point was that the jurisdictional fact (whether the defendant signed the contract) was *disputed*, and no hearing was held. In that circumstance, the trial court could neither resolve the disputed fact itself nor hold the plaintiff to the burden of proof that would apply at trial (i.e., a preponderance of the evidence).

In the present case, there are no disputed facts relevant to our minimum contacts analysis, and the plaintiff does not mention a "prima facie" standard or how it helps its argument.[25] Contrary to the dissent's argument, under our well established standard, a fact is not disputed simply because the defendant's evidence conflicts with the plaintiff's allegations. If that were the rule, then a defendant could never have a case dismissed for lack of personal jurisdiction unless the plaintiff's factual allegations were insufficient. Our rules and case law permit a defendant to contest jurisdictional allegations,

---

[25] For example, as discussed in more detail in footnote 27 of this opinion, B&M offered evidence to refute the plaintiff's allegation that B&M USA was its agent or subsidiary. The plaintiff offered no counterevidence, and, thus, this issue was not in dispute. Only if the plaintiff had offered counterevidence on this issue would it be deemed in dispute, thereby requiring either an evidentiary hearing or application of the prima facie standard to *that* factual issue. Thus, in the present case, in which B&M offered evidence on an issue of fact and the plaintiff failed to offer countering evidence, no jurisdictional facts are in dispute, and the prima facie standard does not apply. The plaintiff merely has failed to satisfy its burden.

thereby requiring a plaintiff to offer proof to support them.

The cases from other jurisdictions the dissent cites, including from the United States Court of Appeals for the Second Circuit, support our analysis. These cases, like *Designs for Health, Inc.*, involved disputed issues of jurisdictional facts whereby both parties offered competing evidence and no evidentiary hearing was held, thus implicating the prima facie standard. See *K-V Pharmaceutical Co.* v. *J. Uriach & CIA, S.A.*, supra, 648 F.3d 592 (citing to cases such as *Dever* v. *Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072–73 (8th Cir. 2004), cert. denied, 543 U.S. 1147, 125 S. Ct. 1304, 161 L. Ed. 2d 108 (2005), that make clear that plaintiff has prima facie burden to allege sufficient facts to support jurisdiction, that defendant may test this prima facie showing through affidavits and exhibits, after which, if defendant has raised meritorious challenge to jurisdiction, burden shifts back to plaintiff to provide counterevidence, otherwise plaintiff fails to meet its burden); *Intercon, Inc.* v. *Bell Atlantic Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000) ("[When] . . . there has been no evidentiary hearing, and the motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written material, the plaintiff need only make a prima facie showing that jurisdiction exists. . . . If the parties *present conflicting affidavits*, all factual disputes must be resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." (Emphasis added; internal quotation marks omitted.)); see also *Ins. Corp. of Ireland, Ltd.* v. *Compagnie des Bauxites de Guinee*, 456 U.S. 694, 716, 102 S. Ct. 2099, 72 L. Ed. 2d 492 (1982) (Powell, J., concurring in the judgment) (plaintiff offered evidence in support of allegations to meet prima facie standard); *Guidry* v. *United States Tobacco Co.*, 188

North Sails Group, LLC *v.* Boards & More GmbH

F.3d 619, 625 (5th Cir. 1999) ("[w]hen a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing . . . the nonmoving party need only make a prima facie showing, and the court must accept as true the nonmov[ant's] allegations and resolve all factual disputes in its favor" when both parties offer evidence regarding disputed jurisdictional facts). But see *Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir. 1993) (case was not clear as to whether both parties presented evidence).

B

The dissent also takes issue with our holding that the plaintiff has failed to allege that B&M had a physical presence in the forum. The dissent contends that B&M has conducted business in Connecticut through its sister entity, B&M USA, arguing that B&M reached into the forum because B&M USA marketed and sold the licensed products in Connecticut. In this court, the plaintiff does not make this argument.[26] Because the

[26] We note that B&M has never stated that B&M USA sold *the licensed products* in Connecticut. Rather, citing to the affidavit of its parent company's chief executive officer, Till Eberle, it represented only that B&M USA sold a small percentage of product (0.006% of its total sales) in Connecticut. In the same affidavit, Eberle averred that B&M USA distributed various branded products in Canada and the United States, including multiple different product lines. Thus, it is not clear if the licensed products at issue in the present case were the products sold in Connecticut by B&M USA, and the plaintiff has failed to advance any allegations or to offer any evidence that would allow this court to attribute B&M USA's forum contacts to B&M. Thus, this arguably ambiguous fact need not be resolved for purposes of deciding this case.

Additionally, we see no reason to respond to the dissent's legal argument for attributing B&M USA's sales in Connecticut to B&M—the so-called "stream of commerce" theory. First, the plaintiff has not advanced this theory either in the trial court or on appeal, and B&M has not had a chance to brief whether this doctrine should apply in the present case. Second, the contours of this theory are far from clear. See *Beverly Hills Fan Co.* v. *Royal Sovereign Corp.*, 21 F.3d 1558, 1566 (Fed. Cir.) (explaining that there exists split of authority over exact requirements for application of stream of commerce theory, with some jurisdictions requiring more than merely

340 Conn. 266 DECEMBER, 2021 319

North Sails Group, LLC *v.* Boards & More GmbH

dissent does not consider it abandoned, we briefly address the issue, which, at any rate, fails factually and legally.

The allegations and evidence show that B&M USA sold the licensed products in the forum and that the plaintiff advertised and offered for sale the licensed products in the forum. Nothing in the record shows that B&M itself made any sales in Connecticut, however. Although a foreign corporation's decision to sell products in the forum may support jurisdiction, B&M did not make any sales in the forum, unless the sales by B&M USA or the plaintiff can be imputed to it.

The dissent contends that these sales can indeed be imputed to B&M because both B&M USA and the plaintiff are part of B&M's distribution channel. The case law the dissent cites, however, does not support this assertion. The record is void of any direct link between B&M USA and B&M—likely because the plaintiff did not argue, let alone try to allege or establish, this factual issue. Although the contract contemplates that B&M may sell the licensed products through distributors, no specific distributors are listed, and there is no allegation or evidence that B&M USA is B&M's distributor. The only evidence is that B&M USA is the distributor for its parent company, which is a separate and distinct entity from B&M. Additionally, contrary to the dissent's assertion, the fact that B&M made sales to B&M USA in Washington does not create a reasonable inference that B&M USA was B&M's distributor of the licensed products in Connecticut. There is no evidence or allegation that B&M sold the licensed products to B&M USA or that B&M USA then sold those products in Connecticut as B&M's distributor.[27] The plaintiff never sought

placing product in stream of commerce while others do not require additional conduct), cert. dismissed, 512 U.S. 1273, 115 S. Ct. 18, 129 L. Ed. 2d 917 (1994).

[27] The plaintiff could have set forth allegations and offered evidence to establish that B&M USA and B&M were involved in an agency or alter ego relationship, thereby imputing the forum contacts of B&M USA to B&M.

to allege or prove that B&M USA is B&M's distributor. Cf. *Beverly Hills Fan Co.* v. *Royal Sovereign Corp.*, 21 F.3d 1558, 1565 (Fed. Cir.) (there were allegations in complaint that defendants purposefully shipped product into forum through established distribution channel), cert. dismissed, 512 U.S. 1273, 115 S. Ct. 18, 129 L. Ed. 2d 917 (1994).

The record also does not demonstrate that the plaintiff is part of B&M's distribution channel: the plaintiff never sought to show that it was part of that channel.[28] The contract specifically envisions that B&M will sell and distribute the licensed product. There is no reference in the contract to the plaintiff's marketing or selling the licensed products. The contract does not envision the plaintiff acting as part of any established distribution channel. In the absence of this connection,

See *Dickson Marine, Inc.* v. *Panalpina, Inc.*, 179 F.3d 331, 338–39 (5th Cir. 1999) (declining to ignore corporate form and to attribute contacts of company to foreign sister entity when one was not parent of other, one does not control other, and there was no evidence of existence of agency relationship). The plaintiff, however, set forth no allegations in this regard and failed to offer any competing evidence to refute B&M's evidence that there was no agency relationship. Thus, there is no evidence on this record that B&M USA was B&M's agent.

[28] Here again, the dissent will not hold the plaintiff to its burden of proof and generalizes about the applicability of distinguishable case law. Specifically, the dissent broadly asserts that, "[u]nder the [parties'] licensing agreement, B&M acquired the right to use North Sails' valuable, market leading trade name to advertise and promote B&M's own products. And, when B&M markets and sells its products in a state using the North Sails trade name, that is about as *fundamental of a contact as there can be*. B&M is reaching out to Connecticut consumers, displaying the brand here, and staking a claim against anyone else who might try to use the brand in Connecticut without authorization, all while *earning royalties on Connecticut sales* for North Sails." (Emphasis added.) Although sales by a defendant in the forum might arguably constitute a fundamental contact with the forum, no such fundamental contact occurred here. Even when we construe the allegations and evidence in the light most favorable to the plaintiff, we conclude that it has failed to satisfy its burden in this respect. This is the danger of advancing arguments the parties do not advance: the record was not built by either side with this argument in mind.

North Sails Group, LLC *v.* Boards & More GmbH

as we explain throughout this opinion consistent with binding precedent, the plaintiff's own conduct in the forum cannot serve as a basis for minimum contacts.

C

The dissent also asserts that B&M has received the protections of Connecticut law because of its ability to sue under CUTPA. The dissent is correct that foreign companies have been allowed to raise CUTPA claims against residents of the forum. What is unclear, and what the dissent provides no support for, is the proposition that this potential ability to bring a CUTPA claim means that any corporation that enters into a contractual agreement with a Connecticut resident avails itself of the protections of the forum. By this logic, any jurisdiction that has an unfair trade practices law has jurisdiction over any foreign corporation that enters into any contract with any resident. The plaintiff does not advance this debatable question of law in support of its minimum contacts claim. Additionally, even if we assume that the potential ability to raise a CUTPA claim creates minimum contacts, it is unclear whether a foreign corporation retains this ability when the contract it has negotiated contains a choice of law provision designating another jurisdiction's law as controlling. We are not aware of any decision by this court or the Appellate Court holding that a choice of law provision designating another forum's law as controlling nevertheless preserves a defendant's ability to bring a CUTPA claim.

D

Finally, the dissent asserts that the contractual provisions[29] regarding the plaintiff's right to inspect the prod-

---

[29] The dissent also relies on the fact that the licensing agreement obligates B&M to assist the plaintiff, should the latter either initiate or be drawn into litigation regarding North Marks, and requires B&M to indemnify and defend the plaintiff under certain circumstances. Neither party raised this argument, and, thus, we do not consider it. Nevertheless, we note that the case on which the dissent relies, *Samelko* v. *Kingstone Ins. Co.*, supra, 329 Conn.

ucts establish minimum contacts because they require B&M to ship products and advertising materials into Connecticut for inspection on demand. The licensing agreement, however, requires only that B&M provide the plaintiff with sample products and advertising materials, and allows the plaintiff to inspect its products. The licensing agreement does not specifically require B&M to send anything to Connecticut. But "[w]here else" other than Connecticut, the dissent demands? "Exactly the point" is our answer. B&M only would have had to send these products and materials to Connecticut as a byproduct of the plaintiff's being located in Connecticut, not because B&M purposefully sought to avail itself of the forum. As with the royalty reports, under the terms of the contract, B&M would have been required to send these materials to wherever the plaintiff was located. This is precisely what case law defines as "ancillary" or "fortuitous" contacts. Additionally, the fact that the plaintiff may inspect those products in Connecticut is not relevant to our minimum contacts analysis, as that involves the plaintiff's own contacts with the forum, not the defendant's contacts. See, e.g., *Walden* v. *Fiore*, supra, 571 U.S. 290–91.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and PALMER, McDONALD and MULLINS, Js., concurred.

ECKER, J., with whom KAHN, J., joins, dissenting. When sophisticated, longtime contractual partners domiciled in different jurisdictions end their business relationship, no one should be surprised that, in the

249, is distinguishable in that this court held in *Samelko* that the duty to defend or assist in litigation provision of the insurance policy at issue created minimum contacts on the part of the defendant insurer because the underlying action stemmed from its alleged breach of this provision. Id., 272. In the present case, unlike in *Samelko*, the underlying action does not stem from B&M's duty to defend or assist in litigation.

absence of a forum selection clause, any disputes aris-
ing from the breakup can be litigated in the courts of
either party's home state. Where else, after all? The
scenario is common and unremarkable—in the rubric
of our minimum contacts jurisprudence, the exercise
of jurisdiction over the foreign party in the aggrieved
party's home state "does not offend traditional notions
of fair play and substantial justice." (Internal quotation
marks omitted.) *International Shoe Co.* v. *Washington*,
326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)
(*International Shoe*). The United States Supreme Court
described the basic rule in these simple terms: "[W]ith
respect to interstate contractual obligations, we have
emphasized that parties who reach out beyond one state
and *create continuing relationships and obligations*
with citizens of another state are subject to regulation
and sanctions in the other [s]tate for the consequences
of their activities." (Emphasis added; internal quotation
marks omitted.) *Burger King Corp.* v. *Rudzewicz*, 471
U.S. 462, 473, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)
(*Burger King*). Although the mere act of contracting
with a forum resident, without more, does not *automat-
ically* confer jurisdiction; see id., 478–79; knowingly
entering into a long-term contractual *relationship* with
a forum resident makes it eminently fair and foreseeable
in the absence of unusual circumstances, and even more
so thirty-six years after *Burger King*, in today's techno-
logically borderless business environment. See, e.g.,
*General Electric Co.* v. *Deutz AG*, 270 F.3d 144, 150 (3d
Cir. 2001) ("Courts are not reluctant to find personal
jurisdiction in such instances. '[M]odern transportation
and communications have made it much less burden-
some for a party sued to defend himself in a [s]tate
where he engages in economic activity . . . .' "), quot-
ing *Burger King Corp.* v. *Rudzewicz*, supra, 474.

Despite this, the majority today holds that Connecti-
cut courts have no jurisdiction over an Austrian entity

North Sails Group, LLC *v.* Boards & More GmbH

with a very American name, Boards and More GmbH
(B&M),[1] a global business operation that has been con-
tinuously engaged for almost two decades in an active,
robust, and financially significant contractual relation-
ship with the plaintiff, North Sails Group, LLC (North
Sails), the brick and mortar base of operations of which
is firmly planted in Milford, Connecticut. I find this
result unwarranted on the present record and, there-
fore, respectfully dissent.

The crux of the disagreement between the majority
and this dissent involves the proper application of mini-
mum contacts precedent in the particular context of
long-term, contractual relationships of the nature at
issue in the present case. The two opinions read *Burger
King*—by far and away the closest United States
Supreme Court precedent—very differently in critical
respects. Ultimately, the majority believes that the prec-
edent imposes a more demanding legal standard than
does the dissent. It concludes that most, if not all, of
B&M's purported contacts with Connecticut were
"ancillary and incidental" for constitutional purposes
because, in the majority's view, B&M's relationship with
Connecticut stemmed largely from the "fortuitous" fact
that North Sails "happens" to be a Connecticut resident.
Part I B of the majority opinion. By contrast, I am
convinced that the legal requirements for personal juris-
diction are easily met on the facts of this case due to
the nature and extent of the contractual relationship
that the defendant deliberately chose to establish and
continuously maintain with the plaintiff over the course
of eighteen years. For the reasons that follow, I believe
it is incorrect to characterize B&M's prolonged, pur-

---

[1] The defendants in this case are B&M and Emeram Capital Partners
GmbH (Emeram), a private equity investment limited liability company with
its principal place of business in Munich, Germany. As the majority notes;
see footnote 5 of the majority opinion; the plaintiff's sole theory of liability
against Emeram is that it is the alter ego of B&M. For the sake of simplicity,
all references to the defendant are to B&M.

340 Conn. 266 DECEMBER, 2021 325

North Sails Group, LLC *v.* Boards & More GmbH

poseful and commercially meaningful contacts into and out of Connecticut—the home state of its contracting partner—as anything like random, fortuitous, or attenuated within the meaning of *Burger King* and related precedent.

The relationship between North Sails and B&M has all of the characteristics of a long-term business venture of considerable importance to both parties. The companies have been engaged since 2000[2] in a joint commercial enterprise that is the very opposite of a one-off, passing, or sporadic business interaction between commercial parties crossing paths briefly while transacting a trivial, ancillary, or inconsequential purchase or sale without discernable terrestrial moorings. Indeed, before the recent breakup, B&M itself described its contractual relationship with North Sails as integral to B&M's international success, boasting on its corporate website that its "Mistral, Fanatic *and North Sails brands* have made Boards & More the world leader in the wind surfing market." For its part, North Sails spent the past twenty years operating out of a physical facility right here in Connecticut, administering the contract, promoting and maintaining the integrity of its market leading brand, monitoring compliance, negotiating disputes, and bringing into the Connecticut economy revenues of hundreds of thousands of dollars *annually* as a result of its performance under the contract.

B&M's contractual connection to Connecticut existed from the outset. Desiring to continue the relationship with North Sails enjoyed by B&M's predecessor in interest, the company's leadership negotiated the terms of the contract by sending communications to North Sails' Milford headquarters and mailing the final agreement to Milford for execution by Thomas A. Whidden, North

---

[2] In fact, the relationship grows directly out of a business venture between the plaintiff and B&M's predecessor in interest tracing back to 1990.

Sails' president and chief executive officer. B&M knew full well that it was entering into a contractual relationship with a Connecticut based business, and it purposefully and deliberately directed its activities at and into Connecticut. The property that B&M purchases from North Sails is an incorporeal license to use certain North Sails trademarks (North Marks) that does not require delivery of a physical product from Connecticut to Austria. But, at all times, B&M knew that North Sails possessed an absolute contractual right, on demand, to *require* shipment of B&M products, documents, and marketing materials into Connecticut for inspection. Indeed, in 2003, B&M's chief executive officer, Yves Marchand, evidently considered it important enough to visit the North Sails facility in Milford in furtherance of the business relationship during its early stages. Both before and after that visit, B&M employees—including high-level executives—directed literally hundreds of business related letters, faxes, telephone calls, and e-mails to North Sails in Milford over the years. These communications, as we shall see, have included many substantive and even contractually essential correspondences on subjects going to the heart of the parties' commercial relationship.

The simple fact of the matter is that B&M made a voluntary, informed choice to enter into a long-term contractual relationship with North Sails, and it did so knowing full well that North Sails would perform its principal obligations under the contract—including filing, processing, maintaining, and protecting the parties' rights to and the value of the North Marks trade name— from its headquarters in Milford. B&M further understood—indeed, the parties' contract expressly states— that B&M's use of the North Marks would be subject to various forms of ongoing oversight by North Sails from and in Connecticut. This included a duty on the part of B&M (1) to send, upon North Sails' request,

samples of the licensed products and associated advertising and promotional materials and quality control test data for North Sails' inspection in Connecticut, (2) to furnish copies of B&M's quarterly and annual financial statements to North Sails in Connecticut to allow North Sails to review and verify its royalty payments, and (3) to conform to all standards and specifications set forth in successive revisions of the North Sails Corporate Identification Manual, promulgated from its Milford headquarters. Moreover, several provisions of the contract also obligate B&M to cooperate to the greatest extent reasonably possible in North Sails' defense in *any* legal action involving the North Marks, meaning that B&M understood from the outset that it could become involved in litigation in Connecticut should North Sails be sued by a third party in its home state. And, finally, it is undisputed that thousands of dollars of B&M products, including those that were subject to the parties' trademark licensing agreement, were marketed and sold in Connecticut.

The majority alternatively overlooks or understates the importance of these facts. In my view, B&M's numerous contacts with Connecticut make it clear that B&M reasonably could have foreseen, from the outset, that it might be haled into court in Connecticut and that it purposefully availed itself of the benefits and protections of this state such that requiring it to answer here for harms allegedly done to a Connecticut resident would not be unjust. Sister courts routinely have concluded that jurisdiction is proper on facts such as these. The majority, in sum, construes the federal constitution too narrowly, fails to consider key legal and factual aspects of the present case, and reaches an unfortunate result inconsistent with the realities of contemporary commercial life in which Connecticut businesses operate.

North Sails Group, LLC *v.* Boards & More GmbH

I

I begin by noting that, although I take issue with the majority's recitation of the relevant facts and its application of the law to those facts, I largely agree at the broadest level with the majority's summary of the governing legal framework under *International Shoe* and its progeny. Our disagreement about the law resides in various important details, which I will address in due course. I would, however, emphasize four general points at the outset.

First, at this stage in the proceedings, the plaintiff need only make a prima facie showing that jurisdiction is proper. See *Designs for Health, Inc.* v. *Miller*, 187 Conn. App. 1, 12–13, 201 A.3d 1125 (2019). Although the majority takes issue with this proposition, it is not clear to me that our disagreement on this narrow legal issue is anything more than semantical. I believe that the majority and I agree on all of the following: (1) the plaintiff bears the burden of advancing allegations or evidence sufficient to establish the court's personal jurisdiction over a nonresident defendant, (2) in the absence of any contrary evidentiary showing by the defendant, the plaintiff need only allege facts sufficient to establish minimum contacts—it need not establish those facts by a preponderance of the evidence, (3) all undisputed allegations and facts must be construed in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor, (4) if the defendant sets forth evidence that calls jurisdiction into question and the plaintiff fails to respond with affidavits or evidence in support of its contrary allegations, the action must be dismissed, and (5) if the defendant sets forth evidence calling jurisdiction into question and the plaintiff responds with affidavits or evidence that creates a material factual dispute, the trial court must either conduct an evidentiary hearing to resolve that dispute or defer resolution of the dispute until trial.

North Sails Group, LLC *v.* Boards & More GmbH

Regardless of whether one or both parties proffer evidence on the jurisdictional question, and regardless of whether there is any material factual dispute, the federal courts routinely characterize the plaintiff's burden as a "prima facie" showing because the plaintiff need only make "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Canciani*, 525 Fed. Appx. 8, 10 (2d Cir. 2013); see, e.g., *Druck Corp.* v. *Macro Fund (U.S.) Ltd.*, 102 Fed. Appx. 192, 193–94 (2d Cir. 2004) (applying prima facie standard despite lack of any factual dispute); *Pecoraro* v. *Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003) (concluding, on basis of undisputed allegations, that "[the plaintiff] has made the requisite prima facie showing of minimum contacts"); *Djordjevich* v. *Bundesminister Finanzen, Germany*, Docket No. 93-7149, 1997 WL 530499, *2–3 (D.C. Cir. July 21, 1997) (decision without published opinion, 124 F.3d 1309) (similar); *PDK Labs, Inc.* v. *Friedlander*, 103 F.3d 1105, 1109 (2d Cir. 1997) ("[the plaintiff's] allegations—uncontested in material part— regarding [the defendant's] actions satisfy its prima facie burden"); *Stone* v. *Chung Pei Chemical Industry Co., Ltd.*, 790 F.2d 20, 22 (2d Cir. 1986) (similar). This approach, as followed by the United States Court of Appeals for the Second Circuit, has been summarized as follows: "Whatever procedural path the [trial] court chooses to follow determines the plaintiff's burden of proof and the standard to be applied on appeal. If the court chooses to rely on pleadings and affidavits, the plaintiff need only make a prima facie showing of personal jurisdiction over [the] defendant. . . . However, if that initial decision is contested, the plaintiff must then prove, following discovery, either at a [pretrial] hearing or at trial, that jurisdiction exists by a preponderance of the evidence. . . . The [c]ourt may examine

North Sails Group, LLC *v.* Boards & More GmbH

the affidavits and depositions submitted by the parties to establish personal jurisdictional facts, so long as these documents are considered in the light most favorable to the [nonmoving] party. . . . While the plaintiff's prima facie showing may be established solely by allegations, [a]fter discovery, [that] showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. At that point, the prima facie showing must be factually supported.'' (Citations omitted; internal quotation marks omitted.) *Dubied Machinery Co.* v. *Vermont Knitting Co.*, Docket No. 85 Civ. 8610 (PKL), 1991 WL 84511, *1 (S.D.N.Y. May 14, 1991).[3]

The Appellate Court has followed suit, embracing the federal approach, which is well settled and universally recognized.[4] See *Designs for Health, Inc.* v. *Miller*, supra, 187 Conn. App. 12–13. This court has never held otherwise. Of course, if for some reason the majority

---

[3] Indeed, although in practice many cases will involve factual disputes, the majority has failed to identify a single case—and my own research has not revealed one—that specifically states that the prima facie standard applies only when material jurisdictional facts are in dispute. Literally scores of cases, by contrast, articulate the unqualified rule that, in the absence of an evidentiary hearing, a plaintiff need only make a prima facie showing that jurisdiction is proper. Nor does the majority offer any rationale for why the burden on the plaintiff would be *lower* when the defendant has actively contested jurisdiction than when the facts alleged by the plaintiff go undisputed.

[4] The majority attempts to distinguish *Designs for Health, Inc.*, because, in that case, some facts were in dispute. See part II A of the majority opinion. This factor bears no relevance to the proposition for which I cite the case. The Appellate Court in *Designs for Health, Inc.*, very clearly articulated and adopted the prevailing constitutional standard applied by the United States Court of Appeals for the Second Circuit and the other federal courts when a foreign defendant challenges the trial court's personal jurisdiction but no evidentiary hearing is requested or held. See *Designs for Health, Inc.* v. *Miller*, supra, 187 Conn. App. 12–13. In such a circumstance—i.e., precisely the circumstance in both *Designs for Health, Inc.*, and the present case—the plaintiff need only make a prima facie showing that jurisdiction is proper.

objects to using the label "prima facie" in this context, it is free to use other language to characterize the plaintiff's burden. The only important thing is that we hold fast to the well established rule that all facts and pleadings, and all reasonable inferences drawn therefrom, must be construed in favor of North Sails at this stage. As I discuss in this opinion, I fear that the majority loses sight of this important requirement at numerous points.

Second, when the trial court has not engaged in jurisdictional fact-finding, a motion to dismiss for lack of personal jurisdiction presents a legal question over which this court exercises de novo review. See *Kenny* v. *Banks*, 289 Conn. 529, 532, 958 A.2d 750 (2008). When "an evidentiary hearing was not requested . . . by either party, we will accept, as the trial court should, *all* undisputed factual allegations for the purpose of determining whether the plaintiffs have sustained their burden of proving that the court had personal jurisdiction . . . ." (Emphasis added.) *Knipple* v. *Viking Communications, Ltd.*, 236 Conn. 602, 608–609, 674 A.2d 426 (1996); see also *Golodner* v. *Women's Center of Southeastern Connecticut, Inc.*, 281 Conn. 819, 826, 917 A.2d 959 (2007) ("a motion to dismiss admits *all* facts well pleaded and invokes *any* record that accompanies the motion, including supporting affidavits that contain undisputed facts" (emphasis added)). In this context, de novo review entails independent appellate consideration of the entire record for constitutionally relevant minimum contacts. See, e.g., *Xena Investments, Ltd.* v. *Magnum Fund Management Ltd.*, 726 F.3d 1278, 1283–84 (11th Cir. 2013) (concluding that personal jurisdiction was proper on basis of de novo review of record); *Mellon Bank (East) PSFS, National Assn.* v. *Farino*, 960 F.2d 1217, 1224 (3d Cir. 1992) ("a court is required to make an independent factual assessment of a defendant's contacts with the forum"); *Vons Companies, Inc.* v. *Seabest Foods, Inc.*, 14 Cal. 4th 434, 449,

North Sails Group, LLC *v.* Boards & More GmbH

926 P.2d 1085, 58 Cal. Rptr. 2d 899 (1996) (''[w]hen no conflict in the evidence exists . . . the question of [personal] jurisdiction is purely one of law and the reviewing court engages in an independent review of the record''), cert. denied sub nom. *Washington Restaurant Management, Inc.* v. *Vons Companies, Inc.*, 522 U.S. 808, 118 S. Ct. 47, 139 L. Ed. 2d 13 (1997); *VKGS, LLC* v. *Planet Bingo, LLC*, 285 Neb. 599, 612, 828 N.W.2d 168 (2013) (reversing trial court's dismissal of action for lack of personal jurisdiction after independently reviewing complaint and affidavits in light most favorable to plaintiff); *Guffey* v. *Ostonakulov*, 321 P.3d 971, 975 (Okla. 2014) (''[t]he determination of in personam jurisdiction is a legal ruling, subject to de novo review by this [c]ourt, and this [c]ourt will canvas[s] the record for proof that the nonresident party had sufficient contacts'' (emphasis omitted; footnote omitted)).

Third, I agree with the majority that the trial court went astray when it concluded that the present case was governed by the decision of the United States Supreme Court in *Bristol-Myers Squibb Co.* v. *Superior Court*, U.S. , 137 S. Ct. 1773, 198 L. Ed. 2d 395 (2017). See footnote 8 of the majority opinion. Applying well established law, *Bristol-Myers Squibb Co.*, which addressed the question of personal jurisdiction in a product liability action, held that specific personal jurisdiction regarding certain plaintiffs' claims was lacking because the injuries alleged to have resulted from the defendant's pharmaceutical products did not occur in the forum state. See *Bristol-Myers Squibb Co.* v. *Superior Court*, supra, 1781–83. The trial court in the present case, apparently under the belief that the same analysis applies in contract cases, proceeded on the assumption that the only jurisdictionally relevant fact was that the alleged contractual breach—B&M's decision to rebrand its products with an in-house trademark rather than the North Marks, without adequate warning to North

340 Conn. 266 DECEMBER, 2021 333

North Sails Group, LLC *v.* Boards & More GmbH

Sails—transpired in Europe and not Connecticut. The trial court readily acknowledged that B&M benefitted from its ongoing dealings with a Connecticut company, that B&M had many mail, telephone, and electronic communications and one in-person contact with North Sails in Connecticut over the parties' eighteen year relationship, that North Sails suffered harm from the alleged breach in Connecticut, that B&M's attorneys contacted North Sails in Connecticut regarding the alleged breach (prior to litigation), and that some of the branded products at issue were sold in Connecticut. But, in light of *Bristol-Myers Squibb Co.*, the court mistakenly concluded that all of those contacts were irrelevant to the constitutional analysis.

I agree with the majority that *Bristol-Myers Squibb Co.* does not govern the present case. Rather, in a breach of contract action brought against a foreign defendant, as long as the cause of action either "arise[s] out of or relate[s] to" a contractual relationship that establishes sufficient minimum contacts with the forum state, the minimum contacts prong of the due process analysis is satisfied. (Internal quotation marks omitted.) *Middleton* v. *Green Cycle Housing, LLC*, 689 Fed. Appx. 12, 13 (2d Cir. 2017); see also *Ford Motor Co.* v. *Montana Eighth Judicial District Court*, U.S. , 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (cause of action need only relate to defendant's minimum contacts with forum state).[5] Indeed, it is black letter law that minimum contacts sufficient for personal jurisdiction to attach may be established by the conduct of the parties during the contract negotiation process, by the terms of the contract itself, and by the parties' contemplated future

---

[5] If there were any doubt, the United States Supreme Court clarified in *Ford Motor Co.* that *Bristol-Myers Squibb Co.* stands only for the proposition that due process requires that there be some "connection between the forum and the specific claims at issue . . . ." (Internal quotation marks omitted.) *Ford Motor Co.* v. *Montana Eighth Judicial District Court*, supra, 141 S. Ct. 1031.

North Sails Group, LLC *v.* Boards & More GmbH

consequences and actual course of dealing over the course of the contractual relationship. See *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 479. Where the alleged breach of contract took place is, therefore, only one of many factors to be considered as part of the totality of the circumstances.[6] See, e.g., *General Electric Co.* v. *Deutz AG*, supra, 270 F.3d 150–51; *Max Ten Marketing, LLC* v. *Marketech, Inc.*, Docket No. 11-1823 (RMB/AMD), 2012 WL 12898795, *2 (D.N.J. December 12, 2012). As I shall discuss, the failure of the majority to consider on appeal the entire trial record is especially concerning because the trial court failed to conduct its analysis of the record under the correct minimum contacts standard.

Fourth, as I noted, the United States Supreme Court's personal jurisdiction cases require us to consider the *totality* of the defendant's relevant contacts with Connecticut and to view them in the light most favorable to the party asserting jurisdiction. See, e.g., *Eades* v. *Kennedy, PC Law Offices*, 799 F.3d 161, 169 (2d Cir. 2015). Although the majority insists that it conducts a proper totality of the circumstances analysis, I find that, in virtually each step in its analysis, the majority mini-

---

[6] Courts have emphasized in this respect that establishing that the defendant's contacts with the forum state arise from or are related to the cause of action is a relaxed, flexible, and lenient standard. See, e.g., *Avocent Huntsville Corp.* v. *Aten International Co., Ltd.*, 552 F.3d 1324, 1330–31 (Fed. Cir. 2008), cert. denied, 557 U.S. 904, 129 S. Ct. 2796, 174 L. Ed. 2d 292 (2009); *Air Products & Controls, Inc.* v. *Safetech International, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007); *Ticketmaster-New York, Inc.* v. *Alioto*, 26 F.3d 201, 206 (1st Cir. 1994); see also *Russell* v. *SNFA*, 987 N.E.2d 778, 797 (Ill.) (citing cases), cert. denied, 571 U.S. 886, 134 S. Ct. 295, 187 L. Ed. 2d 152 (2013); L. Graham, "The Personal Jurisdiction Effect of Notifications of Infringement," 78 J. Pat. & Trademark Off. Society 858, 863 (1996) (relatedness requirement is easily satisfied); G. Miller, "In Search of the Most Adequate Forum: State Court Personal Jurisdiction," 2 Stan. J. Complex Litig. 1, 21 (2014) (" '[m]inimum' in [the personal jurisdiction] context means both that the required contacts need only exceed a certain threshold, and also that the threshold is not demanding").

North Sails Group, LLC *v.* Boards & More GmbH

mizes the contacts at issue by contending or citing authorities stating that this or that factor, *taken alone* or *by itself*, does not necessarily suffice to confer jurisdiction. We see this, for example, in (1) the majority's consideration of the fact that Marchand, B&M's chief executive officer, personally visited North Sails in Connecticut in 2003, (2) the majority's treatment of various provisions of the parties' contract that allowed North Sails to exercise oversight of B&M from Connecticut, to request that product samples be sent to Connecticut for review, and to regularly receive and review B&M's financial statements and royalty reports in Connecticut, and (3) with respect to B&M's hundreds of electronic and telephonic communications with North Sails in Connecticut. North Sails is not contending that any individual contact, standing alone, establishes jurisdiction. North Sails simply asks this court to follow the well established law and assess *all* of B&M's contacts with Connecticut in their totality. Indeed, the federal courts of appeals routinely have rejected the approach taken by the majority, which discounts each individual contact as less than the sum of the parts. See, e.g., *Universal Leather, LLC* v. *Koro AR, S.A.*, 773 F.3d 553, 561 (4th Cir. 2014) (holding that District Court erred in viewing each of defendant's contacts with forum "in isolation from the totality of the facts before the court [rather than] considered as a whole"), cert. denied, 576 U.S. 1035, 135 S. Ct. 2860, 192 L. Ed. 2d 896 (2015); *Chloé* v. *Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010) (court must consider totality of defendant's contacts rather than look at factors in isolation); *Mid-America Tablewares, Inc.* v. *Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1361 (7th Cir. 1996) ("by discussing its contacts with Wisconsin in isolation and suggesting that none alone establishes the requisite minimum contacts, [the defendant] fails to appreciate that the minimum contacts inquiry is one that examines the

totality of the circumstances''); *Northrup King Co.* v. *Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1388 (8th Cir. 1995) (''[The defendant] wrongly attempts to treat each category of [the] numerous and significant communications separately. . . . In determining whether there is personal jurisdiction, the courts consider the defendant's contacts with the forum in the aggregate, not individually; they look at the totality of the circumstances.'' (Citations omitted.)). The remainder of this opinion explains why B&M's various contacts with Connecticut—taken together, viewed under the applicable prima facie standard, and considered in light of the relevant case law—were more than enough to subject it to jurisdiction in our state courts.

II

The first and most fundamental flaw in the majority's analysis is that it fails to give any weight at all to the fact that the parties were engaged in a decades long business partnership rather than a single product sale or some one-off contractual arrangement. Both the United States Supreme Court and sister courts have made clear that jurisdiction is proper under circumstances such as these.

A

The United States Supreme Court set forth the governing rule very clearly in *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 462, the leading case on the subject of personal jurisdiction when there is a direct contractual relationship between the parties: ''[W]ith respect to interstate contractual obligations, we have emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other [s]tate for the consequences of their activities.'' (Internal quotation marks omitted.) Id., 473. The court evidently thought this principle

important enough that the court reiterated—indeed, amplified—it just a few pages later in the decision: "[When] the defendant deliberately has engaged in significant activities within a [s]tate . . . or has created continuing obligations between [itself] and residents of the forum . . . [it] manifestly has availed [itself] of the privilege of conducting business there, and because [its] activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require [it] to submit to the burdens of litigation in that forum as well." (Citations omitted; internal quotation marks omitted.) Id., 475–76. Put differently, by knowingly entering into a long-term contractual relationship that contemplates and entails an ongoing course of dealing of substantial commercial importance to both parties, implicating rights, obligations, communications, and consequences flowing into and out of Connecticut, all of which are integral to contractual performance, a foreign corporation subjects itself to regulation and sanctions in this state for its contract related activities. See id., 479.

One would think that this would be the end of the story. The simple reality is that B&M entered into a contractual relationship that undisputedly created "continuing obligations" between itself and a forum resident and, therefore, according to the United States Supreme Court, "presumptively" subjected itself to jurisdiction in Connecticut. (Internal quotation marks omitted.) Id., 476. The contractual relationship between these particular parties, moreover, was not merely executory or prospective in nature; the parties actively performed their reciprocal and mutual obligations without interruption for eighteen consecutive years.[7]

[7] Courts consistently have held that the duration of the contractual relationship, as well as its quality, has legal significance. See, e.g., *Financial Software Systems, Inc.* v. *Questrade, Inc.*, Docket No. 18-742, 2018 WL 3141329, *5 (E.D. Pa. June 27, 2018) ("[t]he longer the duration of a contract, the more likely that a party is subject to the personal jurisdiction of its counterparty's forum state"); *Blessey Marine Services, Inc.* v. *Jeffboat, LLC*,

North Sails Group, LLC *v.* Boards & More GmbH

The majority rejects this reading of *Burger King*. Rather than take the cited passages at face value, the majority focuses on other language in *Burger King*, first, the court's statement regarding the so-called " 'purposeful availment' " requirement; id., 475; and, second, a footnote that addresses some concerns unique to the retail franchise context. I consider each passage in turn.

1

The majority emphasizes—indeed, its entire argument hangs on—the following language in *Burger King*:

Docket No. 10-1863, 2012 WL 12986645, *5 (E.D. La. March 30, 2012) ("because the [p]laintiff has presented evidence that [the] [d]efendant's contacts at issue go beyond a single [onetime] purchase of goods, the [c]ourt may consider the duration of the relationship between the parties"); *Lively* v. *IJAM, Inc.*, 114 P.3d 487, 497 (Okla. Civ. App. 2005) ("factors such as the duration of a defendant's relationship with the forum state must be considered"). The duration of the contractual relationship matters because the relevant due process (i.e., minimum contacts) principles will apply very differently to a foreign defendant who makes a single purchase from a Connecticut business on one occasion as compared to a foreign defendant who enters into a contractual relationship with a Connecticut business and annually engages in hundreds of thousands of dollars of trade pursuant to that contract over a period of eighteen years.

Moreover, it is clear that the *anticipated* duration of a contractual relationship, and not merely the actual duration, can support a finding of minimum contacts. Numerous cases treat as an important factor the fact that the parties anticipated entering into a relationship of substantial duration, even though the lengthy duration was cut short by unanticipated events. See, e.g., *Citadel Group Ltd.* v. *Washington Regional Medical Center*, 536 F.3d 757, 764 (7th Cir. 2008) ("although the parties had not finalized a long-term relationship yet, during the months prior to closing they were certainly contemplating that one would exist"); *Brookfield Machine, Inc.* v. *Calbrit Design*, 929 F. Supp. 491, 495, 499 (D. Mass. 1996) (anticipated three year duration of agreement supported finding of jurisdiction, notwithstanding fact that relationship was terminated after less than six months); *McKesson Corp.* v. *Hackensack Medical Imaging*, 197 N.J. 262, 278, 962 A.2d 1076 (2009) (relying on fact that "[the] defendant entered into what was intended to be a long-term commercial relationship with [the] plaintiff"); *Harrelson Rubber Co.* v. *Layne*, 69 N.C. App. 577, 583, 317 S.E.2d 737 (1984) (it was important that "the parties anticipated they would have a long, profitable relationship" rather than isolated transactions (internal quotation marks omitted)). This principle flows directly from the United States Supreme Court's statement in *Burger King* that the "contemplated future consequences" of a contractual relationship can be important minimum contacts.

North Sails Group, LLC *v.* Boards & More GmbH

" 'The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum [s]tate. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws.' " Id., 474–75. Another version of this language, which traces its origins to *Hanson* v. *Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958), appears in a more recent United States Supreme Court case, *Walden* v. *Fiore*, 571 U.S. 277, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014): "[T]he relationship must arise out of contacts that the defendant *himself* creates with the forum [s]tate. . . . We have consistently rejected attempts to satisfy the defendant-focused minimum contacts inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum [s]tate. . . . [The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum [s]tate to justify an assertion of jurisdiction . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 284.

The majority interprets this language to essentially read North Sails' location, and its activities at that location, out of the minimum contacts equation. In the majority's view, the fact that North Sails resides and conducts its affairs in the forum state is irrelevant, as are all of North Sails' activities undertaken in performance of its contractual obligations. If that were not enough, the majority also believes that even B&M's own

*Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 479; see, e.g., *Citadel Group Ltd.* v. *Washington Regional Medical Center*, supra, 764 (applying *Burger King*).

interactions with North Sails in the forum state are
"ancillary or incidental" and, thus, largely irrelevant if
they result only from the "fortuitous" fact that North
Sails made a "unilateral" choice to reside in that state.
See part I B of the majority opinion. The majority thus
dismisses out of hand most of B&M's many contacts
with Connecticut because "the contract did not envision
that B&M would deliberately engage in activity in Con-
necticut or have continuous obligations with Connecti-
cut. Any link to Connecticut was merely because [North
Sails was located there], which was a matter of happen-
stance that could have changed at any time." Id.

I strongly disagree with the majority's view that
*Burger King* and *Walden* support its theory that North
Sails—its location and activities in the forum state—is
irrelevant and that jurisdiction cannot attach unless
B&M itself opts to engage with Connecticut qua Con-
necticut. There are at least four reasons why the majori-
ty's reading of *Burger King* and *Walden* is untenable.

a

First, as I noted, the plain language of *Burger King*,
the leading case on the subject, flatly contradicts the
majority's construction. *Burger King* holds, in broad,
clear, and unequivocal terms, that creating continuing
contractual obligations with a forum resident subjects
a foreign defendant to jurisdiction in the forum. As I
discuss more fully hereinafter, countless federal and
sister state decisions have taken this prominent lan-
guage at face value, reading *Burger King* to mean that
knowingly entering into a long-term contractual rela-
tionship with a forum resident presumptively gives rise
to the minimum contacts necessary for jurisdiction to
attach. See footnote 12 of this opinion. We should be
able to agree that an argument is fatally flawed if it
fails to account for the most prominent language used

340 Conn. 266 DECEMBER, 2021 341

North Sails Group, LLC *v.* Boards & More GmbH

by the United States Supreme Court to summarize the holding of the leading case on the subject.[8]

b

Second, the majority misinterprets the language in *Burger King* and *Walden* indicating that the defendant's minimum contacts with the forum state must arise from its own intentional conduct rather than from the plaintiff's unilateral connections to the forum. The majority construes this language without analyzing its contextual meaning or harmonizing it with *Burger King*'s very clear holding about the presumptive jurisdiction created by contract based continuing obligations.

*Burger King* invokes the purposeful availment concept in the course of explaining "when it is that a potential defendant should 'reasonably anticipate' out-of-state litigation . . . ." *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 474. The court elaborated: "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum [s]tate. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." (Internal quotation marks omit-

---

[8] The majority contends, and I agree, that the mere fact that a foreign defendant has entered into a *contract* with a resident of the forum state does not, ipso facto, create the minimum contacts necessary for personal jurisdiction to exist. The majority fails, however, to acknowledge *Burger King*'s fundamental distinction between the mere act of contracting with a forum resident and entering into a contractual *relationship* that creates continuing obligations to residents of the forum state. To the extent that the majority's position is that *Burger King* requires that a defendant create continuing obligations with forum residents other than the plaintiff for jurisdiction to be proper, that proposition is unsupported by any precedent and is belied by *Burger King* itself, as well as the many cases cited in footnote 12 of this opinion.

ted.) Id., 474–75. The very next sentence in *Burger King* reiterates that the exercise of jurisdiction, to be predictable and fair, must not emanate from contacts that the defendant does not intend or control: "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts . . . or of the unilateral activity of another party or a third person . . . ." (Citations omitted; internal quotation marks omitted.) Id., 475.

This uncontroversial observation hardly erects a significant jurisdictional barrier in a case like the present one, in which the mutuality of the contractual relationship stands in stark contrast to the kind of unilateral activity of another party that *Burger King* says will not create the necessary minimum contacts. When the United States Supreme Court has discussed what it means by "random, fortuitous, or attenuated contacts," it has held up as exemplars cases such as *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286, 288, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980), in which a car sold in New York by a New York dealership to New York residents happened to be involved in an accident while passing through Oklahoma, and *Walden* v. *Fiore*, supra, 571 U.S. 279–80, in which a Georgia police officer wrongly confiscated funds at an Atlanta airport from travelers who happened to be en route to Nevada. In each case, there was absolutely nothing in the conduct of the defendants or the nature of the transactions that reflected a voluntary choice to engage in activities occurring in the forum state or that made it likely that the defendants would be haled into court in Oklahoma or Nevada, respectively. By contrast, in those cases in which a defendant knowingly entered into a long-term relationship with a forum resident, the high court has found that specific jurisdiction attached, even when the defendant's contacts with the forum state were limited

340 Conn. 266 DECEMBER, 2021 343

North Sails Group, LLC *v.* Boards & More GmbH

to that one relationship and even when they fully depended on the fact that the plaintiff happened to reside in the forum. See, e.g., *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 474; see also *McGee* v. *International Life Ins. Co.*, 355 U.S. 220, 222, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957) (defendant insurer's only contact with forum state was having assumed insurance contract with plaintiff, a California resident).[9]

The federal courts have understood that *Burger King*'s "random, fortuitous, or attenuated" language simply recognizes that a defendant may provide or receive a product, service, or payment under circumstances that do not create the kind of "continuing [contractual] relationships and obligations with citizens of another state" that *Burger King* instructs *will* serve as the basis for personal jurisdiction. (Internal quotation marks omitted.) *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 473, 475. The limitation has been applied, for example, with respect to transactions involving a onetime product sale or short-term service contract to be performed entirely outside of the forum state; see, e.g., *Wilkerson, Tate & Williams, LLC* v. *Bouza*, Docket No. 97-31259, 1998 WL 857883, *1–2 (5th Cir. November 18, 1998) (decision without published opinion, 163 F.3d 1356); *Chung* v. *NANA Development Corp.*, 783 F.2d 1124, 1125–26 (4th Cir.), cert. denied, 479 U.S. 948, 107 S. Ct. 431, 93 L. Ed. 2d 381 (1986); or when a plaintiff

_____

[9] The majority seeks to distinguish *McGee*, in which the United States Supreme Court held that jurisdiction attached when an out-of-state resident entered into a long-term contract with a single forum resident, by noting that *McGee* involved an insurance contract, but the majority offers no explanation as to why that distinction makes a difference. See footnote 14 of the majority opinion. The majority also notes that *McGee* predated *Walden*. See id. True enough, but *Walden* never even remotely suggests that the decision in that case either overrules *McGee* or reshapes the law of personal jurisdiction. See, e.g., *Curry* v. *Revolution Laboratories, LLC*, 949 F.3d 385, 396 (7th Cir. 2020) ("[i]n the last decade, the [United States] Supreme Court has confirmed that the inquiry into specific jurisdiction has not changed"), citing *Walden* v. *Fiore*, supra, 571 U.S. 291.

unilaterally relocates to the forum state after having entered into a contract with the defendant. See, e.g., *Rambo* v. *American Southern Ins. Co.*, 839 F.2d 1415, 1420–21 (10th Cir. 1988); *Tidy Car International, Inc.* v. *Firestine*, 810 F. Supp. 199, 201, 205 (E.D. Mich. 1993). Those are the sorts of unilateral, ancillary connections with the forum state that the United States Supreme Court has indicated are insufficient to confer jurisdiction because they arise solely from the fact that the plaintiff happens to be a forum resident.

By contrast, more substantial contractual relationships are not unilateral in nature, which is why *Burger King* emphasizes that, by entering into a contractual *relationship* entailing mutual obligations, "it is presumptively not unreasonable to require [the defendant] to submit to the burdens of litigation in that forum as well." *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 476. When a commercial entity knowingly and voluntarily *chooses* to become business partners with a resident of a state, and follows through by engaging in a long-term relationship, it necessarily accepts a connection with the state itself—its laws, economy, transportation and communication infrastructure, and other residents—in all sorts of ways, both predictable and unexpected, such that it should reasonably anticipate the possibility that a contract related dispute may be adjudicated by that state's courts.

*Walden* warrants further attention in this regard because it plays such a prominent role in the majority's analysis. The majority cites *Walden* no fewer than ten times for the proposition that the defendant's knowledge that the plaintiff will perform its contractual obligations or suffer injury in the forum is irrelevant in assessing minimum contacts because it is only the *defendant's* contacts with the forum state that are constitutionally relevant. *Walden* is a constitutional tort case, not a contract case, and the only contact with

340 Conn. 266 DECEMBER, 2021 345

North Sails Group, LLC *v.* Boards & More GmbH

the forum state of Nevada was that the defendant had allegedly confiscated funds at an Atlanta airport from travelers who were en route from Puerto Rico to Las Vegas. See *Walden* v. *Fiore*, supra, 571 U.S. 279–80. Although the defendant police officer may have been aware that the plaintiffs happened to be Nevada residents, that mere knowledge, standing alone, did not bespeak a voluntary choice to engage with Nevada, any more than he chose to engage with any of the other states when he interacted with residents of those states as they passed through Atlanta. Indeed, just this year, the United States Supreme Court emphasized that jurisdiction was lacking in *Walden* because the defendant "had never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada"; (internal quotation marks omitted) *Ford Motor Co.* v. *Montana Eighth Judicial District Court*, supra, 141 S. Ct. 1031; all contacts that B&M *did* have with Connecticut in the present case.

The United States Supreme Court has never applied the cited language, or the underlying principle, to bar jurisdiction in a contract case like this one, and the majority's heavy reliance on *Walden* exposes the central flaw in its argument. The issue is not, as the majority contends, whether B&M's contacts with Connecticut flow largely[10] from the fact that North Sails is a Connecticut resident. In the context of the present case, there was never anything fortuitous about B&M's contact with Connecticut. B&M affirmatively chose to enter into a long-term partnership with a Connecticut resident. It knew from the outset that North Sails would perform its contractual obligations in Connecticut and that B&M might at any time be required to do so as well.[11] B&M's chief executive officer deliberately visited Connecticut

[10] Though not entirely. See part III F of this opinion.

[11] See part III C of this opinion (North Sails had right to require B&M to send products and materials into Connecticut for inspection).

North Sails Group, LLC *v.* Boards & More GmbH

for a business meeting with North Sails in 2003, and, as the years passed, B&M well knew that Connecticut would serve as the source of and destination for countless substantive communications critical to some aspect of contractual performance. B&M knew that it would enjoy the protections of Connecticut's laws in connection with everything that made contractual performance possible, and, not insignificantly given its volume of business, B&M knew that a successful contractual relationship would redound to the economic benefit of Connecticut, whereas the adverse impacts of any breach would be felt here. These contacts are deliberate, purposeful and substantial, not random, fortuitous, and attenuated, and jurisdiction over B&M is therefore proper in Connecticut.

c

Third, the majority fails to consider the underlying principles that animate the United States Supreme Court's personal jurisdiction jurisprudence. The primary concern motivating the high court's personal jurisdiction case law—an offshoot of its due process jurisprudence—is that the defendant have "fair warning" and that the rules "[give] a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit . . . ." (Citation omitted; internal quotation marks omitted.) *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 472; see also *Ford Motor Co.* v. *Montana Eighth Judicial District Court*, supra, 141 S. Ct. 1030 (emphasizing importance that defendant have "predictable," "clear notice" that it will be subject to jurisdiction in forum (internal quotation marks omitted)). The defendant in *Walden* lacked any such notice. Exercising jurisdiction in a case such as the present one, by contrast, is eminently foreseeable to the out-of-state party, insofar as (1) a long-term business rela-

North Sails Group, LLC *v.* Boards & More GmbH

tionship typically will entail various contacts and communications, both physical and electronic, with residents of the forum state; see parts III A and B of this opinion; (2) in most instances the forum resident can be expected to fulfill some or all of its contractual obligations, reap the financial benefits of the relationship, and suffer any contract related damages in the forum state; see part III C of this opinion; and (3) a forum resident reasonably can be expected to seek to vindicate its rights in the most convenient and familiar forum. See, e.g., *Ford Motor Co.* v. *Montana Eighth Judicial District Court*, supra, 1031 (plaintiffs' home state, where injuries were suffered, is "the most natural [s]tate" in which to bring action); D. Kelly & C. Hieber, "Untangling a Web of Minimum Contacts: The Internet and Personal Jurisdiction in Trademark and Unfair Competition Cases," 87 Trademark Rep. 526, 526 (1997) ("a plaintiff typically desires to sue in its home state").

Along with predictability, the other primary values driving the United States Supreme Court's personal jurisdiction jurisprudence are the principles of fairness (i.e., voluntariness) and interstate federalism, that is, that the state most directly impacted by an alleged wrong should be able to provide a convenient forum for redressing the injury. See, e.g., *Ford Motor Co.* v. *Montana Eighth Judicial District Court*, supra, 141 S. Ct. 1031. The exercise of personal jurisdiction over B&M in Connecticut under these circumstances not only is foreseeable, it is also fair. It satisfies the purposeful availment requirement of *International Shoe* and its progeny, insofar as anyone who knowingly and deliberately engages in continuous and robust business dealings with a Connecticut resident over the course of almost two decades benefits in various ways from the protections of our state's laws. See *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 475–76; see also part III D of this opinion (discussing benefits enjoyed by B&M

North Sails Group, LLC *v.* Boards & More GmbH

by virtue of its dealings with North Sails); *Vance's Foods, Inc.* v. *Special Diets Europe Ltd.*, Docket No. 2:11-cv-02943-MCE-GGH, 2012 WL 1353898, *3 (E.D. Cal. April 16, 2012) ("[t]he requirement of purposeful availment is based on the presumption that it is reasonable to require a defendant who conducts business and benefits from his activities in a state to be subject to the burden of litigating in that state as well" (internal quotation marks omitted)).

It is very difficult for me to see how resolving the case in Connecticut is unfair to B&M, a major international corporation with a strong presence in the United States, and, indeed, a company that according to its own website has built its core business on the back of a long-term partnership with a Connecticut resident. In light of the cases I cite in this opinion, B&M should reasonably have anticipated (I would say fully expect) that North Sails would seek to hale it into court in Connecticut in the event of a contractual breach. The majority has failed to identify any other state in which jurisdiction would be more appropriate; nor has it explained why a major international retailer, the business model of which depends on the use of a license situated in Connecticut, should be able to fully evade jurisdiction in the United States. B&M had every opportunity to structure its affairs to avoid being sued in Connecticut, if that was its desire, and it failed to do so. See *Ford Motor Co.* v. *Montana Eighth Judicial District Court*, supra, 141 S. Ct. 1025; *World-Wide Volkswagen Corp.* v. *Woodson*, supra, 444 U.S. 297; *Illinois* v. *Hemi Group, LLC*, 622 F.3d 754, 758 (7th Cir. 2010). Due process would not be offended by calling B&M to account in Connecticut for its alleged misconduct under its contract.

d

Fourth, the vast majority of federal and sister state courts have rejected the majority's unconventional,

North Sails Group, LLC *v.* Boards & More GmbH

overly restrictive reading of *Burger King* for precisely the reasons that I have discussed. Indeed, countless cases have expressly held that, although it is the defendant's own contacts with the forum state and not those of the plaintiff that are relevant to the minimum contacts calculus, a defendant's voluntary choice to enter into a long-term relationship with a forum resident *is* just the sort of direct contact that creates continuing obligations and constitutes purposeful availment of the forum state's laws and protections under *Burger King*.[12]

---

[12] See, e.g., *Benton* v. *Cameco Corp.*, 375 F.3d 1070, 1078 (10th Cir. 2004) ("When [the defendant] negotiated and entered into the [memorandum of understanding] in 1994, it voluntarily and knowingly entered into a relationship with a Colorado resident. Thus, [the defendant] purposefully directed [its] activities at residents of the forum . . . ." (Internal quotation marks omitted.)), cert. denied, 544 U.S. 974, 125 S. Ct. 1826, 161 L. Ed. 2d 723 (2005); *Cole* v. *Mileti*, 133 F.3d 433, 436 (6th Cir.) ("[when] a nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to an Ohio resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in Ohio"), cert. denied, 525 U.S. 810, 119 S. Ct. 42, 142 L. Ed. 2d 32 (1998); *Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, 988 F.2d 476, 482–83 (3d Cir. 1993) (holding that jurisdiction was proper when defendant "engaged in negotiations for an agreement that would have created rights and obligations among citizens of the forum and contemplated significant ties with the forum"); *Associated Business Telephone Systems Corp.* v. *Greater Capital Corp.*, 861 F.2d 793, 797 (3d Cir. 1988) ("by entering into a [long-term] contract [the defendant] had created continuing obligations between itself and [the plaintiff], a business located in New Jersey"); *Mississippi Interstate Express, Inc.* v. *Transpo, Inc.*, 681 F.2d 1003, 1008 (5th Cir. 1982) ("the [nonresident] defendant . . . by contracting with . . . the resident plaintiff . . . is considered to have purposefully availed itself of the privilege of conducting activities within the forum if it was reasonably foreseeable that [the resident plaintiff] would in fact perform a material part of its contractual obligations within the forum state"); *In re Customs & Tax Administration of the Kingdom of Denmark (SKAT) Tax Refund Litigation*, Docket Nos. 18-cv-5053 (LAK) and 18-md-2865 (LAK), 2020 WL 70938, *1 (S.D.N.Y. January 7, 2020) ("[b]y engaging in a long-term business relationship with a New York entity, [the defendant] purposefully availed itself of the benefits of doing business in New York"); *Western Dental Services, Inc.* v. *Media Direct, Inc.*, Docket No. SA CV 19-0318-DOC (JDEx), 2019 WL 6998762, *5 (C.D. Cal. July 19, 2019) ("[b]ecause [the] [p]laintiff has adequately established the existence of a [multiyear] contract between [the] [p]laintiff and [the] [d]efendant, which was targeted at a California

North Sails Group, LLC *v.* Boards & More GmbH

In part II C of this opinion, I discuss several of these

corporation and from which [the] [d]efendant benefitted, the [c]ourt finds the [d]efendant purposefully availed itself of the forum state”); *Maine Community Health Options* v. *Walgreen Co.*, Docket No. 18-mc-0009, 2018 WL 6696042, *5 (W.D. Wis. December 20, 2018) (“[g]iven that [the defendant] purposely availed itself of the opportunity to do business with a Wisconsin company and to communicate with that company on a regular basis, it should reasonably have expected that it could be haled into a Wisconsin court”); *Venuto* v. *Atlantis Motor Group, LLC*, Docket No. 17-3363 (RBK/KMW), 2018 WL 2134035, *3 (D.N.J. May 9, 2018) (“[the defendant] purposefully availed itself of the forum when it decided to engage in business with a New Jersey citizen and it was on notice that it could be haled into court in New Jersey, if only because the prospect of litigation attaches, even if only remotely, to any such deal”); *SWMP, LLC* v. *Downs Racing, L.P.*, Docket No. 12-2608-JWL, 2012 WL 5354602, *3 (D. Kan. October 30, 2012) (“[The] [d]efendant’s contacts with Kansas were not merely random or fortuitous; rather, it reached out beyond the borders of Pennsylvania and entered into a continuing relationship with citizens of Kansas. In doing so, [the] defendant purposefully availed itself of the benefits of [Kansas’] laws and should reasonably have anticipated being haled into court [there].”); *Vance’s Foods, Inc.* v. *Special Diets Europe Ltd.*, supra, 2012 WL 1353898, *5–6 (“[The defendant] knew that it was entering into a long-term contractual relationship with a company located in California . . . . Thus, [the defendant] has taken deliberate action within the forum state and has created continuing obligations to forum residents . . . .” (Citation omitted; internal quotation marks omitted.)); *Nielsen Idaho Tool & Engineering Corp.* v. *Scepter Corp.*, Docket No. 1:11-cv-00058-BLW, 2011 WL 4431751, *4 (D. Idaho September 22, 2011) (“[b]y entering into a continuing relationship with . . . an Idaho citizen, [the defendant] purposefully availed itself of the privileges and protections of doing business in Idaho”); *Engineered Medical Systems, Inc.* v. *Despotis*, Docket No. 1:05-CV-0170-DFH-TAB, 2005 WL 2922448, *3 (S.D. Ind. November 4, 2005) (“[w]hen [the defendant] deliberately entered into a long-term contractual relationship with . . . an Indiana corporation, he purposefully availed himself of the privilege of conducting business in Indiana”); *Comerota* v. *Vickers*, 170 F. Supp. 2d 484, 489 (M.D. Pa. 2001) (“[T]he defendants created minimum contacts with Pennsylvania. They availed themselves of the opportunity to do business with a Pennsylvania resident. Although the business relationships at issue here began outside of Pennsylvania, the defendants were notified of [the] plaintiff’s move to the [c]ommonwealth and voluntarily continued to do business with him over the next several months while he was in Pennsylvania.”); *Eaton Corp.* v. *Maslym Holding Co.*, 929 F. Supp. 792, 797 (D.N.J. 1996) (“long-term commitments with state residents contribute to establishing minimum contacts with the forum, as they create ‘continuing obligations’ among the parties”); *Russell* v. *SNFA*, 987 N.E.2d 778, 796 (Ill.) (“[b]y engaging a business entity located in Illinois, [the] defendant undoubtedly benefitted from

North Sails Group, LLC *v.* Boards & More GmbH

cases in greater detail and explain why the primary case on which the majority relies, *Calphalon Corp.* v. *Rowlette*, 228 F.3d 718 (6th Cir. 2000), is unpersuasive. It is deeply unfortunate, in my view, that we have chosen to travel a path that locates Connecticut well outside of mainstream jurisprudence in this important area of the law.

2

The majority also contends that *Burger King* supports its due process analysis because, in footnote 28 of that opinion, the court cautioned that not every franchise relationship necessarily confers jurisdiction on the franchisee in the franchisor's home state. See *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 485 n.28. The majority interprets this "critical footnote"; part I A of the majority opinion; to mean that my position is flawed because, if even franchise relationships do not necessarily give rise to the types of minimum contacts

Illinois' system of laws, infrastructure, and business climate"), cert. denied, 571 U.S. 886, 134 S. Ct. 295, 187 L. Ed. 2d 152 (2013); *Crete Carrier Corp.* v. *Red Food Stores, Inc.*, 254 Neb. 323, 331–32, 576 N.W.2d 760 (1998) (finding sufficient minimum contacts under *Burger King* because defendants entered into ongoing contractual relationship with Nebraska resident); *Willbros USA, Inc.* v. *Certain Underwriters at Lloyds of London*, 220 P.3d 1166, 1173 (Okla. Civ. App. 2009) ("The appropriate question is not whether the defendant has sufficient contacts with the plaintiff, but whether the defendant has sufficient contacts with the forum state. . . . By choosing to do business with an Oklahoma company, [the defendant] purposefully availed itself of the privilege of conducting activities within Oklahoma." (Citations omitted; footnote omitted.)); *Peters* v. *Top Gun Executive Group*, 396 S.W.3d 57, 70 (Tex. App. 2013) ("when a single contract evidences that the parties sought to establish a long-term arrangement with [a] continuing relationship and obligations, it is likely that the nonresident purposefully availed itself of the forum" (internal quotation marks omitted)); *Raser Technologies, Inc.* v. *Morgan Stanley & Co., LLC*, 449 P.3d 150, 160, 162 (Utah 2019) (noting that "[t]he distinction between a defendant's contacts with the plaintiff and a defendant's contacts with the forum state itself is difficult to grasp in the abstract" and that, "[e]ven if the effects are felt by just the plaintiff in the state, if those effects are the product of a defendant purposefully reaching into the state, specific jurisdiction may exist").

North Sails Group, LLC *v.* Boards & More GmbH

necessary for jurisdiction to attach, then, surely, run-of-the-mill contractual relationships such as the one between North Sails and B&M fall short. The majority misses the point of footnote 28.

A big part of the battle in *Burger King* involved the David and Goliath aspect of some franchise relationships. The footnote appears in the part of *Burger King* where the majority addresses the argument by the defendant franchisee, and by Justice Stevens in dissent, that it may at times be unjust to force a franchisee to defend a lawsuit in the franchisor's home state because, first, the franchisee may fall victim to unfair play by the franchisor, including misrepresentation, fraud, duress, and contracts of adhesion; see *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 484, 486; and, second, the franchisee's relationship may be limited to communications in *its* home state with the franchisor's local representative, such that the franchisee does not reasonably anticipate being haled into court by the distant parent company.[13] See id., 480–85, 487–88. The court in *Burger King*, both in footnote 28 and in the accompanying text, merely acknowledges the unremarkable point that under such circumstances—"unfair business practices" in the inception or a "primarily intrastate" franchise relationship in which the out-of-state parent company is not an active participant—jurisdiction would not necessarily attach. Id., 485 and n.28. Footnote 28 has absolutely nothing to do with the present case. It cannot be invoked in support of the majority's theory that, when a foreign company freely and knowingly forms an ongoing, unmediated business relationship directly with a

---

[13] For example, Justice Stevens argued in his dissent that the defendant franchisee had done business primarily with the franchisor's local Michigan office, which was solely responsible for supervising his restaurant, and that the majority, by relying on boilerplate contract language referencing the franchisor's Florida headquarters, created a greater potential for unfairness in negotiations between franchisors and their franchisees. *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 487–89 (Stevens, J., dissenting).

340 Conn. 266 DECEMBER, 2021 353

North Sails Group, LLC *v.* Boards & More GmbH

forum resident, and in the absence of any suggestion that the parties' contract was born of fraud or duress, the foreign company has not created the sorts of continuing obligations that *Burger King* repeatedly says are sufficient to satisfy due process.

B

Part II A of this opinion explains why the language and reasoning of *Burger King* will not abide the restrictive reading that the majority seeks to impose on it. I now turn to the majority's effort to blunt the force of *Burger King* by distinguishing that case on its facts. In particular, the majority attempts to distinguish *Burger King* on the grounds that (1) *Burger King* involved a highly regulated franchise license that was more elaborate than the relationship at issue in the present case, and (2) the franchise agreement at issue in *Burger King* had a fixed, twenty year term, whereas the contract at issue in the present case had been renewed annually over the course of eighteen years but did not dictate or anticipate that the relationship between the parties would endure for some specific period of time. Neither point withstands scrutiny.

With respect to the first point, I agree that the franchisor in *Burger King* exercised more control over the franchisee's business operations than North Sails exercised, or was contractually authorized to exercise, over B&M. That is the nature of franchise relationships, and it happened to be the contractual relationship under review in *Burger King*. But the United States Supreme Court never indicated that the degree of extensive supervision inherent in a franchise relationship is *necessary* for personal jurisdiction to attach in the context of a long-term contractual relationship, only that it was *sufficient* under the unique facts of that case. Indeed, *Burger King* "emphasized the need for a highly realistic approach that recognizes that a contract is ordinarily

North Sails Group, LLC *v.* Boards & More GmbH

but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction,'' and that it is the ''quality and nature'' of the ensuing relationship that will justify calling the defendant to account in the forum state. (Internal quotation marks omitted.) Id., 479–80. As I discuss more fully in part II C and footnote 12 of this opinion, numerous sister courts have made it clear that the types and degree of ongoing interactions with a forum state resident that characterize the present case are more than enough to invoke personal jurisdiction under *Burger King*. As one court has explained, ''the rationale behind *Burger King* is not limited to disputes surrounding franchise agreements. Rather, *Burger King* stands for the principle that a single contract can produce continuing and [wide reaching] contacts that cross the [purposeful availment] threshold even though a single, isolated contract for a sale of goods in a foreign jurisdiction remains too random, fortuitous, or attenuated to confer jurisdiction.'' (Internal quotation marks omitted.) *Smart Call, LLC* v. *Genio Mobile*, 349 S.W.3d 755, 763 (Tex. App. 2011); see also *ICEE Distributors, Inc.* v. *J&J Snack Foods Corp.*, 325 F.3d 586, 592 (5th Cir. 2003) (holding that jurisdiction was proper under *Burger King* in case in which licensor's control over licensees was far less than that in *Burger King*).

With respect to the second distinction offered by the majority, it is of no constitutional significance that *Burger King* involved a fixed, twenty year contract, rather than a continuous, two decade contractual relationship subject to periodic voluntary renewal. The relevant consideration is not whether two parties commit to doing business together for a specified lengthy period of time or *actually do* business together for a lengthy period of time. What is important, both practically and legally, is that the defendant knowingly and purpose-

fully engages in a long-term business relationship with a resident of the forum state, such that it (1) anticipates visiting the state on occasion for business purposes, (2) knows that its contracting partner's performance of contractual obligations will occur in that state, (3) engages in frequent and ongoing exchanges of substantive and meaningful business phone calls, faxes, and mailings into and out of that state, (4) acknowledges the need, on demand, to deliver products and marketing materials to that state for quality control inspection, (5) acknowledges the need, on demand, to cooperate with the contracting party in third-party litigation in that state, (6) enjoys the protection and benefits of that state's laws and other public services if the need arises, and (7) has a substantial impact on the state's economy and its residents, whether positive (should the contractual relationship flourish) or negative (should the foreign corporation breach the contract). See, e.g., *Crete Carrier Corp.* v. *Red Food Stores, Inc.*, 254 Neb. 323, 325, 331–32, 576 N.W.2d 760 (1998) (finding sufficient minimum contacts under *Burger King* when parties had engaged for five years in open-ended contractual relationship that would continue in force until cancelled); *McKesson Corp.* v. *Hackensack Medical Imaging*, 197 N.J. 262, 278, 962 A.2d 1076 (2009) (concluding that potential for long-term relationship was sufficient to establish jurisdiction when defendant made nine purchases from plaintiff and opened credit line).

In the present case, B&M voluntarily and affirmatively chose in 2000 to renew a licensing partnership that already had been in place for one decade, signed a contract that automatically renewed each year unless certain specified events occurred, and proceeded over the course of eighteen years to build its market leading, global product line in significant part around the North Marks. There can be little doubt under these circumstances that B&M anticipated a long-term relationship

356 DECEMBER, 2021 340 Conn. 266

North Sails Group, LLC *v.* Boards & More GmbH

with North Sails, of undefined but substantial duration, which is exactly what transpired. On these facts, personal jurisdiction in Connecticut clearly exists under *Burger King.*

C

*Burger King* remains the leading precedent in this field, but there are many other personal jurisdiction cases involving long-term contractual relationships. The cases relied on by the majority, in my estimation, are not factually apposite. By contrast, I have identified numerous cases, largely overlooked by the majority, in which personal jurisdiction was held to exist in comparable circumstances—indeed, when a defendant had *less extensive* contacts with the forum state than B&M has in the present action.[14]

For example, in *Cole* v. *Mileti*, 133 F.3d 433 (6th Cir.), cert. denied, 525 U.S. 810, 119 S. Ct. 42, 142 L. Ed. 2d 32 (1998), the plaintiff, an Ohio resident, brought suit in federal court in Ohio to enforce a security agreement against the defendant, a California resident. See id., 435. The defendant's contract related contacts with Ohio were extremely limited—the contract itself and a handful of letters and telephone calls—and the parties agreed that California law would govern the agreement. See id. The District Court found that jurisdiction was proper, and the United States Court of Appeals for the Sixth Circuit affirmed. Id., 435, 438. Applying *Burger King*, the court held that, when "a nonresident defendant transacts business by negotiating and executing

_____

[14] For purposes of this comparison, I am taking into account only those contacts between B&M and Connecticut that are credited by the majority, that is, a long-term contractual relationship with a forum resident that performs its contractual duties and suffers any harms in the forum state, a physical visit to the state, hundreds of telephone and mail communications, and North Sails' right to inspect B&M's products and financial records in Connecticut. But see part III F of this opinion (identifying additional contacts not included in majority's analysis).

North Sails Group, LLC *v.* Boards & More GmbH

a contract via telephone calls and letters to an Ohio resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in Ohio.'' Id., 436.

Similarly, in *Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, 988 F.2d 476 (3d Cir. 1993), the plaintiff brought suit in federal court in Pennsylvania, alleging that the defendants, Spanish citizens, had breached a contract over the rights to distribute various foreign films in North America. See id., 478. The United States Court of Appeals for the Third Circuit affirmed the District Court's ruling that jurisdiction over the defendants in Pennsylvania was proper, notwithstanding that the plaintiff had initiated the parties' relationship and the defendants never once visited Pennsylvania. See id., 479–80. Also applying *Burger King*, the Court of Appeals reasoned that the defendants' formation of a contract that contemplated significant ties with forum residents, in tandem with at least twelve communications into the forum, constituted sufficient minimum contacts to satisfy due process. See id., 482–84.

In *Crete Carrier Corp.* v. *Red Food Stores, Inc.*, supra, 254 Neb. 323, the Supreme Court of Nebraska likewise concluded that ''numerous telephone and mail communications made pursuant to an ongoing and long-term contract [were] sufficient to establish personal jurisdiction.'' Id., 324. In that case, the parties had been engaged for five years in an open-ended contract; the record did not disclose which party had initiated the relationship. See id., 324–25. Nevertheless, the court concluded that the parties' ongoing contractual relationship and the regular communications that ensued were sufficient to confer jurisdiction over the defendant. See id., 331–32.

In fact, the majority itself relies on a case, *Benton* v. *Cameco Corp.*, 375 F.3d 1070, 1077 (10th Cir. 2004),

North Sails Group, LLC *v.* Boards & More GmbH

cert. denied, 544 U.S. 974, 125 S. Ct. 1826, 161 L. Ed. 2d 723 (2005), in which the United States Court of Appeals for the Tenth Circuit, relying on *Burger King*, held that there *were* sufficient minimum contacts, on facts that were substantially similar to—indeed, rather more sparse than—those in the present case. The Court of Appeals held that the interactions of the Canadian defendant with the plaintiff, a Colorado resident, had created sufficient minimum contacts with Colorado to satisfy due process, because (1) the parties had been doing business—trading uranium supply contracts— for eight years and envisioned a continuing business relationship, (2) the plaintiff would fulfill his end of any financial transactions from Colorado, (3) the parties exchanged telephone calls and letters to and from Colo- rado during the negotiations, and (4) the defendant sent several of its employees to Colorado, on a single occasion, to conduct the due diligence review required by the agreement. See id., 1073, 1077–80. Ultimately, the Court of Appeals concluded that, because "[the defendant] voluntarily conducted business with [the plaintiff], whom [the defendant] knew to be located in Colorado for many years prior to and at the time of the events at issue," and "engag[ed] in a business relation- ship with [a person] . . . who operates his business from Colorado, [the defendant] purposefully avail[ed] itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protec- tions of its laws." (Internal quotation marks omitted.) Id., 1077–78.[15] Again, the court reached this conclusion

---

[15] The court in *Benton* ultimately concluded that the plaintiff had failed to establish that the reasonableness prong of the personal jurisdiction test was satisfied. See *Benton* v. *Cameco Corp.*, supra, 375 F.3d 1078–79. In significant part, that conclusion was reached because the law of the foreign defendant's home country—in that case Canada—governed the dispute. See id., 1078–80. In the present case, by contrast, the parties' contract provided that any dispute would be resolved according to Wisconsin law and also committed B&M to assisting North Sails in any litigation arising from the licensing agreement, indicating that B&M was on notice that it might have to litigate any disputes with North Sails in the United States and consented

North Sails Group, LLC *v.* Boards & More GmbH

even though the defendant's only link with Colorado was what the majority would characterize as the "fortuitous" fact that the plaintiff happened to reside there and conduct his business and communications from there.

In each of these cases, the court relied on the fact that the defendant had entered voluntarily into a long-term contractual relationship, knowing that the plaintiff was located in the forum state and, therefore, that the defendant reasonably could expect that the plaintiff would seek to vindicate its rights in its home forum should the defendant breach the contract. There are numerous other cases in which sister courts have indicated that, by knowingly entering into a long-term contractual relationship with a forum resident, a foreign defendant purposefully avails itself of the protections of the forum state and is on notice that it may be haled into court there should it breach that contract. See footnote 12 of this opinion.

Of course, the personal jurisdiction analysis is heavily fact dependent, and every case is unique. Each case can, no doubt, be distinguished along one parameter or another. Taken together, however, the foregoing cases demonstrate that a long-term contractual relationship, in tandem with ongoing mail and telephone communications into the forum state and, perhaps, some minimal additional form of contact, such as a personal visit by the defendant or a right of inspection in the forum state, is sufficient to satisfy the *International Shoe* standard. Indeed, just this year, in its most recent personal jurisdiction decision, the United States Supreme Court confirmed that this is the correct interpretation of *Burger King*. "Specific jurisdiction is different: It covers defendants less intimately connected with a [s]tate, but only

thereto. Certainly this court is in a better position than are the courts of Austria to interpret and apply the law of Wisconsin.

360 DECEMBER, 2021 340 Conn. 266

as to a narrower class of claims. The contacts needed for this kind of jurisdiction often go by the name purposeful availment. *Burger King Corp.* v. *Rudzewicz*, [supra, 471 U.S. 475]. The defendant . . . must take some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum [s]tate. . . . The contacts must be the defendant's own choice and not random, isolated, or fortuitous. . . . They must show that the defendant deliberately reached out beyond its home—by, for example . . . entering a contractual relationship centered there.'' (Citations omitted; internal quotation marks omitted.) *Ford Motor Co.* v. *Montana Eighth Judicial District Court*, supra, 141 S. Ct. 1024–25.

In support of its claim that even cultivating a long-term, multifaceted relationship with a forum resident is not enough to confer jurisdiction unless the defendant expresses some independent interest in engaging with that forum in particular, the majority repeatedly cites *Calphalon Corp.* v. *Rowlette*, supra, 228 F.3d 718. *Calphalon Corp.* is a split decision of the United States Court of Appeals for the Sixth Circuit. In that case, Judge William C. Hillman begins his thorough and incisive dissenting opinion with the following observation, which I believe is applicable to the present case: "In its opinion, the majority goes to great lengths to minimize the [nearly two decade] continuing business relationship between these parties and to broaden the notion of fortuitous contacts so as to expand the concept beyond all recognition. While citing the relevant controlling language from the cases, the majority distorts and distinguishes the facts of this case in ways that render those controlling decisions meaningless. In the end, the instant decision is almost unrecognizable under modern notions of personal jurisdiction . . . .'' (Internal quotation marks omitted.) Id., 724 (Hillman, J., dissenting).

340 Conn. 266 DECEMBER, 2021 361

North Sails Group, LLC *v.* Boards & More GmbH

III

In part II of this opinion, I explained how, under *Burger King* and its progeny, sufficient minimum contacts are established when a nonresident party engages in a long-term business relationship involving the typical attendant communications and trappings of an active, ongoing, and robust contractual relationship with a forum resident.[16] In this section, I discuss in greater detail B&M's most important contacts with Connecticut and the ways in which the majority understates the nature, extent, and/or significance of those contacts and the continuing obligations envisioned and created by the parties' agreement.

A

First, the majority significantly understates, as a matter of both law and fact, the importance of B&M's numerous telephone, electronic, and letter communications with North Sails in Connecticut. In *World-Wide Volkswagen Corp.* v. *Woodson*, supra, 444 U.S. 286, the United States Supreme Court discussed how "[t]he limits imposed on state jurisdiction by the [d]ue [p]rocess [c]lause, in its role as a guarantor against inconvenient litigation, have been substantially relaxed over the years. As [that court] noted in *McGee* v. *International Life Ins. Co.*, [supra, 355 U.S. 222–23], this trend is largely attributable to a fundamental transformation in the American economy: Today many commercial transactions touch two or more [s]tates and may involve parties separated by the full continent. With this

_____

[16] I would emphasize that, although most long-term business relationships will give rise to jurisdiction in the forum state, that certainly is not always or necessarily the case, which is why I have referred to the "typical" trappings of such contracts as "presumptively" generating sufficient minimum contacts. In the remainder of this part of the opinion, I explain why and how the licensing agreement at issue in the present case did in fact envision and actually generate numerous continuing obligations within the meaning of *Burger King*.

North Sails Group, LLC *v.* Boards & More GmbH

increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a [s]tate where he engages in economic activity. The historical developments noted in *McGee*, of course, have only accelerated in the generation since that case was decided.'' (Internal quotation marks omitted.) *World-Wide Volkswagen Corp.* v. *Woodson*, supra, 292–93; see also *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 476 (''[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a [s]tate in which business is conducted. So long as a commercial actor's efforts are purposefully directed toward residents of another [s]tate, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.'' (Internal quotation marks omitted.)); *Metropolitan Life Ins. Co.* v. *Robertson-Ceco Corp.*, 84 F.3d 560, 574 (2d Cir.) (''the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago''), cert. denied, 519 U.S. 1006, 117 S. Ct. 508, 136 L. Ed. 2d 398 (1996), and cert. denied, 519 U.S. 1007, 117 S. Ct. 508, 136 L. Ed. 2d 398 (1996).

The majority denies that any courts deem ''consistent and continuing communication by itself [to be] sufficient to justify jurisdiction . . . .'' Part I B of the majority opinion. In no way do I rely on the stream of communication between the parties ''by itself'' to establish jurisdiction, but I take issue with the majority's reading of the case law on this subject. In fact, consistent with the United States Supreme Court's guidance, many sister courts have held that regular and sustained

North Sails Group, LLC *v.* Boards & More GmbH

contractual communications, if not independently sufficient to establish personal jurisdiction, go a long way in that direction. See, e.g., *Cole* v. *Mileti*, supra, 133 F.3d 436 ("If . . . a nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to an Ohio resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in Ohio. . . . Furthermore, if the cause of action is for breach of that contract . . . then the cause of action naturally arises from the defendant's activities in Ohio." (Citations omitted.)); *Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, supra, 988 F.2d 479–80, 482–83 (in dispute over intellectual property licensing contract, finding sufficient minimum contacts largely on basis of twelve telexes and fifty telephone calls to forum state); *English & Smith* v. *Metzger*, 901 F.2d 36, 38–39 (4th Cir. 1990) (relying in large part on parties' telephone calls and written communications, in conjunction with ongoing contractual dealings, to find jurisdiction); *Pulte Home Corp.* v. *Delaware Land Associates, L.P.*, Docket No. 08-311, 2008 WL 2168788, *3 (E.D. Pa. May 22, 2008) ("[t]he [United States Court of Appeals for the] Third Circuit has found that mail and telephone communications that the defendant sent into the forum state may be sufficient to be considered minimum contacts" (internal quotation marks omitted)); *Eaton Corp.* v. *Maslym Holding Co.*, 929 F. Supp. 792, 797 (D.N.J. 1996) ("courts have found that communications directed into [the forum state] go a long way toward establishing minimum contacts"); *Kultur International Films Ltd.* v. *Covent Garden Pioneer, FSP., Ltd.*, 860 F. Supp. 1055, 1062–63 (D.N.J. 1994) (finding jurisdiction largely on basis of communications and anticipated relationship); *Crete Carrier Corp.* v. *Red Food Stores, Inc.*, supra, 254 Neb. 324 ("numerous telephone and mail communications made pursuant to an ongoing and long-term con-

North Sails Group, LLC *v.* Boards & More GmbH

tract are sufficient to establish personal jurisdiction''); *Willbros USA, Inc.* v. *Certain Underwriters at Lloyds of London*, 220 P.3d 1166, 1174 (Okla. Civ. App. 2009) ('''[t]elephone calls and letters alone may provide sufficient contacts for the existence of personal jurisdiction'').[17] Indeed, one case on which the majority relies for this point, *InfoSpan, Inc.* v. *Emirates NBD Bank PJSC*, 903 F.3d 896 (9th Cir. 2018), implies that, in a contract dispute between a Cayman Islands corporation and an Emirati bank that had no relationship to California, it would have been enough to confer jurisdiction under *Walden* had the defendant bank conducted the contract ''through [e-mail] and [telephone] calls to California . . . .'' Id., 903; see footnote 10 of the majority opinion. The majority does acknowledge, as it must, that sister courts have found business communications

---

[17] The majority is incorrect when it asserts that cases such as these, which treat contractual communications into and out of the forum as powerful evidence of purposeful availment, invariably involve continuous communication coupled with other significant contacts, such as the defendant initiating contact with a forum resident. See footnote 22 of the majority opinion and accompanying text. No such additional contacts were present in *Star Media Sales, Inc.*, for example, and yet the United States Court of Appeals for the Third Circuit had no difficulty concluding that jurisdiction was proper, largely on the basis of twelve communications conducted over a relatively brief period of time. See *Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, supra, 988 F.2d 482–83. Although the majority insists that *Star Media Sales, Inc.*, supports its view, it never explains exactly what other significant contacts distinguish that case, offering only the unhelpful and conclusory statement that ''[B&M] 'engaged in negotiations for an agreement that would have created rights and obligations among citizens of the forum and contemplated significant ties with the forum.' '' Footnote 22 of the majority opinion. The truth is that, aside from the communications between the parties, the primary jurisdictional factor that the court relied on in *Star Media Sales, Inc.*, was that the defendant had entered into a long-term agreement to use the plaintiff's intellectual property. See *Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, supra, 479–80, 482–83. That relationship is the reference point of the ''rights and obligations'' language cited by the majority, which strongly supports my view that ongoing communications, in the context of a long-term commercial relationship, create sufficient minimum contacts with the forum state, especially in the context of an intellectual property licensing agreement.

North Sails Group, LLC *v.* Boards & More GmbH

with a forum resident, in the context of a long-term contractual relationship, to be an important factor supporting a finding of jurisdiction. Indeed, the United States Supreme Court recently reaffirmed as much. See *Walden* v. *Fiore*, supra, 571 U.S. 285 ("physical entry into the [s]tate . . . through . . . goods, mail, or some other means—is certainly a relevant contact"). And although I might quibble with the majority's reading of some of the cases on which it relies,[18] I do agree with its ultimate point that the importance of mail, electronic, and telephone communications as a factor establishing personal jurisdiction depends on both the quantity and the nature of those communications.

But our agreement ends quickly because the majority very significantly underestimates the importance of the hundreds of indisputably substantive communications between B&M and its Connecticut counterpart. The majority dismisses nearly two *decades* of communications, declaring that, "[d]espite this evidence . . . the parties' communications do not weigh in favor of jurisdiction because they were ancillary to the performance of the contract . . . ." Part I B of the majority opinion.

[18] The majority cites cases from the United States Courts of Appeals for the Sixth, Eighth, and Ninth Circuits for the proposition that "e-mail, mail, and telephone communications . . . do not constitute a purposeful availment of the benefits and protections of the forum" and "carry minimal weight . . . ." Part I B of the majority opinion. The cited cases from the Sixth and Eighth Circuits on their face contradict that assertion, stating instead that "[t]he use of interstate facilities such as the telephone and mail is a secondary or ancillary factor and cannot *alone* provide the minimum contacts required by due process." (Emphasis added; internal quotation marks omitted.) *Reynolds* v. *International Amateur Athletic Federation*, 23 F.3d 1110, 1119 (6th Cir.), cert. denied, 513 U.S. 962, 115 S. Ct. 423, 130 L. Ed. 2d 338 (1994); accord *Scullin Steel Co.* v. *National Railway Utilization Corp.*, 676 F.2d 309, 314 (8th Cir. 1982). More recent cases from the Ninth Circuit likewise conclude that traditional and electronic communications, although not dispositive, are relevant to the minimum contacts analysis in the context of a long-term contractual relationship. See, e.g., *In re LLS America, LLC*, 701 Fed. Appx. 565, 567 (9th Cir. 2017) (telephone calls and letters, in context of contractual course of dealing, are relevant contacts).

North Sails Group, LLC *v.* Boards & More GmbH

I find this conclusion inexplicable and completely at odds with the record evidence. The record reflects that the hundreds of pages of sample communications that North Sails proffered in opposition to B&M's motion to dismiss go to the core of the parties' agreement and B&M's alleged breach thereof. They document substantive negotiations over the terms of the licensing agreement, the signing of the agreement itself, numerous examples of the fifty-two quarterly accounting reports of B&M's royalty payments sent for North Sails' review pursuant to the agreement, and attempts to navigate and resolve the parties' ongoing legal and financial disputes, disputes that ultimately culminated in B&M's alleged breach.

North Sails specifically alleges, for example, that, in 2000, while negotiating the licensing agreement, B&M representatives communicated with North Sails by telephone, fax, and mail at its Connecticut offices, after which B&M sent the executed agreement to Connecticut. The record contains evidence that B&M representatives then e-mailed Whidden in February, 2001, seeking substantive amendments to the terms of the agreement; there were significant differences between the parties that required resolution in these communications into and out of Connecticut.

Meaningful contractual negotiations continued in the same manner at various times throughout the long life of the business relationship. The record contains an April 16, 2003 e-mail from B&M representatives to Whidden proposing a change to a core element of the parties' contract, the licensing fee that B&M paid in exchange for its use of the North Marks. The record further reveals that, in June, 2007, B&M wrote to North Sails in Connecticut regarding the former's interest in acquiring the rights to the " 'Northkiteboarding' " trade name. B&M indicated that acquiring the rights to the mark was key to the company's strategic growth plan.

North Sails Group, LLC *v.* Boards & More GmbH

The record plainly reveals that contractual issues reached a level of open and potentially irremediable discord in 2009, when the parties communicated about various alleged breaches of the licensing agreement by B&M, including its failure to pay the required royalties and its attempt to register a trademark (NKB Mark) that was "confusingly similar" to the North Marks. North Sails wrote letters demanding that B&M pay the required royalties, abandon the NKB Mark, and assign the NKB Mark to North Sails. Following a series of negotiations requiring the involvement of counsel from New York and Chicago, B&M agreed to comply with North Sails' demands. This serious contractual rift, which went to the core of the parties' trademark licensing agreement, involved multiple communications and negotiations directed into and out of North Sails' Milford office.

For instance, the record includes a February 25, 2009 letter from Whidden to various B&M executives that references the parties' prior discussions of and efforts to resolve the alleged breach. After memorializing a possible resolution to the dispute that the parties previously had discussed, Whidden closed: "[North Sails] will amend the existing [l]icense [a]greement upon [B&M's] completion of the above assignments and the withdrawal of the intent-to-use [United States] application. . . . [P]lease believe me. I am trying to be a good partner to you and to give you every opportunity possible to be successful. In fact, there is nothing I want more than for you to have fantastic success going forward. Obviously, we have coterminous objectives when it comes to wanting the best for B&M and the North [Sails] brand."

On April 7 of that year, B&M's Chicago counsel e-mailed Whidden a draft of a proposed addendum to the parties' licensing agreement to address North Sails' concerns. The e-mail contains approximately twenty pages of attachments, including the addendum itself, assignments of

B&M's infringing trademarks in the United States and Europe, and a withdrawal of North Sails' notice of opposition before the United States Patent and Trademark Office. Then there is a lengthy July, 2009 e-mail chain from B&M that references prior telephone calls between the parties, as well as meetings with legal counsel, regarding a supplement to the licensing agreement to resolve a dispute over the use of the North Marks in the textile industry. None of this can fairly be characterized as "ancillary."

North Sails further alleges that, since 2014, the parties have engaged in numerous communications, including telephone calls to Milford and the solicitation of a formal bid from North Sails, to address B&M's ongoing interest in purchasing the North Marks and terminating the licensing agreement. Finally, North Sails contends that B&M and its counsel informed North Sails on multiple occasions in 2017 and 2018 that it planned to breach the agreement, after which the parties engaged in multiple conversations in an attempt to reach a settlement. B&M allowed North Sails to audit its financial records at that time. Again, these communications went to the very essence and existence of the business relationship, and they were made into and out of Connecticut. If each of these communications is merely "ancillary," as the majority repeatedly suggests; part I B of the majority opinion; it is difficult to imagine what might qualify as substantive. See, e.g., *Central Freight Lines, Inc.* v. *APA Transport Corp.*, 322 F.3d 376, 382 (5th Cir. 2003) (contract negotiations via telephone and mail are substantive contacts); *Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, supra, 988 F.2d 482 ("contract negotiations with forum residents can empower a court to exercise personal jurisdiction over persons outside the forum"); *Max Ten Marketing, LLC* v. *Marketech, Inc.*, supra, 2012 WL 12898795, *3 (e-mails containing amendments to parties' contract and addressing subject

of terminating or renegotiating contract, along with mailing of executed contract, were important contacts supporting finding of jurisdiction); *Nationwide Mutual Ins. Co.* v. *Curry*, Docket No. 2:96-CV-476, 1997 WL 165374, *4–5 (S.D. Ohio January 7, 1997) (letter from defendants seeking amicable resolution of controversy, while not alone sufficient to establish jurisdiction, was deemed important substantive contact).

These communications are *in addition to* the more than fifty quarterly royalty reports and annual financial reports that B&M sent for North Sails' review in Connecticut, pursuant to paragraphs 7 (c) and 7 (d) of the licensing agreement. These financial reports were not peripheral or ancillary. They were central and essential to North Sails' ability to monitor and enforce its rights under the licensing agreement, such as when, in 2008 and 2009, B&M failed to pay royalties due under the agreement.

I also would hazard to say that, had the quarterly accountings been hand delivered to Milford by a B&M employee, we would not even be discussing the question of personal jurisdiction. "In its application of the test for purposeful availment, the [court in] *Burger King* . . . recognized that wire and phone transmission make possible impact on the forum state without the physical presence of the actor." *Corporate Investment Business Brokers* v. *Melcher*, 824 F.2d 786, 789 (9th Cir. 1987). In this day and age, this is how business is done. See, e.g., *Heritage House Restaurants, Inc.* v. *Continental Funding Group, Inc.*, 906 F.2d 276, 283 (7th Cir. 1990) ("[the defendant] created a relationship [that] is naturally based on telephone and mail contacts rather than physical presence, and it should not be able to avoid jurisdiction based on that distinction"); *Travel Opportunities of Fort Lauderdale, Inc.* v. *Walter Karl List Management, Inc.*, 726 So. 2d 313, 315 (Fla. App. 1998) ("in modern commercial life it matters little that

such solicitation is accomplished by a deluge of catalogs rather than a phalanx of drummers: [t]he requirements of due process are met irrespective'' (internal quotation marks omitted)); cf. *Sarvint Technologies, Inc.* v. *OMsignal, Inc.*, 161 F. Supp. 3d 1250, 1262 (N.D. Ga. 2015) (''[c]yberspace . . . is not some mystical incantation capable of warding off the jurisdiction of courts built from bricks and mortar'' (internal quotation marks omitted)). These reports may seem like nothing more than inconsequential ''receipts'' to the majority; part I B of the majority opinion; but, as I have discussed, the accounting function—confirming that proper royalties were timely paid—was a critical component of the parties' contract, and North Sails relied on it on more than one occasion to enforce its rights under the agreement. Indeed, the record includes various documents in which representatives of both parties underscore the importance—*to them*—of the reports.

There is a good deal more. Reading the record in the light most favorable to finding jurisdiction, we may reasonably assume that the many examples of written correspondence submitted by North Sails in opposition to B&M's motion to dismiss reflect only a portion of the parties' total e-mail, letter, and fax communications over the past two decades. And, of course, the documents in the record do not capture the content of any of the parties' many substantive business telephone calls, a number of which are referenced in North Sails' written communications. In the face of this extensive record, and drawing all reasonable inferences in favor of North Sails, I cannot agree with the majority's conclusion that the parties' hundreds of communications to and from Connecticut were merely ancillary. See, e.g., *Johnson Worldwide Associates, Inc.* v. *Brunton Co.*, 12 F. Supp. 2d 901, 907–908, 911 (E.D. Wis. 1998) (almost sixty letters, with offers to purchase trademarks at issue, represented ''substantial'' contacts).

340 Conn. 266       DECEMBER, 2021                371

North Sails Group, LLC *v.* Boards & More GmbH

B

Not all of the parties' communications were written, telephonic, or electronic. B&M's most senior officer, Marchand, physically visited North Sails in Connecticut in 2003. North Sails has alleged that this visit "concern[ed] [the parties'] ongoing contractual relationship and related business matters," and we are obliged to accept this undisputed allegation as true.

Numerous sister courts have concluded that even one or two visits to the forum state, in the furtherance of a contractual relationship, weigh heavily in favor of a finding of personal jurisdiction. See, e.g., *Control Screening LLC* v. *Technological Application & Production Co. (Tecapro)*, *HCMC-Vietnam*, 687 F.3d 163, 167–68 (3d Cir. 2012); *Central Freight Lines*, *Inc.* v. *APA Transport Corp.*, supra, 322 F.3d 382; *Complete Concepts*, *Ltd.* v. *General Handbag Corp.*, 880 F.2d 382, 388–89 (11th Cir. 1989); *Pulte Home Corp.* v. *Delaware Land Associates*, *L.P.*, supra, 2008 WL 2168788, *4; *Excel Plas*, *Inc.* v. *Sigmax Co.*, *Ltd.*, Docket No. 07-CV-578-IEG (JMA), 2007 WL 2853932, *8 (S.D. Cal. September 27, 2007); *Omni Hotels Management Corp.* v. *Round Hill Developments Ltd.*, 675 F. Supp. 745, 750 (D.N.H. 1987). Although the majority contends otherwise; see footnote 22 of the majority opinion; the visit need not be for purposes of negotiating the contract or the like to be a relevant contact but may simply contribute to maintaining the parties' ongoing business relationship. See, e.g., *Penco Products*, *Inc.* v. *WEC Mfg.*, *LLC*, 974 F. Supp. 2d 740, 751 and n.62 (E.D. Pa. 2013) (finding that jurisdiction existed under *Burger King* when defendant made single forum visit over course of contractual relationship to discuss sales and marketing); *SWMP*, *LLC* v. *Downs Racing*, *L.P.*, Docket No. 12-2608-JWL, 2012 WL 5354602, *3 (D. Kan. October 30, 2012) (single forum visit to discuss project that was subject of contract supported finding of jurisdiction);

North Sails Group, LLC *v.* Boards & More GmbH

*Hexacomb Corp.* v. *Damage Prevention Products Corp.*, 905 F. Supp. 557, 562–63 (N.D. Ind. 1995) ("[The] trip [the defendant's president took] to Indiana to check on [the] progress in building the machine is a manifest indication that [the defendant] purposefully availed itself of the privilege to conduct business in Indiana. . . . That [the] visit to Indiana was subsequent to the formation of the contract . . . is irrelevant." (Citations omitted; footnote omitted.)); *Reliable Tool & Machine Co.* v. *U-Haul International, Inc.*, 837 F. Supp. 274, 280–81 (N.D. Ind. 1993) ("[V]isits made during the course of performance [can] also be significant contacts with the forum state. . . . This court deems controlling the fact that [the defendant] thought the contract was important enough to make substantial contacts with the forum state, not when the visit was made." (Citation omitted.)); *Texas Axles, Inc.* v. *Baillie*, 140 Ill. App. 3d 760, 762, 489 N.E.2d 16 (1986) (considering fact that "on one occasion during the course of the dealings an agent of the [defendant] visited and inspected the [plaintiff's] plant in Texas"); *Willbros USA, Inc.* v. *Certain Underwriters at Lloyds of London*, supra, 220 P.3d 1173–74 (infrequent social visits involving some discussion of business were deemed relevant contacts).[19]

[19] It is unclear why the majority deems the decisions of sister state appellate courts to be irrelevant. See footnote 19 of the majority opinion. In any event, the majority fails to articulate any compelling reason why we should not adopt the reasoning of these decisions that indicate that, by visiting a state such as Connecticut in furtherance of a contractual relationship, a foreign defendant avails itself of the state's protections and, thus, is on notice that it should anticipate being subject to suit there. Physical presence in a state, even short-lived and fortuitous in nature, will often subject an individual (and the individual's principal under some circumstances) to the jurisdictional authority of the forum state for certain purposes. We take for granted, for example, that a corporate officer with no personal or corporate connection to Connecticut may be compelled to appear in Connecticut as a witness at a specified place and time—sometimes for days—if the individual is served with a subpoena while changing planes at Bradley International Airport during a layover on a flight from Chicago to Bangor, Maine. To be sure, there is a significant difference between being a witness and a party to a lawsuit, but the point is that the choice to visit a state, however

This makes perfect sense. First, the fact that B&M's chief executive officer went to the trouble and expense of crossing the Atlantic to cultivate an ongoing business relationship easily distinguishes this case from those involving one-off purchases or other arm's length transactions, in which the plaintiff's state of residence is purely incidental. Second, by sending a representative into the forum, B&M availed itself of all manner of additional protections, everything from Connecticut's law enforcement and emergency services to food safety codes, from traffic laws to our unique state constitutional freedoms. See, e.g., *Mid-America Tablewares, Inc.* v. *Mogi Trading Co., Ltd.*, supra, 100 F.3d 1361 ("by coming to Eau Claire and engaging in preliminary discussions over a [three day] period, [the defendant] invoked the benefits and protections of Wisconsin law; at a minimum, Wisconsin provided police and fire protection . . . during [the] visit to [the plaintiff's] facilities"); *Bell Paper Box, Inc.* v. *U.S. Kids, Inc.*, 22 F.3d 816, 820 (8th Cir. 1994) (single visit by defendant's representative was relevant minimum contact because representative benefitted from police and fire protection and other public services while in forum state); *In re Oil Spill by Amoco Cadiz off Coast of France on March 16, 1978*, 699 F.2d 909, 916 (7th Cir.) ("[the Spanish defendant] had the protection of Illinois' laws all the while that it was transacting business with [the cross claimaint] in Chicago"), cert. denied sub nom. *Astilleros Espanoles, S.A.* v. *Standard Oil Co. (Indiana)*, 464 U.S. 864, 104 S. Ct. 196, 78 L. Ed. 2d 172 (1983). Accordingly, on the basis of Marchand's visit to Connecticut, together with the parties' hundreds of contract related communications over the course of their eighteen year commercial relationship, I would conclude that jurisdiction over B&M is proper.

temporarily, increases the risk that the visitor will be subjected to the coercive authority of that state's judicial machinery.

North Sails Group, LLC *v.* Boards & More GmbH

C

Additional evidence of minimum contacts is found in the terms and execution of the licensing agreement itself. Whidden has averred that all of North Sails' obligations under the agreement *were performed in Connecticut*: "North Sails has performed its obligations under the [l]icense [a]greement, such as registering the North Marks, maintaining the exclusivity of the license granted to [B&M] under the [l]icense [a]greement . . . and handling the [day-to-day] business and contractual relationship with [B&M] from Connecticut." Although mere knowledge that North Sails was a Connecticut resident may not be sufficient to establish minimum contacts; see, e.g., *Chung* v. *NANA Development Corp.*, supra, 783 F.2d 1128; a party's knowledge that contractual performance will occur and is occurring in the forum state is a meaningful indicium of fairness and foreseeability. See, e.g., *Air Products & Controls, Inc.* v. *Safetech International, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007) ("[the] [d]efendants . . . undoubtedly knew that [the plaintiff] had its principal place of business in Michigan . . . and that the focal point of its actions and the brunt of the harm would be in Michigan"); *Mississippi Interstate Express, Inc.* v. *Transpo, Inc.*, 681 F.2d 1003, 1006, 1008 (5th Cir. 1982) (finding jurisdiction, even though "[the defendant's] contact with . . . Mississippi was somewhat minimal, consisting primarily of entering into a contract with a Mississippi corporation and engaging that corporation to deliver certain shipments between states other than Mississippi").

The majority also understates the importance of North Sails' contractual right, on demand, to conduct quality control inspections of the licensed products *in Connecticut*. Article 6 of the licensing agreement confers extensive rights on North Sails, preserving its ability to ensure that the licensed products bearing its name

North Sails Group, LLC *v.* Boards & More GmbH

"are of the highest quality in the industry . . . ." Paragraph 6 (b), among other things, allows North Sails to inspect B&M's products and relevant quality control test data, presumably in Europe.[20] Paragraph 6 (c) then goes one step further by providing that "[North Sails] shall have the right *to receive from B&M* [i.e., *in Connecticut*] at such time as [North Sails] considers it necessary or desirable reasonable sample quantities of the [l]icensed [p]roducts and examples of advertising and promotional materials and all quality control test data pertaining to the [l]icensed [p]roducts in order to determine whether such products conform to the quality standards set forth herein." (Emphasis added.)

It strikes me as unarguable that B&M has voluntarily accepted a real and substantial connection to Connecticut when its contractual commitments *require* it to ship products and advertising materials into Connecticut for inspection on demand. The majority cites three cases, all inapposite, for the proposition that "[c]ourts have found oversight provisions similar to those in the present case to be ancillary and not to support jurisdiction." Part I B of the majority opinion.

First, the majority relies on *Diamond Healthcare of Ohio, Inc.* v. *Humility of Mary Health Partners*, 229 F.3d 448, 449 (4th Cir. 2000) (*Diamond Healthcare*), in which a divided panel of the United States Court of Appeals for the Fourth Circuit held that an Ohio corporation (Humility) that had entered into a contract with a Virginia corporation (Diamond) to operate a clinical facility in Ohio was not subject to personal jurisdiction in Virginia. *Diamond Healthcare* is not our case. First,

---

[20] Paragraph 6 (b) provides: "Representatives of [North Sails] shall have the right, at reasonable times, to inspect the [l]icensed [p]roducts, the premises of B&M on which such products are manufactured or stored and all quality control test data of B&M pertaining thereto in order to determine and assure that all [l]icensed [p]roducts conform to the quality standards established herein."

North Sails Group, LLC *v.* Boards & More GmbH

the right of inspection in that case was limited to the review of financial statements and other business records; there was no question, as in the present case, of the defendant having to ship actual physical products into the forum state for inspection. See id., 451–52. Second, the majority in *Diamond Healthcare* did not hold that a plaintiff's contractual right of inspection is *never* constitutionally relevant. Rather, the majority noted that Diamond's right to inspect Humility's financial statements was peripheral to the agreement in that particular case, insofar as the contract was for the provision of hospitalization services. See id., 452. Here, by contrast, when the subject of the agreement is intangible—the right to use North Sails' intellectual property— the ability to confirm that the appropriate royalties were being paid and that the North Marks were not being debased by use in conjunction with inferior products was an important aspect of the licensing agreement. Third, Judge J. Michael Luttig authored a dissenting opinion in which he argued that jurisdiction was proper under *Burger King* because, among other things, the contract afforded Diamond a right of inspection in Virginia. See id., 455 (Luttig, J., dissenting).

The other cases on which the majority relies are still less availing. *Guinness Import Co.* v. *Mark VII Distributors, Inc.*, 153 F.3d 607 (8th Cir. 1998), did not involve any right of inspection whatsoever. Moreover, the sentence of the decision that the majority quotes, which merely explains that the defendant, a Jamaican beer brewer, did not operate in Minnesota other than through independent importers and distributors, falls in the section of the decision in which the court discusses whether the defendant was subject to *general*, rather than specific, jurisdiction. See id., 614–15. The discussion is irrelevant to the present case. The third case on which the majority relies, *RLB & Associates, Ltd.* v. *Aspen Medical Pty.*, Docket No. 2:15-cv-123, 2016 WL 344925

340 Conn. 266 DECEMBER, 2021 377

North Sails Group, LLC *v.* Boards & More GmbH

(D. Vt. January 27, 2016), is likewise inapposite, as no right of inspection was involved or discussed. The passage to which the majority cites in this unreported District Court decision merely states that the foreign *defendant* had no control over how the resident *plaintiff* carried out its portion of the contract. See id., *5–6. The clear implication is that, if the parties had been able to regulate each other's work under the contract, jurisdiction would have been proper.

The cases that are on point, such as *Marine Charter & Storage Ltd.*, *Inc.* v. *Denison Marine, Inc.*, 701 F. Supp. 930 (D. Mass. 1988), are not cited in the majority opinion. In that case, the court found that jurisdiction over the Florida defendant was proper in Massachusetts on the basis of a yearlong contractual relationship, cross-state communications, and an inspection clause, notwithstanding that the plaintiff had initiated contact and that the agreement was negotiated in Florida and subject to Florida law. See id., 934–95; see also, e.g., *Electrosource, Inc.* v. *Horizon Battery Technologies, Ltd.*, 176 F.3d 867, 872 (5th Cir. 1999); *Mid-America Tablewares, Inc.* v. *Mogi Trading Co., Ltd.*, supra, 100 F.3d 1360; *United Coal Co.* v. *Land Use Corp.*, 575 F. Supp. 1148, 1152, 1157 (W.D. Va. 1983); cf. *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 480 (relying on fact that "[the defendant voluntarily accepted] the long-term and exacting regulation of his business from [the plaintiff's] Miami headquarters").

It is difficult to know what to make of the majority's response that, although the contract required that B&M send materials to North Sails for inspection, and although North Sails has been located in Connecticut throughout the entire two decades of the parties' relationship, the contract did not specifically require that B&M send the materials to North Sails *in Connecticut*. See part I B of the majority opinion. The majority offers no rationale for erecting this sort of arbitrary barrier to jurisdiction.

North Sails Group, LLC *v.* Boards & More GmbH

The agreement that required B&M to send materials for North Sails' inspection listed North Sails' Connecticut address as its principal place of business, on the very first page. The record indicates that B&M mailed its other communications to North Sails in Connecticut, and its chief executive officer visited North Sails in Connecticut; there was no reason to think that the products for inspection would be sent to any location other than Connecticut. In requiring that the contract include a specific inspection-in-Connecticut provision, the majority fails to take into account the primary concern of the due process clause in a case such as this one, which is that the defendant be able to predict that the "contemplated future consequences" of the agreement will involve its reaching out into the forum state. *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 479. That prediction was easy to make here.[21]

The majority's observation that North Sails exercised its inspection rights in a limited manner also is irrelevant. The majority offers neither authority nor analysis in support of its suggestion that a forum resident must exercise its right of inspection on a regular basis in order for that right to factor in the constitutional analysis. Such a theory would make little sense; the important

---

[21] I fail to grasp the logic of the majority's position that, on the one hand, B&M sending hundreds of substantive, contractually mandated communications to North Sails' Connecticut headquarters, as identified in the contract, is mere "happenstance" because North Sails might have chosen to reside elsewhere but, on the other hand, that B&M sending payments to a bank in Wisconsin where North Sails happened to do its banking somehow represented a purposeful availment of the privilege of doing business in Wisconsin. North Sails' fixed, physical location in Connecticut seems far less a matter of accident or chance (fortuity) than does the location of its bank account in Wisconsin. Indeed, the agreement itself reflects the inessential and potentially transitory nature of North Sales' bank account location by expressly providing that North Sails could change the account designation at will. The majority cites *Burger King* for the distinction it draws, but the cited pages say nothing of the sort. See *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 475–76.

point is that the foreign defendant, by voluntarily agreeing to submit to inspection of its products and financial records in the forum state, reasonably foresees that it may be called to answer there for breach of contract. See, e.g., *K-V Pharmaceutical Co.* v. *J. Uriach & CIA, S.A.*, 648 F.3d 588, 593–94 (8th Cir. 2011); see also footnote 6 of this opinion. As the United States Supreme Court explained in *Burger King*, the "terms of the contract" and the attendant "contemplated future consequences" thereof are as important to the due process analysis as "the parties' actual course of dealing . . . ." *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 479. For this reason, sister courts have determined that personal jurisdiction exists on the basis of contractual rights that were *never* actually exercised. See, e.g., *K-V Pharmaceutical Co.* v. *J. Uriach & CIA, S.A.*, supra, 594 ("[a]lthough the record reflects that many of the [contract] terms were never carried out because the contract was terminated before the [product] was successfully developed, both these terms and the future consequences that the parties contemplated in fashioning them support personal jurisdiction"); *North Penn Gas Co.* v. *Corning Natural Gas Corp.*, 897 F.2d 687, 690–91 (3d Cir.) (defendant's unexercised contractual right to store gas in Pennsylvania fields qualified as minimum contact), cert. denied, 498 U.S. 847, 111 S. Ct. 133, 112 L. Ed. 2d 101 (1990); see also *TJF Associates, LLC* v. *Kenneth J. Rotman & Allianex, LLC*, Docket No. 05-705, 2005 WL 1458753, *5 (E.D. Pa. June 17, 2005) ("[a]s it happened, the mutual benefits and obligations of a long-term alliance did not come to pass, but the fact that the parties contemplated such benefits and obligations is significant in and of itself").

Finally, although the majority is correct that the licensing agreement provides that B&M's royalty payments were (subject to North Sails' sole discretion) routed to North Sails through a Wisconsin based bank,

the important point for jurisdictional purposes is that B&M was fully aware that North Sails would, for all practical purposes, receive and use the funds in Connecticut because that is where North Sails resides. B&M necessarily understood that North Sails would suffer the harm in Connecticut should B&M renege on its contractual obligations. See *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 480 (relying on fact that defendant's improper use of plaintiff's trademarks caused foreseeable injury at plaintiff's corporate headquarters in forum state); see also, e.g., *Air Products & Controls, Inc.* v. *Safetech International, Inc.*, supra, 503 F.3d 553; *Associated Business Telephone Systems Corp.* v. *Greater Capital Corp.*, 861 F.2d 793, 797 (3d Cir. 1988); *Combustion Engineering, Inc.* v. *NEI International Combustion, Ltd.*, 798 F. Supp. 100, 106 (D. Conn. 1992). A defendant's knowledge that the plaintiff will suffer harm in the forum state is not, standing alone, enough to confer jurisdiction; see *Walden* v. *Fiore*, supra, 571 U.S. 289–90; but it is relevant to the constitutional analysis; see id., 286; especially in a case that revolves around intellectual property rights. See, e.g., *Glenn H. Curtiss Museum of Local History* v. *Confederate Motors, Inc.*, Docket No. 20-CV-6237 (CJS), 2021 WL 514229, *4 (W.D.N.Y. February 11, 2021) ("[t]he torts of copyright and trademark infringement cause injury in the state where the allegedly infringed intellectual property is held" (internal quotation marks omitted)); *Mountz, Inc.* v. *Northeast Industrial Bolting & Torque, LLC*, Docket No. 15-cv-04538-MEJ, 2016 WL 6699295, *4–5 (N.D. Cal. September 30, 2016) (explaining that, post-*Walden*, it remains true that, "[i]n trademark infringement actions, the claim arises out of [forum related] activities when the infringing conduct harms the plaintiff in the forum"), report and recommendation adopted, 2016 WL 6679548 (N.D. Cal. November 14, 2016); *Raser Technologies, Inc.* v. *Morgan Stanley & Co., LLC*, 449 P.3d 150,

North Sails Group, LLC *v.* Boards & More GmbH

160, 162 (Utah 2019) (noting that "[t]he distinction between a defendant's contacts with the plaintiff and a defendant's contacts with the forum state itself is difficult to grasp in the abstract" and that, "[e]ven if the effects are felt by just the plaintiff in the state, if those effects are the product of a defendant purposefully reaching into the state, specific jurisdiction may exist [under *Walden*]").

D

The majority also understates the legal advantages that B&M enjoyed by virtue of North Sails' Connecticut residency. There are countless ways in which Connecticut law helped to ensure the safety and security of Marchand's visit here and the ability of North Sails to carry out its everyday business functions and the contractual performance on which B&M's contract relied. See, e.g., *Vishay Intertechnology, Inc.* v. *Delta International Corp.*, 696 F.2d 1062, 1068 (4th Cir. 1982) (intent to derive benefit from contracting with forum resident and to inflict financial harm on resident in forum is enough to establish that defendant availed itself of privilege of forum state's laws). To cite one example that North Sails argued before the trial court, over the course of the parties' eighteen year relationship, Connecticut law provided B&M with key protections against North Sails engaging in wrongful commercial practices, business torts, and the like under statutes such as the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. There are numerous cases in which Connecticut courts have permitted a foreign entity, such as B&M, to bring a CUTPA claim against a Connecticut company arising from a dispute involving a long-term contract. See, e.g., *Fabri* v. *United Technologies International, Inc.*, 387 F.3d 109, 122–23 (2d Cir. 2004) (holding that Argentine plaintiffs could prevail on CUTPA claim alleging that Connecticut defendant wrongfully terminated parties'

North Sails Group, LLC *v.* Boards & More GmbH

long-term agreement); *Stanley Works Israel Ltd.* v. *500 Group, Inc.*, 332 F. Supp. 3d 488, 499–500, 510–13 (D. Conn. 2018) (declining to dismiss CUTPA claim brought by Israeli entity alleging that defendants maliciously refused to return overpayment of funds due under licensing agreement); *Metropolitan Enterprise Corp.* v. *United Technologies International, Corp.*, Docket No. 3:03CV1685 (JBA), 2004 WL 1497545, *4 (D. Conn. June 28, 2004) (noting that "the statutory scheme permits [out-of-state] residents to bring a CUTPA action against a defendant located in Connecticut notwithstanding the locus of injury").[22] See generally R. Langer et al., 12

---

[22] The majority's only responses to this point are to observe that (1) North Sails has not specifically argued on appeal that B&M enjoyed the protections of CUTPA, and (2) taking unfair trade practice laws such as CUTPA into account would make jurisdiction too easy to establish. CUTPA, however, is merely one example among many of the broader point that the United States Supreme Court has consistently made, which is that a foreign corporation that chooses to do business in the forum state or partners with a resident thereof necessarily invokes the protection and benefits of that state's commercial laws and business climate. See, e.g., *Ford Motor Co.* v. *Montana Eighth Judicial District Court*, supra, 141 S. Ct. 1029 ("[the] defendant] enjoys the benefits and protection of [the forum states'] laws—the enforcement of contracts, the defense of property, the resulting formation of effective markets" (internal quotation marks omitted)); *Keeton* v. *Hustler Magazine, Inc.*, 465 U.S. 770, 779, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984) ("[c]ertainly [the defendant], which chose to enter the New Hampshire market . . . would have claimed the benefit of [its laws] if it had a complaint against a subscriber, distributor, or other commercial partner"); *Russell* v. *SNFA*, 987 N.E.2d 778, 796 (Ill.) ("[b]y engaging a business entity located in Illinois, [the] defendant undoubtedly benefitted from Illinois' system of laws, infrastructure, and business climate"), cert. denied, 571 U.S. 886, 134 S. Ct. 295, 187 L. Ed. 2d 152 (2013). My point regarding CUTPA is not a new argument; it is merely an example taken from the facts of the present case that goes to the core of what the high court means by purposeful availment.

Relatedly, with respect to the second point, I am not contending that anyone who does business with a Connecticut resident is, ipso facto, subject to jurisdiction in our state courts simply because CUTPA governs those transactions. As with other factors in the minimum contacts analysis, it is a matter of degree, and we look to the totality of the circumstances. The longer a foreign company does business with a Connecticut resident, the more extensive the negotiations and more multifaceted the communications, the stronger the argument that the twin pillars of due process—notice and fairness/voluntariness—have been satisfied. In this case, B&M enjoyed the

North Sails Group, LLC *v.* Boards & More GmbH

Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2020–2021 Ed.) § 4.3, pp. 406–74. The ready availability of such legal protections was an advantage possessed by B&M since 2000 and provides one more reason why it is fair that B&M would shoulder the reciprocal burden of being subject to jurisdiction here, should it be called to account in Connecticut for its alleged commercial misconduct. The majority has not identified any jurisdiction that is more directly impacted by or has a predictably greater interest in resolving the present dispute than does Connecticut.

E

For its part, in concluding that B&M lacks sufficient minimum contacts with Connecticut, the majority relies heavily on the purported fact that "the record contains nothing to show . . . that B&M initiated the October, 2000 licensing agreement." Part I B of the majority opinion. Although it attempts at times to minimize the significance of this point; see footnote 18 of the majority opinion; the majority in fact emphasizes its importance by mentioning the issue of which party initiated contractual relations no fewer than a dozen times throughout its opinion. Indeed, the majority repeatedly highlights the alleged lack of any evidence that B&M first approached North Sails as the missing ingredient in North Sails' jurisdictional allegations and notes that one decision gave "special weight" to the fact that the defendant had initiated contact with the plaintiff. Part I B of the majority opinion; see *CFA Institute* v. *Institute of Chartered Financial Analysts of India*, 551 F.3d 285, 295 n.17 (4th Cir. 2009). I believe that this aspect

protections of CUTPA over the course of nearly two decades, during which the parties repeatedly renegotiated the terms of their contract. Having benefitted during that entire period from Connecticut's unfair trade practice, tort and contract laws, B&M ought not now be heard to contend that it need not answer here for its alleged contract related misconduct.

North Sails Group, LLC *v.* Boards & More GmbH

of the majority's analysis is mistaken as a matter of both law and fact.

Sister courts are not uniform in the legal weight they give to which party originally initiated contractual negotiations. When it is the *defendant* who first reaches out to contract with the plaintiff, there is broad agreement that that is one factor favoring jurisdiction, although no more important than the long-term nature of the parties' relationship. See, e.g., *Diamond Crystal Brands, Inc.* v. *Food Movers International, Inc.*, 593 F.3d 1249, 1268 and n.24 (11th Cir.), cert. denied, 562 U.S. 836, 131 S. Ct. 158, 178 L. Ed. 2d 39 (2010); *Pro Axess, Inc.* v. *Orlux Distribution, Inc.*, 428 F.3d 1270, 1277–78 and n.5 (10th Cir. 2005); *Daniel J. Hartwig Associates, Inc.* v. *Kanner*, 913 F.2d 1213, 1218–19 (7th Cir. 1990). Such cases are uncontroversial, but they provide no support for the inverse proposition that jurisdiction is difficult to establish when it was the plaintiff who made the first overture.

To the contrary, the prevailing rule appears to be that, when it is the plaintiff who initiated contact, sister courts treat this as merely one among many relevant factors, focusing on considerations such as whether, on the one hand, the relationship revolved around a single product sale or was solely the result of the plaintiff's unilateral activity in reaching out to the defendant, which tends to weigh against jurisdiction, or, on the other hand, whether the relationship blossomed into a long-term partnership in which the defendant voluntarily reciprocated by directing its activities toward the forum state in various ways. See, e.g., *Diamond Crystal Brands, Inc.* v. *Food Movers International, Inc.*, supra, 593 F.3d 1271–72 ("[t]hat a plaintiff first solicited a nonresident defendant does not nullify the significance of a defendant's initiation of subsequent transactions"); *Hogar CREA, Inc.* v. *Hogar CREA International of Connecticut, Inc.*, 708 F. Supp. 2d 158, 172 (D.P.R. 2009)

North Sails Group, LLC *v.* Boards & More GmbH

("the relevant question is not which party instigated the relationship, but whether the actions are voluntary or rather the kind of unilateral action that makes the [forum state] contacts involuntary" (internal quotation marks omitted)); *Marine Charter & Storage Ltd., Inc.* v. *Denison Marine, Inc.*, supra, 701 F. Supp. 933 ("[W]hich party initiated negotiations is not dispositive of purposefulness. The character and quantity of an out-of-state defendant's many contacts with the forum state may still reveal an intent on his part to reap some benefit from that state even though he has not taken the first step in the overall negotiation process." (Internal quotation marks omitted.)); *Crouch Railway Consulting, LLC* v. *LS Energy Fabrication, LLC*, 610 S.W.3d 460, 478 (Tenn. 2020) (fact that defendant ultimately chose to contract with plaintiff was deemed more important than who approached whom); *Willbros USA, Inc.* v. *Certain Underwriters at Lloyds of London*, supra, 220 P.3d 1173 ("Regardless of who initiated the contact, the [nonresidents] could have refused to enter into a contract and thereby alleviated the risk of defending a suit in [the forum state of] Oklahoma. . . . By choosing to do business with an Oklahoma company, [the defendant] purposefully availed itself of the privilege of conducting activities within Oklahoma." (Citation omitted; internal quotation marks omitted.)). In most instances in which a long-term contractual relationship ultimately was consummated, sister courts have had no difficulty finding that minimum contacts existed, even when it was the plaintiff who initially reached out to solicit that relationship. See, e.g., *Benton* v. *Cameco Corp.*, supra, 375 F.3d 1077–78; *Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, supra, 988 F.2d 482–83; *Southwest Offset, Inc.* v. *Hudco Publishing Co.*, 622 F.2d 149, 150, 152 (5th Cir. 1980); *Hogar CREA, Inc.* v. *Hogar CREA International of Connecticut, Inc.*, supra, 172; *H. Lewis Packaging, LLC* v. *Spectrum Plastics, Inc.*, 296 F. Supp. 2d 234, 240 (D. Conn. 2003).

North Sails Group, LLC *v.* Boards & More GmbH

Other courts, such as the United States Court of Appeals for the Third Circuit, have afforded no weight whatsoever to whether it was the defendant who first initiated the relationship or opened contract negotiations with a forum resident. As that court explained in *General Electric Co.* v. *Deutz AG*, supra, 270 F.3d 144, "[i]n the commercial milieu," it "is not significant that one or the other party initiated the relationship. . . . [Instead] the intention to establish a common venture extending over a substantial period of time is a more important consideration." (Citation omitted.) Id., 151; see also *Southern Machine Co.* v. *Mohasco Industries, Inc.*, 401 F.2d 374, 382 (6th Cir. 1968) ("[T]he contention that [the plaintiff] solicited the license agreement from [the defendant] is immaterial. . . . [The defendant] chose to deal with [the plaintiff]; and . . . it cannot diminish the purposefulness of [the defendant's] choice that . . . [the defendant] like the maker of the better mousetrap, is fortunate enough to get the business without active solicitation . . . ." (Citation omitted; internal quotation marks omitted.)); *Bodek & Rhodes, Inc.* v. *Bob Lanier Enterprises, Inc.*, Docket No. 15-3421, 2016 WL 398079, *4 (E.D. Pa. February 2, 2016) ("[t]he important consideration is the intention to establish a common venture extending over a substantial period of time, not which party initiated the relationship" (internal quotation marks omitted)); *Carlson Corp.* v. *University of Vermont*, 380 Mass. 102, 109 n.11, 402 N.E.2d 483 (1980) ("[t]he fact that the resident plaintiff may have initiated the entire business relationship is not a fact [that] is entitled to constitutional consideration").

To my knowledge, the United States Court of Appeals for the Fourth Circuit is the *only* appellate court that gives "special weight" to the question of which party originally initiated contractual relations. Indeed, even the Fourth Circuit itself has acknowledged that, "[when] . . . minimum contacts are present, that the defen-

340 Conn. 266 DECEMBER, 2021 387

North Sails Group, LLC *v.* Boards & More GmbH

dant did not initiate the contacts does not bar a judicial finding of purposeful availment.'' *Tire Engineering & Distribution, LLC* v. *Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 302 (4th Cir. 2012), cert. denied, 568 U.S. 1087, 133 S. Ct. 846, 184 L. Ed. 2d 655 (2013); see also *Universal Leather, LLC* v. *Koro AR, S.A.*, supra, 773 F.3d 562 (retaining ''special weight'' language but also indicating that which party initiated contact is merely one factor among many, including whether defendant engaged in significant or long-term relations, made in-person contact, or had extensive communications with forum state). Accordingly, I see no good reason to accord importance to who first contacted whom two decades ago; the proper inquiry involves determining the nature and extent of the relationship once initiated.

Perhaps more importantly, regardless of the legal standard, I disagree with the majority's recitation of the facts. The evidence, with all reasonable inferences properly drawn in the light most favorable to North Sails, reasonably suggests that it was B&M that first approached North Sails. North Sails had been engaged in a predecessor licensing agreement with a German company, North Sails Windsurfing GmbH, since 1990. The business relationship plainly appears to have been of substantial commercial importance to B&M's predecessor,[23] and it makes perfect sense that B&M, as the successor in interest, desired to maintain that beneficial relationship and undertook the necessary steps to do so. Indeed, we need not speculate on this point because the preamble to the October, 2000 licensing agreement

[23] The record contains ample evidence of a highly developed, multifaceted relationship between North Sails and B&M's predecessor in interest. The latter had been paying North Sails approximately $60,000 in quarterly royalties, invited Whidden to attend North Sails Windsurfing GmbH's board of directors meetings in New York, requested key financial data from North Sails in conjunction with a potential acquisition, and invited North Sails to send proposals regarding additional potential licensing agreements.

between the present parties indicates that (1) "B&M has represented to [North Sails] . . . that B&M is the successor of North Sails Windsurfing GmbH," (2) "B&M is [the] assignee of all interests of North Sails [Windsurfing] GmbH," and (3) "*B&M desires to acquire* worldwide rights to use the [North Marks] in connection with manufacturing and selling certain windsurfing products . . . ." (Emphasis added.) The preamble concludes that "B&M and [North Sails] wish to mutually terminate the [p]revious [t]rademark [l]icense [a]greement and to substitute this [t]rademark [l]icense [a]greement . . . ." The fact that B&M acquired North Sails Windsurfing GmbH's interests and desired to step into that company's shoes with respect to the North Marks licensing agreement strongly suggests that B&M initiated the continued business relationship with North Sails. On this record, viewing the facts in the proper light, by far the most reasonable assumption is that, when B&M chose to acquire the interests of the predecessor company, it did so with the intention of retaining its valuable, Connecticut based intellectual property rights. B&M, in other words, initiated the contractual relationship. I do not understand how anyone could conclude otherwise.

F

Two additional facts in particular stand out as directly relevant to the proper due process analysis. First, B&M, with the assistance of North Sails and through B&M's own distribution affiliate, actually marketed and sold the licensed products in Connecticut. Second, the licensing agreement committed B&M to assist North Sails in litigating any actions that should arise in relation to the licensed products or the North Marks. Those facts, while important to any minimum contacts analysis, assume a special significance in the context of trademark licensing and other intellectual property disputes that revolve around intangible assets that cannot readily be ascribed to any particular physical location.

1

The majority, recognizing that knowingly marketing or distributing trademarked products to the residents of a forum represents powerful evidence of purposeful availment, especially in a dispute of this nature; see, e.g., *Curry* v. *Revolution Laboratories, LLC*, 949 F.3d 385, 401 (7th Cir. 2020); states that "the parties' course of dealings shows that B&M, despite having a worldwide license, never conducted any business in Connecticut." Part I B of the majority opinion. The majority further contends that B&M "never attempted to exploit any market for its products in Connecticut." (Internal quotation marks omitted.) Id. Although the majority never defines what it means by conducting business in a state or exploiting a market for its products, these assertions are, for constitutional purposes, inaccurate.

In his affidavit, Whidden specifically alleges that B&M purposefully availed itself of the protections and benefits of the state of Connecticut by, among other things, marketing and selling products subject to the licensing agreement in this state: "North Sails has performed its obligations under the [l]icense [a]greement, such as . . . *advertising and offering for sale in Connecticut the Surf Sport products at issue in the [v]erified [c]omplaint, and other products of . . . B&M*, and handling the [day-to-day] business and contractual relationship with [B&M] from Connecticut." (Emphasis added.) B&M did not dispute in the trial court North Sails' allegations that its Surf Sport products subject to the licensing agreement were marketed and sold in Connecticut. Instead, Till Eberle, the chief executive officer of B&M's ultimate parent company, Boards and More Holding GmbH, acknowledged in his affidavit that, in 2017, approximately 4000 euros worth of B&M products were

North Sails Group, LLC *v.* Boards & More GmbH

sold in Connecticut.[24] Eberle contended, however, that B&M *itself* does not transact any business in Connecticut, distributing its products here via a sister company, Washington based Boards & More, Inc. B&M and Boards & More, Inc., are both wholly owned subsidiaries of Boards and More Beteiligungs GmbH, which, in turn, is a wholly owned subsidiary of Boards and More Holding GmbH. Both parties addressed B&M's Connecticut product sales in their trial briefs. At the hearing on the motion to dismiss, B&M again took the position that sales of the licensed products in Connecticut were "trivial."[25]

In its memorandum of decision, the trial court recognized that "some of the products at issue were sold here [in Connecticut]." The court deemed that fact irrelevant to the minimum contacts analysis, however, on the basis of its mistaken belief that the only constitutionally relevant question was where B&M allegedly breached the licensing agreement. See part I of this opinion. As the following discussion makes clear, product sales by B&

[24] At an average 2017 exchange rate of 1.13 dollars per euro, this means that the company's Connecticut sales were approximately $4500 that year. Eberle did not dispute North Sails' contention that these product sales included B&M products encompassed by the licensing agreement, and we are, therefore, compelled to accept that allegation as true. Neither party indicated the extent of B&M's Connecticut sales, if any, in prior contract years.

[25] For reasons unknown, North Sails does not address these product sales in its appellate briefs. As previously discussed; see part I of this opinion; our independent review of the jurisdictional question, and of the factual record, is de novo. See, e.g., *Golodner* v. *Women's Center of Southeastern Connecticut, Inc.*, supra, 281 Conn. 826 (court should accept all undisputed facts when making personal jurisdiction determination); *Frazer* v. *McGowan*, supra, 198 Conn. 250 (when trial court has applied incorrect legal standard, appellate court reviews undisputed facts disclosed on record to determine whether personal jurisdiction exists). In part V of this opinion, I explain in greater detail why I believe that we can and should consider B&M's sale and marketing of its products to Connecticut consumers as part of the totality of the circumstances in the present case. To be clear, I would reach the same result regardless.

North Sails Group, LLC *v.* Boards & More GmbH

M made through a dealer, such as Boards & More, Inc., are directly relevant to the minimum contacts analysis. This is especially so in the present case, in which B&M derives licensing fees for products sold by its affiliates, including Boards & More, Inc., under the express terms of the licensing agreement.

Even outside of the intellectual property context, a foreign corporation's decision to advertise and sell its products in the forum state is an important, often dispositive, factor in establishing personal jurisdiction. The United States Supreme Court has explained that a company that chooses to direct its products into a particular market not only has "clear notice" that it may face legal action in that state sounding in product liability, unfair competition, or other legal theories, but also "can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the [s]tate." *World-Wide Volkswagen Corp.* v. *Woodson*, supra, 444 U.S. 297. This principle applies not only in so-called "stream of commerce" product liability cases, such as *World-Wide Volkswagen Corp.*,[26] but also in contract actions in which the product is the subject of or relates to the contract at issue. See *Eason* v. *Linden Avionics, Inc.*, 706 F. Supp. 311, 323 (D.N.J. 1989); see also, e.g., *Sky Motor Cars* v. *Auto Sport Designs, Inc.*, Docket No. 09-4055, 2012 WL 3024006, *4 (E.D. Pa. July 23, 2012) ("[w]hen a defendant makes a conscious choice to conduct business with the residents of a forum state, it has clear notice that it is

_____

[26] For the reasons discussed herein, it is clear that B&M's activities in Connecticut, in addition to marketing and selling the licensed products here, are such that the requirements of either Justice Brennan's or Justice O'Connor's approach to the stream of commerce theory would be satisfied. See *Asahi Metal Industry Co., Ltd.* v. *Superior Court*, 480 U.S. 102, 112, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987) (opinion announcing judgment) (O'Connor, J.); id., 117 (Brennan, J., concurring in part and concurring in the judgment).

North Sails Group, LLC *v.* Boards & More GmbH

subject to suit there'' (internal quotation marks omitted)); *Julia Cosmetics, Inc.* v. *National Broadcasting Co.*, 355 F. Supp. 938, 944 (W.D. La. 1973) (applying principle in context of licensing agreement).

Sales of a product in the forum assume a heightened importance in the context of an intellectual property dispute, insofar as it is often the use of the patent or trademark in commerce that forms the core of the dispute. See, e.g., *Breckenridge Pharmaceutical, Inc.* v. *Metabolite Laboratories, Inc.*, 444 F.3d 1356, 1365 (Fed. Cir. 2006) (''a defendant's obligations under an exclusive license agreement may subject it to personal jurisdiction in the forum state even if the licensee is not incorporated or headquartered in the forum state, so long as the exclusive licensee conducts business there''); *Duck Commander, Inc.* v. *TNP Productions, Inc.*, Docket No. 10-1790, 2011 WL 4973880, *4 (W.D. La. September 12, 2011) (''it is the use in commerce of a registered mark that gives rise to liability'' (footnote omitted)), report and recommendation adopted, 2011 WL 4973828 (W.D. La. October 19, 2011); *SRAM Corp.* v. *Sunrace Roots Enterprise Co., Ltd.*, 390 F. Supp. 2d 781, 787 (N.D. Ill. 2005) (sales of competing product to forum state customers were sufficient minimum contacts); *Sollinger* v. *Nasco International, Inc.*, 655 F. Supp. 1385, 1386, 1388–89 (D. Vt. 1987) (offering of copyrighted books for sale in forum was sufficient to establish jurisdiction); *Kmart Properties, Inc.* v. *Taxation & Revenue Dept.*, 139 N.M. 177, 183, 131 P.3d 27 (2001) (''[b]y allowing its [trademarks] to be used in New Mexico to generate income, [the plaintiff] purposefully avail[ed] itself of the benefits of an economic market in the forum'' (internal quotation marks omitted)), rev'd on other grounds sub nom. *Kmart Corp.* v. *Taxation & Revenue Dept.*, 139 N.M. 172, 131 P.3d 22 (2005). This principle holds true regardless of whether the cause of action sounds in breach of contract, as when use of

North Sails Group, LLC *v.* Boards & More GmbH

the intellectual property is subject to a licensing agreement, or in tort, as with an infringement claim under the Lanham Act, 15 U.S.C. § 1051 et seq., or a state equivalent. See, e.g., *Connecticut Community Bank* v. *Bank of Greenwich*, 578 F. Supp. 2d 405, 412 (D. Conn. 2008) (trademark infringement or unfair competition in violation of Lanham Act is automatic CUTPA violation). Under the licensing agreement, B&M acquired the right to use North Sails' valuable, market leading trade name to advertise and promote B&M's own products. And, when B&M markets and sells its products in a state using the North Sails trade name, that is about as fundamental of a contact as there can be. B&M is reaching out to Connecticut consumers, displaying the brand here, and staking a claim against anyone else who might try to use the brand in Connecticut without authorization, all while earning royalties on Connecticut sales for North Sails.

Two points warrant emphasis in this regard. First, the fact that the products were distributed through B&M affiliates makes no difference in the constitutional analysis, particularly on the facts of this case. As the United States Supreme Court indicated in *World-Wide Volkswagen Corp.*, it does not matter for constitutional purposes whether a foreign manufacturer sells its products directly to consumers in the forum state or avails itself of the market indirectly through an established distribution channel. See *World-Wide Volkswagen Corp.* v. *Woodson*, supra, 444 U.S. 297; see also *Beverly Hills Fan Co.* v. *Royal Sovereign Corp.*, 21 F.3d 1558, 1565 (Fed. Cir.) ("[The] defendants purposefully shipped the [product] into Virginia through an established distribution channel. The cause of action for patent infringement is alleged to arise out of these activities. No more is usually required to establish specific jurisdiction."), cert. dismissed, 512 U.S. 1273, 115 S. Ct. 18, 129 L. Ed. 2d 917 (1994); *Akeva LLC* v. *Mizuno Corp.*, 199 F. Supp.

2d 336, 341 (M.D.N.C. 2002) (establishment by foreign corporation of independent subsidiary in nonforum state to sell trademarked products in United States, including in forum state, was deemed sufficient to establish minimum contacts); *Aluminum Housewares Co.* v. *Chip Clip Corp.*, 609 F. Supp. 358, 361 (E.D. Mo. 1984) (jurisdiction attached when all sales to forum were through independent manufacturer's representative); L. Graham, "The Personal Jurisdiction Effect of Notifications on Infringement," 78 J. Pat. & Trademark Off. Society 858, 864 (1996) ("it . . . makes no difference whether the defendant's sales are made directly or through a distributor").

These cases show that the choice of business model, whether selling directly, through a sister company, or using an independent distributor, does not shield a foreign defendant from jurisdiction if it chooses to make use of the licensed intellectual property in the forum state. In *Beverly Hills Fan Co.* v. *Royal Sovereign Corp.*, supra, 21 F.3d 1558, for example, the Court of Appeals found that sales of the infringing product into the forum were sufficient to confer jurisdiction, notwithstanding that the plaintiff had alleged only that the products had been sold via intermediaries, such as an independent building products retailer. See id., 1563, 1565. Accordingly, B&M's choice to supply the Connecticut surf products market through a sister distribution company, and with the assistance of North Sails, rather than directly from Austria, is of no moment; B&M was, nevertheless, conducting business in Connecticut. Indeed, the parties' licensing agreement expressly applied to sales of the licensed products to B&M's affiliates and dealers, as well as direct-to-consumer sales. The agreement even specifically established pricing/royalty levels for sales to affiliates with principal operations in the United States, of which Boards & More, Inc., is the only one. Accordingly, B&M's sales of its products to

340 Conn. 266 DECEMBER, 2021 395

North Sails Group, LLC *v.* Boards & More GmbH

Connecticut customers via Boards & More, Inc., clearly arise from and directly implicate the licensing agreement.

The majority attempts to blunt the import of B&M's Connecticut sales in various ways, none of which survives scrutiny. The majority appears to take the position that, if the plaintiff did not specifically allege that either it or Boards & More, Inc., has served as B&M's distributor in Connecticut, then we cannot assume that B&M's acknowledged Connecticut sales went through those channels. The majority takes this to mean that B&M itself had no Connecticut sales. See footnote 28 of the majority opinion and accompanying text. The flaws in this argument are numerous.

As I stated, North Sales *has* alleged that it marketed and sold not only B&M products but the licensed products in Connecticut under the auspices of the contractual relationship. B&M has not denied or refuted that allegation. In fact, Eberle conceded in his affidavit that the Boards & More group's Connecticut sales consisted of sales by Boards & More, Inc., to North Sails. Accordingly, both parties agree that North Sails was part of B&M's distribution network for Connecticut, and there is no dispute that the licensed products were among those sold through that channel.

Nevertheless, the majority concludes that B&M's Connecticut product sales are not relevant to the constitutional analysis for three reasons, each of which is contradicted by the trial record. First, the majority contends that "[t]he record is void of any direct link between [Boards & More, Inc.] and B&M . . . ." Part II B of the majority opinion. That statement is contradicted by Eberle's own concession, in his affidavit, that "[B&M's] only sales in the [United States] occur as *direct sales* to Boards & More, Inc. . . . ." (Emphasis added.) Eberle's statement that B&M had "direct sales"

to its American counterpart is reproduced twice in the appendix to B&M's brief; the majority fails to explain how a direct sale from one company to its own corporate sister company falls short of a "direct link." Second, the majority contends that "there is no allegation or evidence that [Boards & More, Inc.] is B&M's distributor." Part II B of the majority opinion. Before the trial court, however, B&M conceded that "[Boards & More, Inc.] is [the] distributor of the Boards & More group's branded products (i.e. . . . NorthSails Windsurfing) in Canada and the USA." The record also is clear that B&M, the primary defendant in this action, *is* the company within the Boards & More group that produces the "NorthSails Windsurfing" licensed products. There really is no question that Boards & More, Inc., is B&M's distributor. The majority fails to acknowledge or account for this record evidence. Third, although its reasoning is never spelled out, the majority appears to be of the view that, even if B&M sells its products solely to Boards & More, Inc., in the United States, and even if Boards & More, Inc., distributes those products in the United States, and even if those products—including the licensed products—are sold in Connecticut, we cannot be sure that Boards & More, Inc., is the one that distributes those products in Connecticut. I assume the theory here is that Boards & More, Inc., might sell the products to, say, Walmart, which, in turn, distributes them in Connecticut. This theory fails to abide by the legal standard obliging us to draw reasonable inferences in favor of North Sails rather than against it. The theory also is directly contradicted by the trial record. Eberle declared that the Boards & More group's Connecticut sales consist of sales "*direct*[*ly*]" from Boards & More, Inc., to the plaintiff; (emphasis added); which is consistent with Whidden's own declaration that North Sails sells and markets the licensed products in Connecticut as part of the contractual relationship. Indeed, the

licensing agreement itself bars anyone except B&M and its corporate affiliates from distributing the licensed products to dealers and consumers. In sum, there simply is no basis for concluding, in the face of B&M's own repeated admissions, that it did not distribute its products to the Connecticut market via Boards & More, Inc., and North Sails.

Second, I am not persuaded by B&M's argument that sales of its products in Connecticut, which account for a small share of the company's global revenues, were de minimis and, therefore, cannot provide a basis for personal jurisdiction. In the present case, it is undisputed that the Boards & More group, with the assistance of North Sails, logged product sales of approximately $4500 in Connecticut in 2017. Particularly in the trademark licensing arena, the volume of sales is largely immaterial because, simply by selling a trademarked product in the forum state, the seller (1) avails itself of the protections afforded by the state's competition and trademark protection laws,[27] and (2) simultaneously exposes itself to potential litigation in the state should it be accused of infringement or the like. See, e.g., *Chloé* v. *Queen Bee of Beverly Hills, LLC*, supra, 616 F.3d 165–66 (single shipment of counterfeit item into forum conferred jurisdiction); *Neogen Corp.* v. *Neo Gen Screening, Inc.*, 282 F.3d 883, 886–87, 891–92 (6th Cir. 2002) (holding that District Court erred in dismissing trademark infringement action for lack of personal jurisdiction when defendant's principal contact with forum was sale of fourteen medical test kits, notwithstanding that those sales represented insignificant percentage of defendant's total annual global sales of 215,000 kits); *Sarvint Technologies, Inc.* v. *OMsignal,*

---

[27] In Connecticut, for example, product sales enjoy the protection of CUTPA (unfair competition), General Statutes § 35-11a et seq. (trademark regulation), and General Statutes § 35-24 et seq. (Connecticut Antitrust Act), among other laws.

North Sails Group, LLC *v.* Boards & More GmbH

*Inc.*, supra, 161 F. Supp. 3d 1262–63 ("multiple courts have found personal jurisdiction over a patent defendant based on a single sale or minimal sales of the accused product"); *Patterson* v. *Fendrich Industries, Inc.*, Docket No. CIV-01-0006 RLP/WWD, 2001 WL 37125385, *1, *4–5 (D.N.M. August 28, 2001) (finding that defendant was subject to personal jurisdiction in New Mexico primarily on basis of two sales of allegedly infringing products to forum residents amounting to $787.50, or 0.0023 percent of defendant's total annual revenues, and rejecting argument that sales were de minimis); *Aluminum Housewares Co.* v. *Chip Clip Corp.*, supra, 609 F. Supp. 361 (product sales to forum of $3553 over six month period, accounting for 0.5 percent of defendant's total national sales, subjected defendant to jurisdiction of forum courts); see also *Digital Equipment Corp.* v. *AltaVista Technology, Inc.*, 960 F. Supp. 456, 472 (D. Mass. 1997) ("in the context of trademark infringement, it has long been the law that harm is caused by the very offer of an infringing work, even if not one single sale is made" (emphasis omitted)); L. Graham, supra, 78 J. Pat. & Trademark Off. Society 865 ("[T]he quantity of sales required before minimum contacts are established is not great. . . . Courts have . . . not been persuaded [by the argument] that a virtually negligible percentage of the defendant's overall sales have been made in the forum state."). The fact that B&M logged product sales—including the licensed products—of approximately $4500 to the Connecticut market in 2017, and also advertised the licensed products to consumers in this state via North Sails, was sufficient to invoke the trial court's jurisdiction. See, e.g., *Patterson* v. *Fendrich Industries, Inc.*, supra, *1, *3–4.

2

The majority also declines to consider the provisions of the licensing agreement that obligate B&M to assist

340 Conn. 266 DECEMBER, 2021 399

North Sails Group, LLC *v.* Boards & More GmbH

North Sails should the latter either initiate or be drawn into litigation regarding the North Marks. See footnote 29 of the majority opinion. Those provisions are relevant to the constitutional analysis because they leave no room for doubt that B&M understood from the outset that it could be haled into court in Connecticut and that it freely consented to that arrangement.[28]

The pertinent facts are as follows. Paragraph 9 of the licensing agreement provides in relevant part:

"Infringements:

"(a) B&M shall cooperate fully and in good faith with [North Sails] to secure and preserve, and to procure protection of, [North Sails'] right, title and interest in and to the [North Marks]. B&M agrees to inform [North Sails] promptly in writing of any possible infringement or imitations of, or unfair competition affecting the [North Marks] which comes to the attention of B&M. In the event [North Sails] decides to take action against any such possible infringement or acts of unfair competition, *B&M agrees to assist* [*North Sails*] *in whatever reasonable manner* [*North Sails*] *may direct at the expense of* [*North Sails*]. . . .

"(b) *Should either party be involved as a defendant in judicial action with respect to the* [*North Marks*], *the parties agree to cooperate in each other's defense to the greatest extent reasonably possible*." (Emphasis added.)

Paragraph 10 (a) further provides in relevant part: "B&M hereby agrees to indemnify, defend and hold [North Sails] harmless from any loss, actions, suits, claims liability, damages cost or expense (including, without limitation, reasonable attorneys fees), arising

_____

[28] North Sails itself has not discussed these provisions of the parties' agreement and their potential implications for the due process analysis. See part V of this opinion.

North Sails Group, LLC *v.* Boards & More GmbH

out of (i) any unauthorized use by B&M of the [North Marks]; and (ii) *any claims, suits or actions brought against* [*North Sails*] *or any affiliate thereof arising out of the* [*l*]*icensed* [*p*]*roducts or other products designed, manufactured or sold by B&M or any actions or failures by B&M to act relating to the conduct of its business. . . .*" (Emphasis added.) Finally, paragraph 5 (c) of the agreement provides in relevant part: "B&M agrees to assist [North Sails] upon request from [North Sails] to the extent necessary to protect and procure protection for [North Sails'] rights to the [North Marks], including execution, formalization and filing of any legal documents . . . ."

As with paragraph 6 (c) of the agreement relating to North Sails' right to require B&M to send product samples and documents into Connecticut for inspection, these contractual provisions should weigh heavily in the minimum contacts analysis because they made it readily foreseeable to B&M that it could be haled into Connecticut—indeed, in this context, a Connecticut *courtroom*—on the basis of its contractual obligations to assist North Sails in the prosecution or defense of a very broad range of possible trademark related lawsuits, litigation that obviously could occur in North Sails' home state, Connecticut. Although a contractual commitment by a foreign defendant to assist a forum resident in litigation does not carry the same significance as a forum selection clause, which can operate as a waiver of a party's due process rights in the personal jurisdiction context; see *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 472 n.14; it does tend to establish that the foreign corporation foresaw, and was amenable to the possibility, that it might become engaged in litigation in the forum state. See, e.g., *Breckenridge Pharmaceutical, Inc.* v. *Metabolite Laboratories, Inc.*, supra, 444 F.3d 1366; *Genetic Implant Systems, Inc.* v. *Core-Vent Corp.*, 123 F.3d 1455, 1459 (Fed. Cir. 1997); see

North Sails Group, LLC *v.* Boards & More GmbH

also *Beloteca, Inc.* v. *Apicore US LLC*, Docket No. 19 CV 00360, 2019 WL 1516943, *5 (N.D. Ill. April 8, 2019) (''[the defendant] cannot credibly claim surprise that it has been sued in Illinois, given its execution of an exclusive licensing agreement that pledges cooperation with . . . an Illinois corporation'').

This court recently applied these same principles to find that personal jurisdiction existed over a company domiciled in New York, albeit in the distinct context of a subrogation action against an automobile liability insurer. See *Samelko* v. *Kingstone Ins. Co.*, 329 Conn. 249, 184 A.3d 741 (2018). In *Samelko*, the defendant insurer was not licensed to and did not conduct any business in Connecticut, the insured was a New York resident, and the defense clause in the policy made no specific mention of Connecticut, merely obligating the insurer to defend the insured against any action arising from any accident within the designated coverage territory of the United States. See id., 252–53. Indeed, the only nexus between the defendant insurer and this state was the happenstance that the insured was involved in a collision while driving in Stamford. See id., 253. We nonetheless held that jurisdiction was proper, explaining that, ''[b]ecause the defendant obligated itself to provide a legal defense in Connecticut, it should have reasonably anticipated being haled into a Connecticut court when a dispute arose over the performance or nonperformance of its obligations. The defendant's promise to provide a defense—entailing acts such as interviewing witnesses, taking depositions, meeting with opposing counsel, and litigating in court—purposefully availed it of the privilege of conducting activities within this forum.'' Id., 266–67. In the present case, B&M knowingly committed itself to assist in the legal defense or trademark prosecution of a company that was domiciled in Connecticut under circumstances making it eminently foreseeable that any third party

North Sails Group, LLC *v.* Boards & More GmbH

seeking to bring a trademark infringement or unfair competition claim against North Sails could do so in North Sails' home state. For these reasons as well, I would conclude that jurisdiction over B&M is proper.

IV

I also am concerned that the result reached by the majority will compromise our state's legitimate efforts to provide a forum for Connecticut residents to seek redress when they have been wronged by foreign corporations. The due process calculus is not confined to the interests of the defendant. Rather, it is well established that the proper constitutional analysis also must take account of Connecticut's "manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." (Internal quotation marks omitted.) *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 473; see also *B & J Mfg. Co.* v. *Solar Industries, Inc.*, 483 F.2d 594, 598–99 (8th Cir. 1973) ("Minnesota most certainly has an interest in providing a forum for a resident who claims that a foreign corporation is attempting to prevent it from manufacturing and marketing its product"), cert. denied, 415 U.S. 918, 94 S. Ct. 1417, 39 L. Ed. 2d 473 (1974); *Akeva LLC* v. *Mizuno Corp.*, supra, 199 F. Supp. 2d 341 (stating, in patent infringement case, that forum state "has a significant interest in providing a forum for its residents"); *Richmar Development, Inc.* v. *Midland Doherty Services, Ltd.*, 717 F. Supp. 1107, 1120 (W.D.N.C. 1989) ("North Carolina and this [d]istrict have strong interests in protecting the corporate entities that are contributing to the economic well-being of the area"); *Aquarium Pharmaceuticals, Inc.* v. *Industrial Pressing & Packaging, Inc.*, 358 F. Supp. 441, 445 (E.D. Pa. 1973) ("States have always had a legitimate and substantial interest in safeguarding the rights and property of their citizens. It is not unreasonable for them to expect foreign [businesses

that] involve themselves, to one degree or another, in commercial transactions with citizens of their state to accept the corresponding burden of accepting service and defending themselves in a court of that state.''); G. Miller, ''In Search of the Most Adequate Forum: State Court Personal Jurisdiction,'' 2 Stan. J. Complex Litig. 1, 7 (2014) (''[a]lthough the [United States] Supreme Court has never fully explained exactly how the minimum contacts test implements the requirements of due process, the answer appears to be the following: the minimum contacts inquiry, which focuses on the relationship between the defendant, the forum, and the litigation, balances between the interests of the defendant in avoiding answering in the forum state's courts and the interest of the forum state in calling the defendant to account there'' (footnotes omitted; internal quotation marks omitted)).

To the extent that the majority would place the onus on the plaintiff to negotiate for the inclusion of a forum selection clause if it wishes to be able to litigate any contractual claims in Connecticut, that is not the law. See footnote 15 of the majority opinion. Far from being necessary to ensure that a party will be able to vindicate its interests in its home courts, forum selection clauses are not typical in commercial contracts between parties of relatively equal bargaining power. Until relatively recently, in fact, they were widely deemed to be unenforceable as contrary to public policy. See, e.g., *Reiner, Reiner & Bendett, P.C.* v. *Cadle Co.*, 278 Conn. 92, 100–101, 897 A.2d 58 (2006) (discussing history). In Connecticut, as elsewhere, the obstacles to enforcing such clauses have eroded significantly since the United States Supreme Court decided *Bremen* v. *Zapata Off-Shore Co.*, 407 U.S. 1, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972), which held that, under appropriate circumstances, forum selection clauses are enforceable in admiralty. See id., 12–15. I am not aware of any authority, however, to the effect that the pendulum has swung so far in the other direction that a contracting party

entering into a long-term business relationship must negotiate for a contractual forum selection clause in order to have the right to vindicate its rights *in its home state*. To the contrary, a plaintiff in those circumstances should presumptively be entitled to seek to vindicate its rights in the state in which it performs its contractual obligations and suffers harm as a result of the alleged breach. Should a party wish to limit its potential exposure to suit in foreign venues, the onus should be on that party to negotiate for the right to be sued only in a chosen forum.[29] The majority turns this commonsense arrangement on its head, without authority or explanation.

As I discussed, *Burger King* emphasized the need to conduct the due process analysis in a way that recognizes and respects the realities of the commercial world. I see no reason why we should disregard those commercial realities, as articulated in an amicus curiae brief filed in the present case by the Connecticut Business and Industry Association, and adopt a default rule that requires Connecticut residents to bargain for the right to litigate claims in their home courts when jurisdiction is otherwise proper.

V

For all of the foregoing reasons, I would hold that B&M had more than sufficient contacts with Connecticut for personal jurisdiction to attach.[30] We have explained

_____

[29] Notably, the record suggests that B&M at one point sought the inclusion of a forum selection clause that would have provided for the litigation of all claims in the International Chamber of Commerce, but it ultimately signed on to the agreement despite its inability to obtain a contractual assurance that it would not have to litigate in the United States. This fact itself indicates that B&M foresaw and accepted the possibility that it could be haled into court here.

[30] With respect to the second prong of the *International Shoe* test, it should be clear that, in my view, B&M has failed to satisfy its burden of presenting a "compelling case" that exercising jurisdiction would be unreasonable insofar as it would offend traditional notions of fair play and substantial justice. *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 477.

North Sails Group, LLC *v.* Boards & More GmbH

that the primary rationale for the purposeful availment requirement is to ensure that a defendant will not be forced to defend itself in a jurisdiction solely as a result of ''random, fortuitous, or attenuated contacts . . . or of the unilateral activity of another party or a third person . . . .'' (Internal quotation marks omitted.) *Cogswell* v. *American Transit Ins. Co.*, 282 Conn. 505, 530, 923 A.2d 638 (2007). That simply is not the case here. B&M (1) sought to step into an existing contractual relationship with North Sails, (2) negotiated a new agreement knowing that North Sails would perform its obligations from and suffer any consequences in Connecticut, (3) agreed to send regular financial reports, product samples, and marketing materials to Connecticut for review, (4) submitted itself to various forms of oversight by North Sails, (5) sent an executive to Connecticut for an on-site visit, (6) engaged in hundreds of substantive mail, telephonic, and electronic communications with North Sails in the context of negotiating and amending the licensing agreement, conducting business over the course of eighteen years and discussing B&M's desire at various points in time to alter and then sever the agreement, (7) marketed and sold thousands of dollars of the licensed products in Connecticut, and (8) agreed to assist North Sails in any litigation arising from the licensing agreement, without restriction as to the forum.

I recognize that, for reasons that are not immediately apparent, North Sails did not brief on appeal the arguments discussed in part III F of this opinion. The fact that B&M's licensed products were marketed and sold in Connecticut was raised and briefed before the trial court and discussed in its memorandum of decision. No one, however, appears to have addressed the significance of the contractual provisions that committed B&M to assist North Sails in litigation. Although it is important to understand that those arguments are not

essential to my opinion—as I have discussed, the contacts that the parties have fully briefed are more than enough to establish jurisdiction—I have considered these additional points for three reasons.

First, as I discussed in part I of this opinion, it is well established that a reviewing court must examine a party's minimum contacts with a forum state de novo, after having conducted an independent review of the entire record. I am not aware of any authority suggesting that a court conducting a jurisdictional analysis of this nature—having concluded that a full, totality of the circumstances analysis of the relevant facts of record was warranted—should not evaluate all of the unrebutted factual allegations made by the plaintiff. Second, I feel compelled to correct various factual errors in the majority opinion, including the assertion that B&M had no product sales in Connecticut. Third, although it is impossible to know why North Sails failed to discuss these points in its appellate briefing, that choice or oversight presumably reflects the fact that North Sails' primary focus in its brief was to establish the predicate point that the trial court misapplied *Bristol-Myers Squibb Co.*, a point on which the majority and I are in agreement. Having concluded that the trial court applied the incorrect legal standard and, thus, failed to fully consider all of the relevant factual allegations, the majority should either (1) conduct its own complete review of the record; see, e.g., *Frazer* v. *McGowan*, 198 Conn. 243, 250, 502 A.2d 905 (1986) (when trial court has applied incorrect legal standard, appellate court reviews undisputed facts disclosed on record to determine whether personal jurisdiction exists); or (2) remand the case to give the trial court an opportunity to apply the correct legal standard in the first instance. See, e.g., *Frederiksson* v. *HR Textron*, *Inc.*, 484 Fed. Appx. 610, 613 (2d Cir. 2012) (concluding that District Court improperly dismissed action for forum nonconve-

niens under incorrect legal standard and remanding case for consideration under correct standard); *State v. Swebilius*, 325 Conn. 793, 815, 159 A.3d 1099 (2017) (directing Appellate Court to reverse judgment of trial court denying motion to dismiss and to remand case to give parties opportunity to argue case under correct legal standard); *Southwest Appraisal Group, LLC* v. *Administrator, Unemployment Compensation Act*, 324 Conn. 822, 844–45, 155 A.3d 738 (2017) (remanding case to give board opportunity to apply correct legal standard); *Raser Technologies, Inc.* v. *Morgan Stanley & Co., LLC*, supra, 449 P.3d 164–65 (concluding that trial court applied incorrect legal standard in dismissing action for lack of personal jurisdiction and remanding case to allow that court to perform proper analysis of record in first instance). In either event, North Sails, as the plaintiff, is entitled to have the record evaluated under the correct legal standard.

Because the majority does not afford the trial court the opportunity to conduct a proper constitutional analysis and, in conducting its own analysis, overlooks key portions of the record, relevant legal principles, and the overwhelming weight of federal and sister state authority, I respectfully dissent.

––––––––––––––––––––